## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

CATHY CALDWELL, an individual,    )
    )
       Plaintiff,    )
    )
v.    )   **CIVIL ACTION NO. CV-06-1088-**
    )   **MHT**
SMART ALABAMA, LLC, a legal entity,  )
    )
       Defendant.    )

## DEFENDANT SMART ALABAMA, LLC'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

COMES NOW defendant SMART Alabama, LLC ("SMART"), and pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, moves this Court to dismiss the Complaint in this case and render judgment on the pleadings. In the alternative, SMART moves this Court to enter summary judgment in its favor pursuant to Rule 56 of the Federal Rules of Civil Procedure. In support of its Motion, SMART states as follows:

### I.    PROCEDURAL HISTORY

1.    On December 8, 2006, plaintiff Cathy Caldwell filed the above-captioned civil action alleging sex discrimination, sexual harassment, hostile environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). All of her claims arose under Title VII. (Compl., Doc. No. 1).

2.    Plaintiff's Complaint alleged that, at all times relevant to this action, she was employed by SMART.  (Compl., ¶4, Doc. No. 1).

3.    On December 27, 2006, SMART filed an Answer, denying that it employed plaintiff.  (Answer ¶¶4, 6, Doc. No. 4).

4.    On June 27, 2007, SMART deposed plaintiff.  Tab A (Pl.'s Depo. at p. 1).

5.    After the deposition, on the same day, plaintiff filed a Motion for Leave to Amend Complaint to add state law claims and to add Rance Maddox as a defendant.  (Pl.'s Mot. for Leave to Amend Compl., Doc. No. 15).

6.    Plaintiff's counsel filed this Motion after plaintiff's testimony demonstrated that SMART was not her employer, thereby defeating plaintiff's Title VII claims.  (Pl.'s Mot. for Leave to Amend Compl., ¶1, Doc. No. 15).

## II.    UNDISPUTED FACTS

7.    At all times relevant to plaintiff's claims, she was employed by Alany Divisions, Inc. ("ADI"), a company that provided security services to SMART. (Pl.'s Mot. for Leave to Amend Compl., ¶1); Tab A (Pl.'s Depo. pp. 24-32, 34, 37-42, 49, 51-55, 62-63, 65-67 & DX 1, DX 2); Tab B (Eisenberger Aff., ¶4).

8.    Plaintiff was hired by Cliff Eisenberger, Owner and President of Operations of ADI; SMART did not participate in the hiring process, nor was

SMART involved in the decision to hire plaintiff.  Tab B (Eisenberger Aff., ¶4); Tab C (Sport Aff., ¶¶3-5).

9.    During the hiring process, plaintiff did not communicate with anyone at SMART regarding her offer of employment, only Misty Dix, an ADI employee. (Pl.'s Depo. pp. 24-31); Tab B (Eisenberger Aff., ¶6); Tab C (Sport Aff., ¶6).

10.    ADI determined the rate of plaintiff's pay, paid her, deducted taxes, and maintained workers' compensation coverage over her throughout her employment as an ADI security guard working at SMART.  Tab A (Pl.'s Depo. pp. 62-63 & DX 2); Tab B (Eisenberger Aff., ¶¶3-4); Tab C (Sport Aff., ¶¶3-5).

11.    Plaintiff was trained and supervised by Stan Adair, a Supervisor employed by ADI.  Tab A (Pl.'s Depo. pp. 34, 37-42); Tab B (Eisenberger Aff., ¶¶3-4); Tab C (Sport Aff., ¶¶3-5).

12.    ADI maintained control over the terms and conditions of plaintiff's employment, and was responsible for hiring and firing security guards such as plaintiff.  Tab B (Eisenberger Aff., ¶¶3-4); Tab C (Sport Aff., ¶¶3-5).

13.    Eisenberger and Misty Dix, also of ADI, scheduled plaintiff's work. Tab A (Pl.'s Depo. pp. 49, 51-55, 60 & DX 1); Tab B (Eisenberger Aff., ¶¶3-4); Tab C (Sport Aff., ¶4).

14.    Plaintiff wore a blue uniform, as did all ADI guards, which were not worn by SMART employees.  Furthermore, SMART employees were required to

wear security badges that ADI employees were not required to wear.  Tab A (Pl.'s Depo. pp. 29, 31-32, 53, 65-67).

15.    SMART and ADI are separately owned and operated companies.  The companies do not share ownership, management, or employees. Tab B (Eisenberger Aff., ¶5); Tab C (Sport Aff., ¶7).

### III.  <u>ARGUMENT</u>

Plaintiff's claims must be dismissed.  She cannot maintain any of her claims in this lawsuit because she was not "employed" by SMART, as required by Title VII.  The undisputed facts, in addition to plaintiff's Motion for Leave to Amend the Complaint, demonstrate that ADI, not SMART, was plaintiff's employer.  The existence of a Title VII "employer" is a jurisdictional prerequisite to maintaining a lawsuit under the statute.  <u>See</u> 42 U.S.C. § 2000e(b); <u>see also</u> <u>Virgo v. Riviera Beach Assocs., Ltd.</u>, 30 F.3d 1350, 1359 (11th Cir. 1994) ("Before a district court may entertain a . . . Title VII claim, the . . . actor must be an 'employer'").  An entity must control the essential terms and conditions of an individual's employment to be deemed an employer and subject to suit under Title VII.  <u>See e.g.</u>, <u>Llampallas v. Mini-Circuits, Lab, Inc.</u>, 163 F.3d 1236, 1243-45 (11th Cir. 1998).

The undisputed facts in the record reveal that SMART did not control the essential terms and conditions of plaintiff's employment. (Facts, ¶¶8-13).

Importantly, plaintiff was compensated by ADI throughout her employment; SMART played no role in decisions related to plaintiff's compensation. (Facts, ¶¶9-10). See also Llampallas, 163 F.3d at 1243 ("only individuals who receive compensation from an employer can be deemed 'employees' under the statute") (citations omitted). Furthermore, plaintiff was hired, trained, and supervised by ADI, she wore an ADI uniform, and ADI scheduled plaintiff's work. (Facts, ¶¶8-13). See also Fike v. Gold Kist, Inc., 514 F. Supp. 722, 727 (N.D. Ala. 1981) (holding that "control" of essential terms and conditions requires "actual and active control of day-to-day labor practices" in the area of human resources or personnel). Because SMART did not compensate plaintiff or otherwise control the essential terms and conditions of her employment, it cannot be considered her employer for purposes of Title VII.

SMART further does not meet the elements for being a joint employer or an integrated entity with ADI under Title VII. The Eleventh Circuit reviews the following elements in determining the existence of an employment relationship in that context: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." See Lyes v. City of Riviera Beach, 166 F.3d 1332, 1341 (11th Cir. 1999) (citations omitted). Of these factors, centralized control of labor operations--the ability to make decisions about essential terms or conditions of employment--is the

most determinative factor in finding an entity to be an "employer" under Title VII. E.g., Fike, 514 F. Supp. at 727. Because SMART played absolutely no role in decisions affecting essential terms and conditions of plaintiff's employment, it cannot be deemed a joint employer or integrated entity with ADI, who solely made those decisions. (Facts, ¶¶8-13). Plaintiff also cannot establish any of the other factors, since the companies are separately owned and operated and do not share common management. (Facts, ¶14).

Because SMART was not plaintiff's employer, this Court lacks subject matter jurisdiction over her Title VII claim pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. See 42 U.S.C. § 2000e(b); see also Virgo, 30 F.3d at 1359. Alternatively, because there is no genuine issue of material fact, plaintiff's Title VII claims are due to be dismissed.

WHEREFORE, PREMISES CONSIDERED, defendant SMART respectfully requests this Honorable Court to dismiss the plaintiff's Complaint for lack of subject matter jurisdiction. In the alternative, SMART requests that this Court grant summary judgment in its favor.

/s/ Ronald W. Flowers
Marcel L. Debruge (DEB006)
Ronald W. Flowers (FLO031)
Kathryn M. Willis (MOR130)
Sonya E. Eubank (EUB007)
Attorneys for Defendant
SMART ALABAMA, LLC

**OF COUNSEL:**
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served on the following by directing same to their office addresses through first-class, United States mail, postage prepaid, on this the 26th day of July, 2007:

> Richard F. Horsley
> Lindsey O. Hill
> KING, HORSLEY & LYONS, LLC
> 1 Metroplex Drive, Ste. 280
> Birmingham, AL 35209

> */s/ Ronald W. Flowers*
> OF COUNSEL

# TAB "A"

# FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CASE NUMBER:  2:06CV1088-MHT

**ORIGINAL**

CATHY CALDWELL, an individual,

　　　　Plaintiff,

　　　　vs.


SMART ALABAMA, LLC, a legal entity,

　　　　Defendant.


　　　S T I P U L A T I O N

　　　　IT IS STIPULATED AND AGREED by

and between the parties through their

respective counsel, that the deposition

of CATHY CALDWELL may be taken before

Leslie K. Hartsfield, at the offices of

Burr & Forman, LLP, 201 Monroe Street,

Suite 1950, Montgomery, Alabama, 36104,

　　　　DEPOSITION OF CATHY CALDWELL

taken on the 27th day of June, 2007.

# FREEDOM COURT REPORTING

1    IT IS FURTHER STIPULATED AND

2  AGREED that the signature to and the

3  reading of the deposition by the witness

4  is waived, the deposition to have the

5  same force and effect as if full

6  compliance had been had with all laws

7  and rules of Court relating to the

8  taking of the deposition.

9    IT IS FURTHER STIPULATED AND

10  AGREED that it shall not be necessary

11  for any objections to be made by counsel

12  to any questions except as to the form

13  or leading questions, and that counsel

14  for the parties may make objections and

15  assign grounds at the time of the trial,

16  or at the time said deposition is

17  offered in evidence, or prior thereto.

18    IT IS FURTHER STIPULATED AND

19  AGREED that the notice of filing of the

20  deposition by the Commissioner is

21  waived.

22

23

# FREEDOM COURT REPORTING

Page 3

1                         INDEX

2   EXAMINATION BY:        PAGE NUMBER:

3   Mr. Flowers                    6

4

5

6

7   DEFENDANT'S EXHIBITS:

8   1 - Schedules                 45

9   2 - Earnings record           61

10  3 - Complaint                 72

11  4 - Duty report               85

12  5 - EEOC                     101

13  6 - Alany Division           117

14

15

16

17

18

19

20

21

22

23

## FREEDOM COURT REPORTING

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    CASE NUMBER:  2:06CV1088-MHT

6

7    CATHY CALDWELL, an individual,

8        Plaintiff,

9        vs.

10

11    SMART ALABAMA, LLC, a legal entity,

12        Defendant.

13

14    BEFORE:

15        LESLIE K. HARTSFIELD,

16        Commissioner.

17

18    APPEARANCES:

19        BURR & FORMAN, LLP, by Mr. Ronald

20    Flowers, Jr. and Ms. Sonya E. Eubank,

21    420 20th Street North, Suite 3400,

22    Wachovia Tower, Birmingham, Alabama,

23    35203, appearing on behalf of the

## FREEDOM COURT REPORTING

Page 5

1    Defendant.

2            GOOZEE, KING & HORSLEY, LLP, by

3    Mr. Richard F. Horsley, 3300 Cahaba

4    Road, Suite 200, Birmingham, Alabama,

5    35223, appearing on behalf of the

6    Plaintiff.

7            THOMAS F. KELLY, JR., PC,

8    ATTORNEY AT LAW, 17 Court Square,

9    Clayton, Alabama, 36016-0605, appearing

10   on behalf of the Plaintiff.

11

12   ALSO PRESENT:

13       Gary Sport

14

15              * * * * * * * *

16

17       I, LESLIE K. HARTSFIELD, a Court

18   Reporter of Prattville, Alabama, acting

19   as Commissioner, certify that on this

20   date, as provided by the Federal Rules

21   of Civil Procedure and the foregoing

22   stipulation of counsel, there came

23   before me at the offices of Burr &

## FREEDOM COURT REPORTING

1   Forman, LLP, 201 Monroe Street, Suite

2   1950, Montgomery, Alabama, 36104,

3   beginning at 10:06 a.m., CATHY CALDWELL,

4   witness in the above cause, for oral

5   examination, whereupon, the following

6   proceedings were had:

7

8               CATHY CALDWELL

9    being first, duly sworn, was examined

10            and testified as follows:

11

12            THE REPORTER:  Usual

13   stipulations?

14            MR. HORSLEY:  Sure.

15            MR. FLOWERS:  Yes.

16

17   EXAMINATION BY MR. FLOWERS:

18       Q.    Would you please state your

19   name for the record?

20       A.    Cathy Caldwell.

21       Q.    Ms. Caldwell, my name is Ron

22   Flowers.  I'm here to take your

23   deposition in a case you filed against

# FREEDOM COURT REPORTING

1    SMART Alabama.

2          A.      Okay.

3          Q.      Have you ever had your

4    deposition taken before?

5          A.      No.

6          Q.      Let me just lay out a few

7    ground rules.  If you don't understand a

8    question, you need me to clarify, will

9    you ask me to do so?

10          A.      Okay.

11          Q.      And that way if you don't

12    and you answer the question, the record

13    will reflect that you understood the

14    question, your answer was responsive to

15    the question, you understand that?

16          A.      Yes.

17          Q.      And it's a good answer, yes

18    answer, so make sure your answers are in

19    audible form rather than an uh-huh or

20    huh-uh or a shaking or nodding of your

21    head because the court reporter can't

22    determine what your response would be in

23    that case, you understand?

## FREEDOM COURT REPORTING

Page 8

1          A.      Yes.

2          Q.      And if you need a break

3    during the deposition, just let me know.

4          A.      Okay.

5          Q.      You understand that the

6    questions you're being asked today are

7    under penalty of perjury?

8          A.      Yes.

9          Q.      Have you taken any

10   medications today?

11         A.      No.

12         Q.      Have you ever been a

13   plaintiff or defendant in a lawsuit

14   before?

15         A.      No.

16         Q.      Have you ever brought any

17   other EEOC charges against an employer

18   besides the one you brought against

19   SMART?

20         A.      No.

21         Q.      Have you ever raised a claim

22   with the Department of Labor?

23         A.      No.

## FREEDOM COURT REPORTING

Page 9

1      Q.    Have you ever given sworn

2  testimony before to the best of your

3  knowledge?

4      A.    No.

5      Q.    Can you describe for me

6  briefly your educational background,

7  high school and any other education?

8      A.    I attended some college.

9  I'm still attending.

10     Q.    Where did you go to high

11 school?

12     A.    Charles Henderson.

13     Q.    Charles Vinson?

14     A.    Charles Henderson High

15 School.

16     Q.    Where is that?

17     A.    Troy, Alabama.

18     Q.    Did you graduate?

19     A.    No.

20     Q.    Did you get your -- how many

21 years of school did you go through?

22     A.    You mean high school?

23     Q.    Uh-huh (affirmative

## FREEDOM COURT REPORTING

1    response).

2          A.      Three.

3          Q.      Did you get your GED?

4          A.      Yes.

5          Q.      When was that?

6          A.      '05.

7          Q.      You said you're attending

8    some college now?

9          A.      Yes.

10         Q.      Where is that?

11         A.      In Troy, Alabama.

12         Q.      Troy University?

13         A.      Yes.

14         Q.      How many years of school

15   have you attended?

16         A.      Two.

17         Q.      What is your major if you

18   have one?

19         A.      Accounting.

20         Q.      Are you a full-time or

21   part-time student?

22         A.      Full-time.

23         Q.      Any other schooling you've

## FREEDOM COURT REPORTING

Page 11

1   had since high school or since your

2   GED?

3       A.    No.

4       Q.    What's your date of birth?

5       A.        .

6       Q.    What's your Social Security

7   number?

8       A.            .

9       Q.    Are you married?

10      A.    Divorced.

11      Q.    How long have you been

12  divorced?

13      A.    Three years.

14      Q.    What was your husband's

15  name?

16      A.    Marcus.

17      Q.    Last name?

18      A.    Caldwell.

19      Q.    How long were you married?

20      A.    Three years.

21      Q.    So you got married in around

22  2001?

23      A.    Uh-huh (affirmative

## FREEDOM COURT REPORTING

Page 12

1  response).  Yes.

2       Q.    Is that your only

3  marriage?

4       A.    Yes.

5       Q.    You have any children?

6       A.    Yes.

7       Q.    How many?

8       A.    Two.

9       Q.    What are their names and

10  ages?

11       A.    Michael Jenkins, age 8;

12  Marshay Caldwell, age 6.

13       Q.    Do they live with you?

14       A.    Yes.

15       Q.    Where does Marcus Caldwell

16  live now, your ex-husband?

17       A.    Montgomery.

18       Q.    What is his job?

19       A.    He lay bricks.

20       Q.    Is he employed by a specific

21  company?

22       A.    No.  He's like mainly

23  self-employed.

## FREEDOM COURT REPORTING

Page 13

1      Q.     What is your current home
2  address?
3      A.     6053 Alabama Highway 87.
4      Q.     What's the town and zip
5  code?
6      A.     Troy, Alabama, 36079.
7      Q.     How long have you lived at
8  that address?
9      A.     2 1/2 years.
10      Q.     Who else has lived with you
11  at that address during that time?
12      A.     My mother.
13      Q.     Your children?
14      A.     And children.
15      Q.     Anybody else?
16      A.     That's it.
17      Q.     Where did you live before
18  that?
19      A.     Pineview Trailer Park.
20      Q.     Is that in Troy?
21      A.     Yes.
22      Q.     How long did you live
23  there?

## FREEDOM COURT REPORTING

Page 14

1      A.    I lived there about five

2   years.

3      Q.    Was that with

4   Mr. Caldwell?

5      A.    Yes.

6      Q.    So when you were employed as

7   a security guard for ADI working at

8   SMART, you were living at your current

9   address; is that correct?

10     A.    Yes.

11     Q.    During the time you were

12  employed as a security guard for ADI

13  working at SMART, did you have a cell

14  phone?

15     A.    Cell phone, yes.

16     Q.    Do you recall the number?

17     A.    No.

18     Q.    Do you have a cell phone

19  now?

20     A.    No.

21     Q.    When did you stop using the

22  cell phone that you had at that time?

23     A.    I think I was -- I'm not

## FREEDOM COURT REPORTING

Page 15

1   sure.

2       Q.    Do you recall the service

3   provider?

4       A.    Unicell.

5       Q.    Have you ever been

6   arrested?

7       A.    Yes.

8       Q.    When was that?

9       A.    January the 30th.

10      Q.    Of this year?

11      A.    Yes.

12      Q.    What was the arrest for?

13      A.    Traffic ticket.

14      Q.    What type of traffic

15  ticket?

16      A.    Speeding, driving while

17  revoked.

18      Q.    Driving while revoked?

19      A.    Yes.

20      Q.    Why was your license

21  revoked?

22      A.    I kept getting tickets and I

23  wasn't paying them.

## FREEDOM COURT REPORTING

Page 16

1          Q.    Have you been to court over

2     that ticket?

3          A.    Yes.

4          Q.    Has it been resolved?

5          A.    Yes.

6          Q.    Were you convicted of

7     driving while your license was

8     revoked?

9          A.    Convicted, I don't

10    understand.  What you mean?

11         Q.    Did you serve any jail

12    time?

13         A.    No.

14         Q.    What county was that in, do

15    you know?

16         A.    Pike.

17         Q.    Is that the only time you've

18    been arrested?

19         A.    Yes.

20         Q.    Have you ever declared

21    bankruptcy?

22         A.    No.

23         Q.    Do you have any plans to

## FREEDOM COURT REPORTING

Page 17

1     declare bankruptcy?

2          A.     No.

3          Q.     Do you currently have any

4     medical conditions?

5          A.     No.

6          Q.     Did you have any medical

7     conditions at the time you were employed

8     as a security guard for ADI?

9          A.     No.

10          Q.     Where were you employed

11    directly before the time you became a

12    security guard for ADI?

13          A.     At the time I became?

14          Q.     Before, the place you were

15    employed before you became a security

16    guard for ADI.

17          A.     I don't remember.

18          Q.     Have you been employed

19    anywhere since you resigned from being a

20    security guard at ADI?

21          A.     Yes.

22          Q.     Where was the first place

23    you held employment after that?

## FREEDOM COURT REPORTING

Page 18

1       A.     Fred's.

2       Q.     Fred's Discount Store?

3       A.     Uh-huh (affirmative

4 response).

5       Q.     What was your position?

6       A.     Cashier, stocker.

7       Q.     How long after you left your

8 employment for ADI did you become a

9 cashier, stocker for Fred's?

10      A.     I just started working at

11 Fred's this year.

12      Q.     2007.  Do you recall what

13 month?

14      A.     I don't remember.

15      Q.     Was that the first place you

16 were employed after --

17      A.     Yes.

18      Q.     Any idea how many months

19 you've been working there?

20      A.     I want to say approximately

21 three months.

22      Q.     You're still employed by

23 Fred's --

## FREEDOM COURT REPORTING

Page 19

1       A.      Yes.

2       Q.      -- as a cashier, stocker?

3       A.      Yes.

4       Q.      How many hours do you work a

5   week?

6       A.      Sometimes I work -- I might

7   work 26 hours and the next week I might

8   work 14.  It all depends.

9       Q.      Which Fred's are you working

10  at, which location?

11      A.      I'm working at store 3058.

12      Q.      Is that in Troy?

13      A.      Yes.

14      Q.      Is there any other

15  employment that you've held since you

16  left your employment as a security guard

17  for ADI?

18      A.      No.

19      Q.      Do you recall any places in

20  which you were employed before you began

21  your employment as a security guard for

22  ADI?

23      A.      Do I recall --

## FREEDOM COURT REPORTING

Page 20

1      Q.     Were you employed anywhere

2  at any time before you started as a

3  security guard for ADI?

4      A.     Yes.

5      Q.     What are those places?

6      A.     Wal-Mart, KFC, Pike Manor

7  Nursing Home.

8      Q.     Pike Manor?

9      A.     Uh-huh (affirmative

10  response).  And that's about it.

11      Q.     What was your position for

12  Wal-Mart?

13      A.     Cashier.

14      Q.     How long did you hold that

15  job?

16      A.     I don't remember.

17      Q.     Do you remember the years or

18  around the year in which you held it?

19      A.     It's been a while.

20      Q.     Any idea how long before you

21  started as a security guard for ADI?

22      A.     No.

23      Q.     Which Wal-Mart was your

**FREEDOM COURT REPORTING**

Page 21

1    employment as a cashier?

2         A.    I don't know the store

3    number.

4         Q.    Was it in Troy?

5         A.    Yes.

6         Q.    What was your position for

7    KFC?

8         A.    Packer.

9         Q.    Do you know how long you

10   held that position?

11        A.    I worked there a year.

12        Q.    Do you recall when?

13        A.    Like -- I think like in

14   2000, something like that.

15        Q.    Do you recall which KFC it

16   was, was it in Troy?

17        A.    Yes.

18        Q.    What street or road?

19        A.    It was just on U.S. Highway

20   231.

21        Q.    What was your position for

22   Pike Manor Nursing Home?

23        A.    Dietary aide.

## FREEDOM COURT REPORTING

Page 22

1      Q.      How long did you hold that

2  position?

3      A.      I worked there two years.

4      Q.      Do you recall what years you

5  worked there?

6      A.      No.

7      Q.      Was that -- would that have

8  been the last position you held before

9  ADI?

10      A.      I think Wal-Mart was my last

11  position as far as ADI.

12      Q.      How did your employment at

13  Wal-Mart end?

14      A.      Just quit.

15      Q.      What's the reason for

16  quitting?

17      A.      Not having enough hours.

18      Q.      What was your reason for

19  leaving KFC?

20      A.      Surgery.

21      Q.      What was your reason for

22  leaving Pike Manor Nursing Home?

23      A.      Medical leave.

## FREEDOM COURT REPORTING

Page 23

1    Q.    Did you attempt to return to

2    either KFC or Pike Manor after medical

3    leave?

4    A.    Huh-uh (negative response).

5    MR. HORSLEY:  Say no.

6    A.    Oh, I'm sorry.  No.

7    Q.    Thanks.  During the time you

8    were employed as a security guard for

9    ADI, did you have any other employment?

10    A.    No.

11    Q.    Were you attending school at

12    that time at any time?

13    A.    Yes.

14    Q.    Which school was that?

15    A.    Troy University.

16    Q.    Throughout the time you were

17    a security guard or just part of it?

18    A.    Part of the time.

19    Q.    Were you a full-time student

20    with Troy University?

21    A.    Yes.

22    Q.    Do you recall which semester

23    you began for Troy University?

## FREEDOM COURT REPORTING

Page 24

1          A.     Summer '05.

2          Q.     So you got your GED in the

3     spring of '05, I assume?

4          A.     I'm not sure.

5          Q.     Since your employment as a

6     security guard for ADI, are there any

7     places other than Fred's with which you

8     sought employment from?

9          A.     No.

10         Q.     So Fred's was the first

11    place you tried to get a job with

12    after --

13         A.     Yes.

14         Q.     -- ADI?  How did you come to

15    work as a security guard for ADI?

16         A.     I went down there just

17    looking for a job and I was looking for

18    something that fit in with my, you know,

19    schedule as far as school.  And I seen a

20    guard sitting behind the desk and she

21    was just telling me about a position

22    they had available.

23         Q.     Did you know that there were

## FREEDOM COURT REPORTING

Page 25

1  any positions available before you went

2  there?

3          A.    No.

4          Q.    When you say you went there,

5  were did you go?

6          A.    SMART.

7          Q.    Do you know the name of the

8  guard who was behind the desk?

9          A.    Misti Dicks.

10          Q.    What did she tell you once

11  you asked if there were any positions

12  available?

13          A.    No.  I asked for a

14  application for SMART.

15          Q.    What did she say in response

16  to that?

17          A.    That -- I asked her did they

18  have any open positions and she was like

19  they had a position open for a guard but

20  it was only for weekends.

21          Q.    Did you ask her if SMART had

22  any positions open or did you just say

23  do they have any positions open?

## FREEDOM COURT REPORTING

Page 26

1    A.    Does SMART have any

2  positions available.

3    Q.    Did she give you an

4  application?

5    A.    Yes.

6    Q.    Do you recall what the

7  application -- what company the

8  application was for?

9    A.    No, I don't.

10    Q.    Did you fill the application

11  out there or did you take it with you?

12    A.    I filled it out there.

13    Q.    Turned it into Misty; is

14  that correct?

15    A.    Yes.

16    Q.    Did she say anything else to

17  you during the time you spent with

18  her?

19    A.    No.

20    Q.    Did you talk with anybody

21  else in that visit to the SMART

22  facility?

23    A.    No.

## FREEDOM COURT REPORTING

Page 27

1    Q.    She said they had a guard

2   position only on weekends?

3    A.    Yes.

4    Q.    Did she give you any

5   information about that position?

6    A.    No.

7    Q.    Did she tell you you had to

8   have any qualifications for that

9   position?

10   A.    No.

11   Q.    What was the next thing you

12  heard regarding that position?

13   A.    I just got a call, said come

14  in.

15   Q.    How long after the visit you

16  just described?

17   A.    About three days.

18   Q.    Who was the call from?

19   A.    Misti.

20   Q.    What did Misti say in that

21  call?

22   A.    She asked me if I could come

23  in for another interview and that she

## FREEDOM COURT REPORTING

Page 28

1    wanted, you know, to see if I still

2    wanted the job and to just come down.

3         Q.    When you say another

4    interview, had you already had an

5    interview?

6         A.    No.

7         Q.    Anything else you recall her

8    saying in that conversation?

9         A.    No.

10        Q.    When did she tell you to

11   come down?

12        A.    Three days after I filled

13   out the application.

14        Q.    What did you do next after

15   that?

16        A.    Well, she told me come the

17   next day.  So the next day I went back

18   down to SMART.

19        Q.    Who did you talk to when you

20   got there?

21        A.    Misti Dicks.

22        Q.    She was working at the front

23   desk when you walked in the facility; is

**FREEDOM COURT REPORTING**

Page 29

1   that correct?

2        A.    Yes.

3        Q.    Was she wearing a uniform of

4   any kind?

5        A.    Yes.

6        Q.    Do you recall what that

7   uniform said?

8        A.    It was just a blue

9   uniform.

10       Q.    Did it have any writing on

11  it?

12       A.    No.

13       Q.    When you talked to Misti,

14  what did she tell you to do?

15       A.    She was just -- she was

16  going over about, you know, about how,

17  you know, it's only for the weekend, how

18  much they pay an hour, and basically

19  everything I have to do.

20       Q.    What was everything you had

21  to do?

22       A.    Well, at the time when I got

23  hired, the only thing we had to do was

## FREEDOM COURT REPORTING

Page 30

1    like make sure, you know, check all the

2    exit doors and just walk the plant, you

3    know, just make sure stuff is out of the

4    way and stuff like that.

5         Q.    Check the exit doors, walk

6    the plant.  When you say make sure stuff

7    was out of the way, what do you mean by

8    that?

9         A.    Like equipment, make sure

10   they're not blocking the exits.

11        Q.    After she told you that,

12   what happened?

13        A.    I took the job.

14        Q.    So did she offer the job to

15   you?

16        A.    Yes.

17        Q.    Did you talk with anybody

18   else before she offered the job to

19   you?

20        A.    No.

21        Q.    Was anybody else present in

22   the room that you recall when you had

23   this conversation with Ms. Dicks?

**FREEDOM COURT REPORTING**

Page 31

1    A.    No.

2    Q.    Did this occur around

3  October of 2005?

4    A.    I don't remember.

5    Q.    Do you recall what she said

6  to you when she offered you the job?

7    A.    Basically, does it sound

8  like something I want to do or do I want

9  the job is all.

10    Q.    And you said yes?

11    A.    Yes.

12    Q.    What happened next?

13    A.    Nothing.  She gave me my

14  uniform.

15    Q.    And it's a blue uniform?

16    A.    Yes.

17    Q.    No writing on it?

18    A.    None that I remember.

19    Q.    Did they already have a size

20  for you or is it one size fits all?

21    A.    No.  She had to find my

22  size.

23    Q.    Do you know where she went

## FREEDOM COURT REPORTING

Page 32

1    to look for your size?

2         A.    No.

3         Q.    Were you with her when she

4    did that?

5         A.    No.

6         Q.    After she gave you the

7    uniform, what happened next?

8         A.    I went home.

9         Q.    Did she tell you when to

10   report for the facility next?

11        A.    Yes.

12        Q.    When did she say?

13        A.    At eight.

14        Q.    Eight the next morning?

15        A.    No, it wasn't the next

16   morning.  I don't think -- well, I'm not

17   sure but I don't think it was eight the

18   next morning because I was only working

19   weekends.

20        Q.    Do you recall what day of

21   the week this occurred?

22        A.    No.

23        Q.    So was it eight the next

**FREEDOM COURT REPORTING**

Page 33

1    Saturday?

2         A.    No.  It was that

3    following -- that following Saturday.

4         Q.    So a week from the next

5    Saturday; is that correct?

6         A.    It happened -- I went to her

7    during that week and that weekend is

8    when I started.

9         Q.    So the first Saturday after

10   you --

11        A.    Yes.

12        Q.    -- went there?  She told you

13   to report at 8 a.m.?

14        A.    Yes.

15        Q.    Where were you to report?

16        A.    The guard shack.

17        Q.    Where is the guard shack?

18        A.    It sits like close -- it's

19   not near the road but it like sit close

20   down below SMART, in front of SMART.

21        Q.    How far would you say is it

22   from the primary facility?

23        A.    I have no idea.

## FREEDOM COURT REPORTING

Page 34

1       Q.      Is it more than a football

2    field?

3       A.      I wouldn't say that.  I

4    don't think it's that far.

5       Q.      That's the first thing you

6    drive upon when you drive into the

7    facility?

8       A.      Yes.

9       Q.      Had you been to the guard

10   shack before you arrived at 8 a.m.?

11      A.      No.

12      Q.      What happened when you

13   arrived at 8 a.m. at the guard shack

14   that Saturday?

15      A.      Basically, I had someone

16   there to train me for my shift.

17      Q.      Who was there to train

18   you?

19      A.      Stan Adair.

20      Q.      Was there anybody else at

21   the guard shack besides Stan?

22      A.      No.

23      Q.      It was just you and he?

## FREEDOM COURT REPORTING

Page 35

1       A.      Yes.

2       Q.      Did he tell you anything

3   about the job before he started training

4   you?

5       A.      No.

6       Q.      Did you fill out any

7   paperwork?

8       A.      Yes.  I filled out stuff for

9   as far as like my thing for my taxes and

10   stuff like that.

11       Q.      So you filled out your

12   paperwork for your taxes.  Do you recall

13   any other paperwork you filled out that

14   morning?

15       A.      Just the regular basic

16   employment papers, you know, like stuff

17   like that and had papers to sign, you

18   know, for SMART safety or whatever.

19       Q.      Did Stan give you all those

20   papers?

21       A.      I got them from Misti.

22       Q.      Misti was there too that

23   morning?

## FREEDOM COURT REPORTING

Page 36

1      A.      No, she was not there that
2  morning.
3      Q.      She gave them to you --
4      A.      She didn't give them
5  directly to me but they came from up
6  there in the -- how am I going to say
7  this -- inside of SMART, behind the
8  desk.
9      Q.      The receptionist's desk?
10     A.      Yes.  She works up that way
11  and I guess she left them for me when
12  I -- so I could have them when I came to
13  work Saturday.
14     Q.      When you came to work
15  Saturday, you met Mr. Adair at the
16  security guard shack?
17     A.      Yes.
18     Q.      Did you sign the papers then
19  or did you --
20     A.      I didn't have to.  No, I
21  didn't.  I didn't sign them directly
22  that day.
23     Q.      You didn't sign the papers

## FREEDOM COURT REPORTING

Page 37

1    that day?

2        A.    No.

3        Q.    So when you met Mr. Adair,

4    you said he was there to train you.

5    What all did he do to train you?

6        A.    He showed me that everything

7    that I was supposed to do as far as

8    being a guard:  Check parking lots, walk

9    the plant, make sure the exit doors, you

10   know, are not -- make sure they're

11   closed, make sure there's nothing

12   blocking the exit doors, make sure fire

13   extinguishers work.

14       Q.    He said check the parking

15   lot, walk the exit, check the exit

16   doors, make sure fire extinguishers

17   work.  Anything else he told you?

18       A.    No.  Just basically, you

19   know, just keep a lookout on who comes

20   in, who goes out.

21       Q.    Any other training he

22   provided you that day?

23       A.    No.  How to -- yes, how to

## FREEDOM COURT REPORTING

Page 38

1  answer phone.

2      Q.    How did he tell you how to

3  answer the phones?

4      A.    Just basically just showing

5  me how to -- when calls come in, what to

6  press and how to take call-ins, just --

7      Q.    These were calls coming into

8  the security office?

9      A.    Well, the calls -- mainly on

10  the weekend, the calls were coming into

11  the security office anyway like for

12  people calling off for the plant, come

13  through security guard shack.

14      Q.    Any other training he

15  provided you?

16      A.    No.

17      Q.    Did he give you any

18  paperwork that day?

19      A.    No.

20      Q.    Did you follow him around as

21  he was doing the duties that day?

22      A.    Yes.

23      Q.    Is that what you did for the

## FREEDOM COURT REPORTING

Page 39

1    whole day?

2         A.    Yes, for that day, I did.

3         Q.    And he would explain to you

4    what you needed to be doing as he was

5    doing it?

6         A.    Yes.

7         Q.    Did he give you any policies

8    or anything like that?

9         A.    No.

10        Q.    Did you watch any videos or

11   training programs?

12        A.    No.

13        Q.    Were there any other

14   security officers who worked there that

15   day?

16        A.    No.

17        Q.    Did Mr. Adair tell you his

18   position?

19        A.    He was more like a

20   supervisor.

21        Q.    So he was in a position

22   above the level of security officer --

23        A.    Yeah.

## FREEDOM COURT REPORTING

Page 40

1      Q.      -- supervisory position?

2      A.      Yeah.

3      Q.      Do you know what company he

4   was employed by?

5      A.      Not -- no.

6      Q.      Anything else you remember

7   you did on that first day?

8      A.      That's basically it.

9      Q.      How long after that first

10  day did you receive this paperwork that

11  Misti left for you?

12     A.      I filled it out that

13  Sunday.

14     Q.      Your second day?

15     A.      Yes.

16     Q.      And can you describe how you

17  received that paperwork to fill out?

18     A.      It was just laying on the

19  desk when I got to the guard shack.

20     Q.      So you went to the guard

21  shack and there was paperwork laying on

22  the desk?

23     A.      Yes, in a manila folder with

## FREEDOM COURT REPORTING

Page 41

1    my name on it.

2        Q.    Did anybody tell you to fill

3    it out or --

4        A.    I just knew to.

5        Q.    You said there was tax

6    paperwork, safety document.  Anything

7    else you remember that was in that

8    manila folder?

9        A.    I really -- I don't remember

10   what all was in there.

11       Q.    On that second day, do you

12   remember who all was working out of the

13   security shack?

14       A.    No, I don't remember.

15       Q.    Do you remember was Stan

16   there?

17       A.    No, Stan wasn't there.

18       Q.    Did you receive any more

19   training in the second day?

20       A.    No.

21       Q.    Did you follow anybody

22   around or did you --

23       A.    No.

## FREEDOM COURT REPORTING

Page 42

1          Q.      -- just do the duties

2    yourself?

3          A.      Myself.

4          Q.      When you were a security

5    officer, were you required to do

6    training every month of any sort?

7          A.      No.

8          Q.      Did you ever have any

9    training after that first day?

10         A.      No.

11         Q.      What other security officers

12   worked on the weekend?

13         A.      It was like a -- different

14   people, you know, but I always worked in

15   the morning time.  But it was different

16   people, you know, that relieved me from

17   my shift.

18         Q.      What was your shift in the

19   morning on the weekends?

20         A.      Eight to five.

21         Q.      And there was three shifts

22   of security officers; is that correct?

23         A.      Yes.

## FREEDOM COURT REPORTING

Page 43

1    Q.    Did anybody work with you on

2    your eight to five weekend shift when

3    you first started?

4    A.    No.

5    Q.    So it was just you when you

6    first started?

7    A.    Yes.

8    Q.    Later on in your employment,

9    did you share the shift with anybody?

10    A.    Not the weekend shift.  I

11    didn't work the weekends anymore.  I

12    moved to weekdays.

13    Q.    How long after your first

14    day did you meet Cliff Eisenberger?

15    A.    The following week.

16    Q.    Did he usually come in on

17    weekdays in the morning?

18    A.    I don't remember.

19    Q.    Around how often would he

20    come in during the week while you were

21    working?

22    A.    Like every other week.

23    Q.    After you worked that Sunday

## FREEDOM COURT REPORTING

Page 44

1  of the first weekend, was the next time

2  you worked the next weekend or did you

3  work any during that week, do you

4  recall?

5          A.      Was -- did I work any --

6          Q.      Like during the weekdays or

7  was the next time you worked was the

8  next weekend?

9          A.      No, it was next weekend.

10          Q.      How long did you just work

11  weekends?

12          A.      I think I worked weekends

13  about -- I'd say -- I'm not sure.  I

14  don't know.  I don't know.

15          Q.      We may have gone over this

16  already, but did your employment as a

17  security officer begin in October of

18  '05?

19          A.      I'm not sure when it

20  began.

21          Q.      Was it in the fall of '05 or

22  the winter of '05?

23          A.      I don't remember.

## FREEDOM COURT REPORTING

Page 45

1        Q.    Around how many months did

2  you work as a security officer?

3        A.    I would say -- I'm not sure.

4  It's been a while.  I don't know.

5        Q.    Was it more than six

6  months?

7        A.    I don't know.

8          MR. HORSLEY:  Can I take a

9  bathroom break?

10         MR. FLOWERS:   Yes.

11

12     (A brief recess was taken.)

13

14        Q.   (By Mr. Flowers)  Do you

15  recall around how many months you just

16  worked weekends?

17        A.    No.

18        Q.    How did you know when you

19  were scheduled to work?

20        A.    They had a sheet saying with

21  our names and what days we work.

22

23     (Defendant's Exhibit No. 1 was

**FREEDOM COURT REPORTING**

Page 46

1          marked for identification and

2          attached hereto.)

3

4          Q.    I've marked a document as

5     Defendant's Exhibit 1.  Will you review

6     this document and let me know when

7     you've had the chance to review it.

8     It's actually two documents, two pages.

9               MR. HORSLEY:  You looked at

10    it?

11         A.    Uh-huh (affirmative

12    response).

13         Q.    Do you recognize the two

14    documents that are Defendant's Exhibit

15    1?

16         A.    Yes.

17         Q.    Are these the schedules that

18    you were talking about that notified you

19    when you were to work?

20         A.    Yes.

21         Q.    And these are just two

22    examples of two weeks; correct?

23         A.    Yes.

## FREEDOM COURT REPORTING

Page 47

1      Q.     Do you recall when these

2  schedules would first be posted?

3      A.     No.

4      Q.     Were they posted in the

5  security shack?

6      A.     Not that I remember.

7      Q.     Where were they posted?

8      A.     I'm not sure.  I'm not

9  sure.

10     Q.     But they may have been

11  posted in the security shack?

12     A.     They may have.  I don't

13  know.

14     Q.     Did you ever have any

15  problems with shifts you were scheduled

16  for?

17     A.     No.

18     Q.     Did you ever have to ask

19  anybody questions about the shifts you

20  were to work?

21     A.     No.

22     Q.     Do you know who you would

23  have called if you had a problem with

## FREEDOM COURT REPORTING

Page 48

1    your scheduling?

2         A.    With the scheduling you mean

3    as far as days I had to work?

4         Q.    Uh-huh (affirmative

5    response).

6         A.    No.

7         Q.    Do you know who made the

8    schedule?

9         A.    Misti.

10        Q.    Misti made the schedule?

11        A.    Yes.

12        Q.    Do you know what Misti's

13   position was?

14        A.    Guard slash receptionist.

15        Q.    Is that what you're just

16   guessing or did she tell you that?

17        A.    I'm saying that because

18   she -- either -- she never -- she wore

19   the uniform.  She was a guard, but she

20   spent most of her time inside of SMART

21   answering phones.

22        Q.    Did anybody ever tell you

23   what her position title was?

## FREEDOM COURT REPORTING

Page 49

1      A.    No.

2      Q.    Now, on the bottom of the

3 first page of Defendant's Exhibit 1,

4 there are three phone numbers for Cliff

5 Eisenberger; correct?

6      A.    Yes.

7      Q.    Do you know what Cliff

8 Eisenberger's position was?

9      A.    I don't know just exactly

10 what his position was, no, I don't.  I

11 knew he was over us but I didn't know

12 exactly what his position was.

13      Q.    So he was up the chain of

14 authority as far as security guards

15 go?

16      A.    Yes.

17      Q.    Do you know if he was the

18 owner of ADI?

19      A.    The owner of ADI?

20      Q.    (Nodded head affirmatively.)

21      A.    I don't -- I'm not going to

22 say owner, but I mean, he might have

23 been the owner.  I'm not sure.  I'm

## FREEDOM COURT REPORTING

Page 50

1    thinking that ADI was part of SMART.

2         Q.    What makes you think that

3    ADI was part of SMART?

4         A.    Because that's who I was

5    working for was SMART.

6         Q.    How do you know you were

7    working for SMART?

8         A.    How do I know, because when

9    I started working, you know, if they --

10   we mainly was not told, you know,

11   anything.  All I know is that when I

12   started working there, we had to answer

13   to safety at SMART.  So that's how I

14   felt that we was working for SMART

15   because anything we do we had to go

16   through SMART's people.

17        Q.    Any other reasons that you

18   feel you were employed by SMART?

19        A.    I mean, when we picked up

20   our checks, we had to go inside of SMART

21   to pick them up.

22        Q.    Where did you go to pick up

23   your checks?

## FREEDOM COURT REPORTING

Page 51

1    A.    The lobby.

2    Q.    Who gave you your checks?

3    A.    The receptionist, Misti.

4    Q.    Do you know who Misti was

5    employed by?

6    A.    I felt like we all was

7    employed by SMART.

8    Q.    Did anybody ever tell you

9    who Misti was employed by?

10    A.    No.

11    Q.    Did anybody tell you that

12    ADI was a part of SMART?

13    A.    No.

14    Q.    In Defendant's Exhibit 1,

15    and you can't really see all the image,

16    but does it look like ADI is at the top

17    of your schedule?

18    A.    Yes.

19    Q.    And that's just below

20    subject to change per Cliff Eisenberger;

21    is that correct?

22    A.    Yes.

23    Q.    Did the schedules for

## FREEDOM COURT REPORTING

Page 52

1   security officers look like the two

2   pages in Defendant's Exhibit 1

3   throughout your employment?

4          A.      Did they look like this?

5          Q.      (Nodded head affirmatively.)

6          A.      No, they changed.

7          Q.      How did they change?

8          A.      I mean, the whole concept

9   the way they was made out, she made a

10  new layout.  It wasn't all like that.

11         Q.      So the layout changed?

12         A.      Yes.

13         Q.      Did they basically have the

14  same information?

15         A.      Yes.

16         Q.      Do you know if Misti was the

17  one who changed the layout?

18         A.      Yes.

19         Q.      Did you see her do it?

20         A.      No.

21         Q.      Did she tell you she did

22  it?

23         A.      No.

## FREEDOM COURT REPORTING

Page 53

1    Q.    How do you know she was the

2    one that changed the layout?

3    A.    Because Misti, basically

4    Misti did everything, you know, as far

5    as, you know, schedule making and stuff.

6    She basically did everything.

7    Q.    Did she work every weekday

8    for the most part?

9    A.    Yes.

10    Q.    She ever work on weekends?

11    A.    Not to my knowledge.

12    Q.    The workers who worked

13    inside the SMART production floor, did

14    they wear uniforms?

15    A.    No.

16    Q.    They didn't wear uniforms?

17    A.    No.

18    Q.    Do you know if ADI had

19    security officers that worked in any

20    other facilities other than SMART?

21    A.    I don't know.

22    Q.    Did Stan Adair work most

23    days during the week?

# FREEDOM COURT REPORTING

Page 54

1      A.    Yeah.  Yes.

2      Q.    Would he work weekdays and

3  weekends or just weekdays or kind of a

4  mix?

5      A.    Weekdays.

6      Q.    Was he usually there on

7  first shift or was he there on different

8  shifts?

9      A.    I don't know.

10      Q.    When you were working

11  weekends, would you work both days of

12  the weekend?

13      A.    Both days?

14      Q.    (Nodded head affirmatively.)

15      A.    Uh-huh (affirmative

16  response).  Yes.

17      Q.    When you started working

18  during the week some, how many shifts

19  would you typically work a week?

20      A.    Just two shifts.

21      Q.    Just two shifts a week.  So

22  were you two shifts a week throughout

23  your employment as a security officer?

## FREEDOM COURT REPORTING

Page 55

1     A.    No.   Just when I was working

2   weekends.

3     Q.    When you were working

4   weekends, you worked two shifts?

5     A.    Yes.

6     Q.    When you started working

7   weeks during weekdays -- let me start

8   over.

9         When you started working

10  weekdays, how many shifts would you

11  typically work?

12    A.    Three to four.

13    Q.    Would any of those shifts be

14  on weekends at that time?

15    A.    No.

16    Q.    Who told you that you were

17  moving to weekdays?

18    A.    Stan.

19    Q.    Did you ask to be moved to

20  weekdays or did he just tell you?

21    A.    I asked.

22    Q.    What was the reason you

23  wanted to move to weekdays?

## FREEDOM COURT REPORTING

Page 56

1          A.      Wanted more hours.

2          Q.      Could you work weekdays and

3    not interfere with school or did you

4    have to work around your school

5    schedule?

6          A.      It didn't interfere.

7          Q.      Would you give anyone your

8    school schedule so it wouldn't

9    interfere?

10          A.      I don't understand the

11    question.

12          Q.      Did you have classes

13    scheduled during the week during the

14    time you were working weekdays?

15          A.      My hours varied because when

16    I started school, you know, some days --

17    like some days I went to school, some

18    days I didn't.

19          Q.      Did you give anybody like

20    Stan or anyone else your school

21    schedule?

22          A.      No.

23          Q.      Did they ever schedule you

## FREEDOM COURT REPORTING

Page 57

1    to work shifts that interfered with any

2    of your classes?

3         A.    No.

4         Q.    You described earlier the

5    duties that Stan Adair described to you

6    about the security officer job.

7         A.    Uh-huh (affirmative

8    response).

9         Q.    Did those duties change at

10   all during the time of your employment

11   as a security officer?

12        A.    The only thing changed is

13   when they had put up -- it's like this

14   chain that you let up and let down.  At

15   the time when I first started, we wasn't

16   checking badges but then we had to

17   start -- had to check badges when people

18   came in.

19        Q.    The chain was out by the

20   security shack?

21        A.    Uh-huh (affirmative

22   response).  Yes.

23        Q.    The guard shack?

## FREEDOM COURT REPORTING

Page 58

1    A.    Yes.

2    Q.    And you would check the

3 badge at the guard shack?

4    A.    Yes.

5    Q.    I guess for visitors you

6 would check their ID?

7    A.    We would have to give them a

8 visitor badge.

9    Q.    Were there written rules as

10 to how to handle this checking of badges

11 or giving a visitor's pass?

12    A.    Mainly everything -- since I

13 was there, everything mainly that SMART

14 wanted us to do, we was basically told.

15 There was no written nothing.

16    Q.    Who told you how to check

17 badges?

18    A.    Stan.

19    Q.    And he told you about giving

20 out visitor badges as well?

21    A.    Yes, told all the guards.

22    Q.    Did any new security

23 officers start during the time that you

## FREEDOM COURT REPORTING

Page 59

1  were employed as a security officer?

2      A.    Yes.

3      Q.    Did they go through the same

4  training you did?

5      A.    Yes.

6      Q.    Did Stan do that?

7      A.    Yes.

8      Q.    Were any security officers

9  fired during the time that you were a

10 security officer?

11     A.    No.

12     Q.    Do you know if any security

13 officers were promoted?

14     A.    No.

15     Q.    Do you know if any of their

16 pay was changed?

17     A.    No.

18     Q.    Or any security officers

19 were written up during the time you were

20 employed as a security officer?

21     A.    I don't know.

22     Q.    You don't know of anybody

23 who was written up?

## FREEDOM COURT REPORTING

Page 60

1      A.      Huh-uh (negative

2  response).

3      Q.      Do you know who made the

4  decision to hire you as a security

5  officer?

6      A.      No.

7      Q.      Do you know who made the

8  decision to hire other security

9  officers?

10     A.      (Shook head negatively.)

11     Q.      Do you know who all took a

12 role in scheduling the security officers

13 to work a schedule during the week?

14     A.      No, I don't.

15     Q.      Do you know of anybody who

16 had a role in that besides Misti?

17     A.      Cliff.

18     Q.      Cliff Eisenberger?

19     A.      Yes.

20     Q.      Anybody besides Cliff

21 Eisenberger or Misti?

22     A.      I don't know.

23     Q.      Who was Clifford

## FREEDOM COURT REPORTING

Page 61

1    Eisenberger, is that somebody different

2    than Cliff Eisenberger?

3         A.    That's his son.

4         Q.    Do you know what his son's

5    role was?

6         A.    I never meet his son.

7         Q.    So his son didn't come to

8    the facility very often?

9         A.    Not the days I worked.

10        Q.    Do you know what Alany

11   Divisions is, A-L-A-N-Y?

12        A.    No.

13        Q.    Did you ever see that name

14   while you were a security officer?

15        A.    No.

16

17        (Defendant's Exhibit No. 2 was

18         marked for identification and

19         attached hereto.)

20

21        Q.    I'm marking a document as

22   Defendant's Exhibit 2.  Will you review

23   this document and let me know when

# FREEDOM COURT REPORTING

Page 62

1  you've had a chance to review it.

2          A.     (Reviewed document.)

3                 MR. HORSLEY:   Just tell him

4  when you've looked at it.

5          A.     I've looked at it.

6          Q.     Have you ever seen the

7  document marked as Defendant's Exhibit 2

8  before?

9          A.     Yes.

10         Q.     What is this document?

11         A.     This is a check stub.

12         Q.     So this is a check stub, is

13 it for you?

14         A.     Yes, it is.

15         Q.     Would you receive check

16 stubs like this when you were employed

17 as a security officer?

18         A.     I can't recall how they

19 looked.

20         Q.     So you don't remember if

21 they looked like this or similar to

22 this?

23         A.     I don't -- I don't

## FREEDOM COURT REPORTING

Page 63

1    remember.

2        Q.    Did the check stubs you

3    receive have SMART written on it

4    anywhere?

5        A.    Not that -- not that I

6    recall.

7        Q.    Do you recall if they had

8    ADI written anywhere on them?

9        A.    I don't -- I can't recall

10   what was on it.

11       Q.    Do you see on the top of

12   Defendant's Exhibit 2 where it has Alany

13   Divisions, Inc.?

14       A.    Yes, I do.

15       Q.    Did you ever know what ADI

16   stood for?

17       A.    No.

18       Q.    Does Defendant's Exhibit 2

19   reflect the pay you received while you

20   were a security officer to the best of

21   your recollection?

22       A.    I don't understand the

23   question.

## FREEDOM COURT REPORTING

Page 64

1      Q.    Does this show all the

2  checks you received while you were a

3  security officer?

4      A.    I don't know.

5      Q.    You don't recall?

6      A.    No.

7      Q.    Did you ever receive

8  paychecks from anybody but Misti?

9      A.    No.

10     Q.    Did they come in an envelope

11  addressed to you or how were they

12  presented when you got them?

13     A.    I don't remember.

14     Q.    Did you fill out time

15  records while you were a security

16  officer?

17     A.    Time records?

18     Q.    Was there a time clock or

19  did you write the time you worked?

20     A.    Yes, we wrote in what time

21  we came in.

22     Q.    Did you write that in the

23  security shack?

## FREEDOM COURT REPORTING

Page 65

1          A.      Yes.

2          Q.      And it was just the security

3    officers that would write the time they

4    came in in the guard shack?

5          A.      Yes.

6          Q.      Do you know how the time was

7    kept of employees who worked out on the

8    SMART production floor?

9          A.      No.

10          Q.      Did you have to have a badge

11    as a security officer?

12          A.      What you mean?

13          Q.      Was there a special security

14    officer badge like people coming through

15    the checkpoint had badges?

16          A.      No.

17          Q.      So you didn't have a

18    badge?

19          A.      No.

20          Q.      Do you know who determined

21    how you were to be paid?

22          A.      No.

23          Q.      Besides security officers

## FREEDOM COURT REPORTING

Page 66

1  and visitors, would everybody coming

2  through have a badge?

3      A.    Yes.

4      Q.    Coming through the security

5  checkpoint; I should have made that

6  question more clear.  Everybody coming

7  through the security checkpoint but

8  security officers and visitors would

9  have a badge for the security officer to

10  check?

11      A.    Well, they was required by

12  everybody to have.

13      Q.    Who else wouldn't have a

14  badge?

15      A.    I mean, as far as employees

16  inside the plant, you know, it was like

17  people coming through, you know, they

18  didn't have their badge but they still

19  came through, you know.

20      Q.    The employees working on the

21  production floor and inside the plant,

22  they had badges; right?

23      A.    Yes.

## FREEDOM COURT REPORTING

Page 67

1    Q.    Visitors would not have a

2    badge so you gave them one; correct?

3    A.    Right.  Correct.

4    Q.    Did anybody work out of the

5    guard shack other than the security

6    officers?

7    A.    No.

8    Q.    Stan, I guess, did too.

9    Stan Adair did too.  And he was like you

10   said a security officer supervisor?

11   A.    Something like that.

12   Q.    Something in a position

13   higher than the other security

14   officers?

15   A.    Yes.

16   Q.    In performing your duties as

17   a security officer, you would either be

18   in the guard shack or walking around the

19   parking lot or the exit doors?

20   A.    Yes.

21   Q.    Did you ever work at the

22   receptionist's desk?

23   A.    Yes.

## FREEDOM COURT REPORTING

Page 68

1          Q.      How often did you do that?

2          A.      Only when Misti wasn't

3     available.

4          Q.      Any idea of how many times

5     that happened?

6          A.      No.

7          Q.      How did you know that you

8     were supposed to work at the

9     receptionist's desk?

10         A.      When I get to work.

11         Q.      Who would tell you?

12         A.      Stan.

13         Q.      So the duties of security

14    officers involved being in the guard

15    shack, checking people as they come in,

16    walking around the facility and the

17    parking lot as you described earlier,

18    and working at the receptionist's

19    desk?

20         A.      And the plant.

21         Q.      Walking around the plant.

22         A.      Checking exit doors, fire

23    extinguishers, stuff like that.

## FREEDOM COURT REPORTING

Page 69

1      Q.    Was there anything else that

2  security officers did?

3      A.    No.

4      Q.    Do you recall receiving any

5  policies while you were a security

6  officer?

7      A.    I mean, no.

8      Q.    Did you ever receive

9  anything like a handbook?

10      A.    No.

11      Q.    Did you ever receive a

12  complaint procedure of any sort?

13      A.    Basically, everything that

14  went on that we was supposed to know we

15  were -- we wasn't given any handbooks or

16  anything.  It was just basically handed

17  down from, you know, SMART to us.  The

18  dos and the don'ts.

19      Q.    What dos and the don'ts are

20  you talking about?

21      A.    I'm not -- I don't really

22  remember everything they had required

23  from us.  But you know, stuff like, you

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 70

1    know, we have to be, you know, we have

2    to work, you know, stay busy and company

3    policy like no -- well, from what we was

4    told, no dating, you know, like

5    coworkers and stuff like that.

6         Q.    Do you recall who told you

7    there was no dating coworkers?

8         A.    No.

9         Q.    As a security officer, were

10   you ever supposed to go into the office

11   area of the SMART facility?

12        A.    Basically, the only time is

13   like when like mail, you know, take them

14   their mail, something like that.

15        Q.    But otherwise you were

16   supposed to stay out of the office

17   facility?

18        A.    No, we wasn't required to

19   stay out of the office facility.  We

20   have to walk through that also.

21        Q.    Did you have a breakroom

22   that you used as a security officer?

23        A.    Basically, everybody ate in

## FREEDOM COURT REPORTING

Page 71

1    the guard shack.

2         Q.    Did you have any reasons in

3    your responsibilities as a security

4    officer to go into the safety office?

5         A.    Unless -- no, not unless

6    something happened.

7         Q.    What do you mean unless

8    something happened?

9         A.    Like as far as like if

10   something happened at the plant like

11   maybe someone get hurt, or you know, we

12   know something -- we know an incident

13   that happen, you know, at SMART, we

14   have -- we was told we have to notify

15   the safety department.

16        Q.    Who told you you were

17   supposed to notify the safety

18   department?

19        A.    Stan.

20        Q.    Did anybody ever tell you

21   what you should do if you had a problem

22   while working as a security officer?

23        A.    No.

## FREEDOM COURT REPORTING

1

2          (Defendant's Exhibit No. 3 was

3          marked for identification and

4          attached hereto.)

5

6          Q.     I'm marking a document as

7     Defendant's Exhibit 3.  Will you review

8     this document and let me know when

9     you've had a chance to review it.

10         A.     (Reviewed document.)

11         Q.     You recognize Defendant's

12    Exhibit 3?

13         A.     Yes.

14         Q.     Is this the complaint you

15    filed in this action?

16         A.     Yes.

17         Q.     In this complaint, you're

18    alleging that you were sexually harassed

19    by Rance Maddox; is that correct?

20         A.     Yes.

21         Q.     Who was Rance Maddox -- who

22    is Rance Maddox?

23         A.     He was a safety manager.

## FREEDOM COURT REPORTING

Page 73

1       Q.      SMART safety manager?

2       A.      Yes.

3       Q.      When did you first meet

4    Mr. Maddox, do you recall?

5       A.      I don't know.

6       Q.      Was it soon after you

7    started your employment, was it a few

8    weeks, months?

9       A.      I don't know.

10      Q.      Did Mr. Maddox work out of

11   the safety office?

12      A.      Yes.

13      Q.      Did anybody ever tell you

14   that he was your supervisor?

15      A.      We was told -- no, no.

16      Q.      And now will you describe

17   for me every way in which you allege

18   Rance Maddox sexually harassed you?

19      A.      You want me to describe what

20   happened?

21      Q.      Yes, just everything you're

22   saying happened that is sexual

23   harassment.

## FREEDOM COURT REPORTING

Page 74

1    A.    Well, on the day of January

2  28, 2006, we got a call from Cliff

3  Eisenberger.  Me and Deana Shelburne, we

4  was on duty together that day.  And

5  he -- we -- he said I was trying to get

6  in touch with Rance due to the fact that

7  something happened at the plant.

8  Because everything we basically did, you

9  know, we have to notify Rance of

10  everything.  And he must have knew about

11  something that happened that we didn't

12  know about so he wanted us to get in

13  touch with Rance.

14              So we tried calling the

15  office; he wasn't answering the phone.

16  So we seen him in the parking lot at his

17  car.  So he come -- you know, we goes up

18  to him and tell him that Cliff is trying

19  to get in touch for  him -- touch with

20  him, you know, about an incident that

21  happened and he was on the phone.  So he

22  decided to walk back to the guard shack

23  with us since he was closer to the guard

**FREEDOM COURT REPORTING**

Page 75

1  shack anyway.  So he decided to walk

2  back to the guard shack with us and

3  answer Cliff's call.  So he was on the

4  phone with Cliff and me and Deana was

5  still in the guard shack.  So it was

6  Deana's turn to go make rounds inside

7  the plant while I check badges.  So that

8  left me and Rance inside the guard

9  shack.  He talked to Cliff for a while,

10  then after that, he hung up the phone

11  and then he started asking me personal

12  questions about myself.  And then I

13  felt --

14        Q.    What all did he ask you?

15        A.    What all did he ask me, he

16  was asking me stuff like, you know, will

17  I go out with him.  He asked me, you

18  know, will I sleep with him and I was

19  like no, I'm a married woman.  And he

20  was like, well, I'm going through a

21  divorce and stuff, you know.  And then

22  he started by touching me on my arm like

23  rubbing me on my arm (indicated) and I

# FREEDOM COURT REPORTING

Page 76

1    told him not to touch me because I'm

2    married.  So I moved and go over -- I

3    was standing right there by the door so

4    I moved and go over there by where the

5    chair and the little desk and everything

6    was.  And I started -- I was writing

7    over there and he came behind me and

8    started rubbing me like on my legs like

9    below my waist moving closer to the

10    front.  And then I told him, don't touch

11    me, and I went, you know, to get away

12    from him and I turned around and he

13    grabbed me and pulled me to him and

14    kissed me.

15        Q.    What happened next?

16        A.    I told him that I was going

17    to report him and he told me wouldn't

18    nobody believe me anyway.

19        Q.    Did you back away from

20    him?

21        A.    I pushed him -- I pushed him

22    off me.

23        Q.    Did he go to the ground or

**FREEDOM COURT REPORTING**

Page 77

1    did he --

2         A.     No, it wasn't that hard.

3         Q.     Did he leave after that or

4    did anything else happen?

5         A.     Well, he was -- he had

6    stayed there for a while until he saw

7    Deana coming from the plant.  He seen

8    Deana coming from the plant and then

9    that's when he decided to leave.

10        Q.     What happened in between the

11   time you pushed him away and he saw

12   Deana coming and left?

13        A.     That's -- that was during

14   the time he was telling me -- I was

15   telling him that I'm going to report him

16   because, you know, I feel like he

17   violated me and he was wrong for doing

18   what he did.  He was telling me won't

19   nobody believe me anyway because I'm

20   just a guard.

21        Q.     Was there anything else said

22   between the two of you during that

23   time?

## FREEDOM COURT REPORTING

Page 78

1      A.     No.

2      Q.     How long passed between the

3  time you pushed him away and the time

4  that he saw Deana approaching and

5  left?

6      A.     It was just like a split

7  second because by the time I pushed him,

8  you know, pushed him off me, Deana was

9  walking out the front door then.

10     Q.     So he left.  Did Deana come

11 in the guard shack?

12     A.     Yes.

13     Q.     When -- after he first got

14 off the phone, did he just start asking

15 you if you would go out with him or was

16 there any conversation before that?

17     A.     Basically, when he got off

18 the phone, he -- only thing he really

19 said to me was so how have you been

20 doing.  And I was like fine.  Then

21 that's when he asked me will I go out

22 with him.  I was like no.

23     Q.     How long passed between the

## FREEDOM COURT REPORTING

Page 79

1    time that he got off the phone and you

2    pushing him away?

3         A.    I don't know.

4         Q.    Was it minutes, was it 15

5    minutes or was it -- just any estimate

6    as to how long it was?

7         A.    I don't know.

8         Q.    Is there anything else that

9    you remember him saying to you in that

10   time?

11        A.    Last thing I remember him

12   saying no one going to believe you

13   because you're just a guard.

14        Q.    What about before he started

15   rubbing you, do you remember him saying

16   anything else to you?

17        A.    No.

18        Q.    Do you recall saying

19   anything else to him other than what

20   you've told me?

21        A.    No.

22        Q.    Did he ever do anything you

23   consider to be sexual harassment other

## FREEDOM COURT REPORTING

Page 80

1   than that incident in the guard shack?

2       A.    No.

3       Q.    When Deana was approaching

4   and he left, what happened next?

5       A.    She came in.

6       Q.    Did you talk with her about

7   this?

8       A.    Yes.

9       Q.    What all did you say?

10      A.    I just basically told her

11  everything that happened.

12      Q.    What was her response?

13      A.    That I should report him.

14      Q.    How long did you speak with

15  Deana?

16      A.    Well, me and Deana worked

17  all that day together, you know, because

18  we was on the same shift.

19      Q.    Did you just continue

20  working that day?

21      A.    Yes, I did.

22      Q.    Do you recall what day of

23  the week this was?

## FREEDOM COURT REPORTING

Page 81

1    A.    I don't know.  All I know it

2  was the 28th.

3    Q.    Looking back on Defendant's

4  Exhibit 1, the first page, now, it looks

5  like January the 28th of 2006 is a

6  Saturday; is that right?

7    A.    Uh-huh (affirmative

8  response).

9    Q.    And it has you and Deana

10  Shelburne working the morning shift?

11    A.    Uh-huh (affirmative

12  response).

13    MR. HORSLEY:  Say yes.

14    A.    Yes.

15    Q.    Did you -- does that sound

16  right, did that happen on a Saturday?

17    A.    Yes.

18    Q.    Do you recall what time

19  during your shift the incident with

20  Rance occurred?

21    A.    It was approximately between

22  11:15 and 11:45.

23    Q.    Did you work the rest of

## FREEDOM COURT REPORTING

Page 82

1    your shift?

2         A.    Yes.

3         Q.    Did you see Rance at all the

4    rest of that shift?

5         A.    No.

6         Q.    Who else did you tell about

7    what happened with Rance other than

8    Deana during that shift?

9         A.    I told Cliff.

10        Q.    Cliff Eisenberger?

11        A.    Yes.

12        Q.    How did you tell

13   Mr. Eisenberger?

14        A.    I called him.

15        Q.    On his cell phone, his home

16   phone?

17        A.    I don't know -- I don't know

18   if it's his cell, house.  I don't know.

19        Q.    How long after the incident

20   did you call him?

21        A.    Immediately.

22        Q.    After you spoke with Deana

23   or --

**FREEDOM COURT REPORTING**

Page 83

1        A.    After I spoke with Deana.

2        Q.    Did you call him from the

3 guard shack?

4        A.    Yes.

5        Q.    What all did you tell him?

6        A.    I told him everything that

7 he did.

8        Q.    So I mean, do you remember

9 how you described it to him, did you

10 just kind of tell the story from

11 beginning to end or did you just say

12 Rance did this and Rance did that?

13        A.    From the beginning to the

14 end.

15        Q.    Do you know of any way that

16 you told it differently when you spoke

17 with Mr. Eisenberger than you did

18 today?

19        A.    No.

20        Q.    What was Mr. Eisenberger's

21 response?

22        A.    He told me to write -- to

23 write down exactly what Rance did.  He

**FREEDOM COURT REPORTING**

Page 84

1  told me to write it down.  And he told

2  me get Deana to write out a statement of

3  what I told her.  And he said that he --

4  that he was going to take it to Gary

5  Sport and that he was going to try to

6  get everything resolved.

7       Q.    Did you know who Gary Sport

8  was?

9       A.    Yes, I did.

10      Q.    Who was he at that time?

11      A.    I think he was the human

12  resource manager.

13      Q.    Do you recall anything else

14  that Cliff told you in that phone

15  conversation?

16      A.    That was basically it.

17      Q.    Did you say anything after

18  he told you to write the statement down

19  and Deana's statement?

20      A.    No.

21      Q.    Did you write out a

22  statement?

23      A.    Yes, I did.

## FREEDOM COURT REPORTING

1          Q.      Did you get Deana to write

2     out a statement?

3          A.      Yes, I did.

4

5          (Defendant's Exhibit No. 4 was

6           marked for identification and

7           attached hereto.)

8

9          Q.      I marked a document as

10    Defendant's Exhibit 4.  This is a

11    document that was produced to me today.

12    Do you recognize the document marked as

13    Defendant's Exhibit 4?

14         A.      Yes, I do.

15         Q.      Is this the statement that

16    Deana wrote that day on the 28th?

17         A.      Yes, it is.

18         Q.      Is this the entire statement

19    she wrote?

20         A.      Yes.

21         Q.      Was there any other document

22    she gave you that day?

23         A.      No.

# FREEDOM COURT REPORTING

Page 86

1    Q.    Did you write the statement

2    directly after you spoke with

3    Mr. Eisenberger?

4    A.    Yes.  After he told me to

5    write the statement, that's when I wrote

6    it.

7    Q.    What happened after you

8    wrote the statement, what happened next

9    regarding this incident?

10    A.    Nothing happened.

11    Q.    Did you give these

12    statements to anybody that day?

13    A.    No.  He said just put them

14    in the lockbox and I would get them.

15    Q.    So there's a lockbox in the

16    security office?

17    A.    No.  It was inside of

18    SMART.

19    Q.    Where was it in SMART?

20    A.    Behind the receptionist's

21    desk.

22    Q.    Did you have access to that

23    lockbox?

**FREEDOM COURT REPORTING**

Page 87

1      A.      Well, if we needed to.

2      Q.      How would you get access to

3  it?

4      A.      It was certain place they

5  put like the keys.  If the guards need

6  to get in there for like safety goggles

7  or something like that, go inside the

8  plant, that we could have access, you

9  know.

10      Q.      Where would you get the keys

11  from?

12      A.      In the drawer behind the

13  receptionist's desk.

14      Q.      Do you recall who was

15  working at the receptionist's desk that

16  day?

17      A.      I don't think anybody was

18  behind the receptionist --

19      Q.      'Cause it's Saturday.

20      A.      Not on weekends.

21      Q.      Right.  So nobody works the

22  receptionist's desk.

23      A.      Not on weekends.

## FREEDOM COURT REPORTING

Page 88

1      Q.    Had you ever been in the

2  lockbox behind the receptionist's desk

3  before?

4      A.    To get a pair of safety

5  goggles or maybe earplugs.

6      Q.    Any other reasons?

7      A.    No.

8      Q.    Was that lockbox just for

9  security officers?

10     A.    I don't know.  To my

11 knowledge, it was, but I don't know.

12     Q.    So after you drafted the

13 statements, you put them into the

14 lockbox behind the receptionist's

15 desk?

16     A.    Yes, I did.

17     Q.    Did you talk with anybody

18 else that day about the -- about this

19 incident?

20     A.    No.

21     Q.    Do you recall when the next

22 day was you were scheduled for work?

23     A.    I think it was that -- I

### FREEDOM COURT REPORTING

Page 89

1    don't know if it was -- I don't know.

2    Maybe the next day 'cause I think it

3    happened on a Saturday.  I don't know.

4         Q.    If you look at the second

5    page of Defendant's Exhibit 1, it has

6    you scheduled for the first shift on

7    Sunday, January 29th; correct?

8         A.    I didn't work that day.

9         Q.    You didn't work on that

10   Sunday?

11        A.    No, I didn't.

12        Q.    Do you recall why you didn't

13   work that day?

14        A.    Yes.  'Cause I was headed

15   out there -- when I was headed out

16   there, I was told that Cliff, Stan, Gary

17   Sport and Rance had a meeting.  And from

18   what I was told that during the meeting

19   it was said that there was nothing could

20   be done to Rance since that was his

21   first time offense.  And you know, it

22   was nothing they could do about it.  And

23   I felt like if I had to work up under

## FREEDOM COURT REPORTING

Page 90

1   him by him being the safety manager and

2   I was part of safety, I wasn't going to

3   work there anymore.

4         Q.    You said Cliff, Stan, and

5   Gary Sport had this meeting?

6         A.    And Rance.

7         Q.    But you worked out the

8   remainder of your shift on Saturday,

9   January 28th?

10        A.    Yes, I did.

11        Q.    Are you sure you got this

12  call about the meeting on Sunday the

13  29th or could it have been Tuesday the

14  31st of January?

15        A.    I want to say it was the

16  29th, but then again, it could have been

17  another day.  I mean, it's been -- I

18  don't know.

19        Q.    Is it possible you might

20  have worked the Sunday after January

21  28th?

22        A.    It's possible but I don't

23  know.

# FREEDOM COURT REPORTING

Page 91

1       Q.    On the day that you were

2  driving to the facility and you said you

3  got the phone call, were you working a

4  morning shift or an afternoon or second

5  shift?

6       A.    Got what phone call?

7       Q.    You just described you were

8  told about a meeting between Cliff

9  Eisenberger --

10      A.    They didn't call me.  I had

11  got to SMART.  They told me directly.

12      Q.    Describe for me how that

13  happened.

14      A.    Nothing, but I was just

15  approaching inside of SMART fixing

16  getting ready to go to duty.

17      Q.    This is you were approaching

18  the inside of SMART or the guard

19  shack?

20      A.    Inside of SMART.

21      Q.    Go on.

22      A.    And I was told that the

23  meeting -- they had a meeting and they

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 92

1     told me that, you know, and the result

2     of the meeting.  It was nothing they

3     could do to Rance Maddox as that was his

4     first offense.

5          Q.     Who told you this?

6          A.     Cliff Eisenberger and Stan

7     Adair.

8          Q.     Did they tell you who was in

9     the meeting?

10         A.     Yes.  It was Cliff, Stan,

11    Rance, Gary Sport, and if I'm not

12    mistaken, I think there were a few more

13    people up there.  I'm not sure.  But I

14    know those four was there.

15         Q.     What happened after you were

16    told this by Cliff Eisenberger and Stan

17    Adair?

18         A.     I left.

19         Q.     You left immediately?

20         A.     Yes.

21         Q.     Left the facility?

22         A.     Yes, I did.

23         Q.     Did you return to the

## FREEDOM COURT REPORTING

Page 93

1  facility that day?

2       A.    No.

3       Q.    Did you say anything in

4  response after Cliff Eisenberger and

5  Stan Adair told you that?

6       A.    Did I say anything?

7       Q.    Uh-huh (affirmative

8  response).

9       A.    Yes.

10      Q.    What did you say?

11      A.    I said that I'm not going --

12  I'm not going to work under Rance, you

13  know.  He's safety manager.  We're part

14  of safety, and if I've got to continue

15  to work under him, I'm not going to work

16  here.

17      Q.    Anything else you said?

18      A.    No.

19      Q.    Do you recall either

20  Mr. Eisenberger or Mr. Adair saying

21  anything else?

22      A.    No.

23      Q.    Who was doing the talking,

## FREEDOM COURT REPORTING

Page 94

1   was it Mr. Eisenberger or Mr. Adair?

2          A.      I don't know.

3          Q.      You don't recall?

4          A.      No, I wasn't there.

5          Q.      The talking when they told

6   you that nothing was going to be done,

7   was it Mr. Eisenberger or Mr. Adair

8   talking?

9          A.      Well, first Stan told me.

10         Q.      Stan told you?

11         A.      Yes.  Then Cliff calls me,

12  you know, 'cause after -- after I left

13  the building, Cliff called me.

14         Q.      I must have misunderstood

15  earlier.  You were approaching the

16  building, Stan was the one who told you

17  that?

18         A.      Yes.

19         Q.      He told you that it was the

20  first offense and nothing was going to

21  be done about it?

22         A.      Exactly.  Said nothing they

23  could do because it was his first

# FREEDOM COURT REPORTING

Page 95

1    offense.

2         Q.      And then after that, that's

3    when you said that I'm not going to work

4    under Rance, that's when you made that

5    comment?

6         A.      Right.

7         Q.      So then you leave; is that

8    right?

9         A.      Yes.

10        Q.      Now, when did you talk to

11   Mr. Eisenberger?

12        A.      When I got home.

13        Q.      Did you see Mr. Eisenberger

14   when you were at the facility that

15   day?

16        A.      He had left.

17        Q.      So you didn't see him while

18   you were there?

19        A.      No.

20        Q.      How did it come that you

21   talked to him when you got home?

22        A.      He called my house.

23        Q.      What did he tell you when he

Page 96

1   called your house?

2       A.    He asked me why did I leave

3   'cause I suppose -- Stan called him and

4   told him I had left.  I was like

5   because, you know, Stan -- I was like

6   Stan told me what they said in the

7   meeting and I feel like, you know, my

8   rights was violated and if there's

9   nothing, you know, they're going to do

10  about it, then I don't need to work

11  here.  I don't need to work there.

12      Q.    What did Mr. Eisenberger say

13  in response?

14      A.    He was like, well, just try

15  to, you know, try to work through it,

16  and you know, just forget about it.  I

17  said I'm not going to forget about it.

18      Q.    Did he talk about this

19  meeting at all?

20      A.    Yes.  He told me the same

21  thing that Stan told me.

22      Q.    At what point in time in

23  this call did he tell you about the

**FREEDOM COURT REPORTING**

Page 97

1    meeting?

2        A.    During, you know, just -- I

3    don't know exactly the direct point, but

4    before he hung up, you know, we did get

5    on the conversation about the meeting

6    that had occurred.

7        Q.    Do you recall what he

8    specifically told you about the

9    meeting?

10       A.    Yes.  He told me that they

11   had a meeting with Gary Sport and they

12   was saying that it was his first offense

13   and there was nothing that they can do.

14   But if it happened again, they could

15   take action then.

16       Q.    Anything else you recall

17   Mr. Eisenberger saying in that call?

18       A.    No.

19       Q.    Did you tell him anything

20   else?

21       A.    No.

22       Q.    Did you tell him you're not

23   coming back to your employment?

# FREEDOM COURT REPORTING

Page 98

1          A.      Yeah, I had already told him

2    that.

3          Q.      The first time you told him

4    that was in that call; correct?

5          A.      When I told -- well, when I

6    left, I mean, but when he told me -- I

7    told him that I'm not going to work up

8    under Rance, try to forget about it.    I

9    had already told him I wasn't going to

10   do it, wasn't going to work there

11   anymore.

12         Q.      The first time you told

13   Mr. Eisenberger that was in the phone

14   call; correct?

15         A.      Yes.

16         Q.      Did you have any more

17   conversations that day with anybody from

18   ADI or SMART?

19         A.      No.

20         Q.      Did you ever talk with Gary

21   Sport about what had happened with

22   Rance?

23         A.      No.

## FREEDOM COURT REPORTING

Page 99

1    Q.    Did you ever talk with

2  anybody in SMART HR or management about

3  what happened with Rance?

4    A.    No.

5    Q.    Did you receive any other

6  calls at your house from

7  Mr. Eisenberger?

8    A.    No.

9    Q.    Did you receive any calls at

10  your house from anybody at SMART?

11    A.    No.

12    Q.    Did you ever get a call from

13  anybody named Ruth Ryan?

14    A.    Ruth Ryan?

15    Q.    (Nodded head affirmatively.)

16    A.    No.

17    Q.    Do you recall what your

18  phone number was at that time, home

19  phone number?

20    A.    No, I don't.

21    Q.    Did you have an answering

22  machine?

23    A.    No.

# FREEDOM COURT REPORTING

Page 100

1    Q.    Have you told me every way

2    in which you're alleging that you were

3    sexually harassed in your complaint

4    against SMART?

5    A.    Yes.

6    Q.    Do you know if any

7    corrective action was later taken

8    against Mr. Maddox because of what you

9    alleged he did?

10    A.    I don't understand.

11    Q.    Do you know if anything ever

12    happened to him or he was told anything

13    because of what you allege he did?

14    A.    No, 'cause last -- last I

15    heard, you know, after I quit he was

16    still working at SMART.

17    Q.    Do you know how long he

18    worked at SMART after you left?

19    A.    No, I don't.

20    Q.    In your complaint, are you

21    alleging that you were retaliated

22    against by SMART?

23    A.    What do you mean?

## FREEDOM COURT REPORTING

Page 101

1    Q.    I'll hold off on that

2    question.

3

4    (Defendant's Exhibit No. 5 was

5    marked for identification and

6    attached hereto.)

7

8    Q.    I'm marking a document as

9    Defendant's Exhibit 5.  Do you recognize

10   the two-page document marked as

11   Defendant's Exhibit 5?

12   A.    Yes.

13   Q.    Is this the EEOC charge you

14   filed against SMART?

15   A.    Yes.

16   Q.    Tell me every way you

17   believe you were forced to resign.

18   A.    Well, basically, everything

19   that, you know, if we had to report to

20   anybody, you know, we had to report

21   everything that we see or happen to

22   Rance Maddox because he is the safety

23   manager.  And after, you know, he made

# FREEDOM COURT REPORTING

Page 102

1    those sexual advances towards me and

2    I -- I couldn't have anything done about

3    it and I knew if something else happened

4    at that plant that's the first person I

5    would had to go to was Rance.  I

6    couldn't go to Rance because, you know,

7    I had already, you know, you know,

8    made -- wrote a complaint about him, you

9    know, sexual harassment.  He knew

10   exactly who the person was.  That's why

11   I feel like I was forced to quit because

12   I couldn't work under him knowing that

13   he had did all that to me.

14        Q.    Any other reasons you feel

15   you were forced to quit?

16        A.    That's it.

17        Q.    Now, when you say you

18   were -- you described earlier I believe

19   that you had to report if there were

20   employee injuries or any safety

21   incidents or security incidents that

22   occurred at the facility, you had to

23   report that to the safety department --

## FREEDOM COURT REPORTING

Page 103

1      A.    Uh-huh (affirmative

2  response).

3      Q.    -- is that correct?

4      A.    Yes.

5      Q.    Is that your only -- the

6  only things you would be required to

7  report to the safety department?

8      A.    Yes, like if something

9  happens, yes.

10      Q.    If something happens?

11      A.    Yes.

12      Q.    But you didn't regularly

13  report to the safety department unless

14  something happens; right?

15      A.    Yes.

16      Q.    Meaning -- your yes answer

17  means I did not regularly report to the

18  safety department unless something

19  happens; correct?

20      A.    Yes.

21      Q.    When something happened, did

22  you ever report to anybody in the safety

23  department other than Rance Maddox?

# FREEDOM COURT REPORTING

Page 104

1      A.      Yes.

2              MR. FLOWERS:  Let's take

3      like a five-minute break or so.

4

5              (A brief recess was taken.)

6

7      Q.      (By Mr. Flowers)  When the

8      incident occurred with Rance in the

9      security shack, the guard shack, you

10     said he rubbed your legs and your

11     shoulders; is that correct?

12     A.      My arm.

13     Q.      He rubbed your arm?

14     A.      Yes.

15     Q.      Anywhere else?

16     A.      Yes.  Right here below my

17     waist like on my legs approaching me in

18     the front (indicated).

19     Q.      He rubbed on your legs in

20     the front below your waist?

21     A.      Yes.

22     Q.      Was he rubbing on top of

23     clothing?

## FREEDOM COURT REPORTING

Page 105

1          A.      Yes.

2          Q.      You had your uniform on?

3          A.      Yes.

4          Q.      Anywhere else that he

5     rubbed?

6          A.      No.

7          Q.      Besides rubbing you on the

8     arm and the front of the legs and

9     kissing you, did he touch you in any

10    other way?

11         A.      No.

12         Q.      Where did he kiss you?

13         A.      In the mouth.

14         Q.      How long did he hold the

15    kiss before you pushed him away?

16         A.      I don't know.

17         Q.      Now, you had a daily duty

18    report the security officers filled out;

19    correct?

20         A.      Yes.

21         Q.      What all was reported on

22    that report?

23         A.      Basically, every hour, you

# FREEDOM COURT REPORTING

Page 106

1    know, we write down like we make -- if

2    we making rounds, we write down we made

3    a round, what all we saw inside the

4    plant.  And if we're in the guard shack

5    checking badges, we just say check

6    badges.

7         Q.    The only thing you had to

8    report directly to the quality

9    department and not just on the duty

10   report were employee injuries or other

11   major incidents; is that correct?

12        A.    Yes.

13        Q.    How often would you have

14   something that required you to directly

15   report it to the safety department?

16        A.    Well, from my understanding,

17   our daily reports were going to the

18   safety manager, so that's really --

19   that's just like reporting.

20        Q.    Who did you give the daily

21   report to once you finished it?

22        A.    We didn't give them to

23   anybody.  We leave them up front on the

# FREEDOM COURT REPORTING

Page 107

1    receptionist's desk.

2        Q.    So at the end of your shift,

3    you leave them on the receptionist's

4    desk?

5        A.    Uh-huh (affirmative

6    response).

7        Q.    How often would you have to

8    make a report to the safety department

9    other than a duty report?

10       A.    No time.

11       Q.    Well, there were no other

12   occasions where you had to go to the

13   safety department and tell somebody that

14   somebody was injured or something had

15   happened?

16       A.    I mean, when people get

17   hurt, like if there's a fire or that we

18   know about or maybe if somebody get hurt

19   or something like that, then we might go

20   to the safety department.

21       Q.    During the time you worked

22   as a security officer, how many times

23   did that happen that you recall?

## FREEDOM COURT REPORTING

Page 108

1      A.      Maybe once or twice.

2      Q.      Do you recall what the

3  occasions were that required you to go

4  report to the safety department?

5      A.      No.  I mean, we've had

6  smoke, I mean, coming from the side of

7  the plant.

8      Q.      Was that something you

9  reported?

10      A.      No.  I reported -- the only

11  thing I reported from there was when I

12  think someone -- someone got hurt from

13  one of the machines.

14      Q.      Do you remember how they got

15  hurt?

16      A.      No.

17      Q.      Who did you report to in the

18  safety department?

19      A.      I don't remember who I

20  reported it to.  I don't know her

21  name.

22      Q.      It's a female in the safety

23  department?

# FREEDOM COURT REPORTING

Page 109

1      A.    Huh?

2      Q.    Was it a female in the

3 safety department?

4      A.    Yes, it was a female.

5      Q.    Around how many people work

6 in the safety department?

7      A.    Well, I don't know how many

8 people but I saw three different

9 people.

10     Q.    Three different people.

11 Does that include Mr. Maddox?

12     A.    Yes.

13     Q.    Did Mr. Maddox have his own

14 office separate from the other offices

15 in the safety department?

16     A.    No, just one office.

17     Q.    Was reporting incidents like

18 you've described the only interaction

19 that you had to have as part of your job

20 with the safety department?

21     A.    Yes.

22     Q.    Did the safety department

23 employees ever tell you to do things

Page 110

1    around the facility directly?

2    A.    They have.  If there's

3    certain things they wanted us to do.

4    Q.    What all did safety

5    department employees tell you to do

6    there while you were employed?

7    A.    Well, they'll come tell us

8    like if someone get fired or quit or

9    whatever, something go on, they'll tell

10   us let us -- come to -- certain person

11   not allowed back on the facility.  And

12   just -- if -- if there's just

13   something -- was something going on they

14   wanted us to know about or wanted us to

15   do they tell us specifically.

16   Q.    So they tell you if somebody

17   wasn't allowed to come back on the

18   facility so you know not to let them in;

19   correct?

20   A.    Correct.

21   Q.    Are there any other

22   occasions in which somebody with the

23   safety department told you to do

**FREEDOM COURT REPORTING**

Page 111

1  something?

2     A.    Just when they started --

3  when they first started to change their

4  little routine about as far as like

5  badges.  You're required to have your

6  badge in order to enter SMART, and you

7  know, stuff like that when big major

8  changes going on with the plant, you

9  know, they'll come let us know.

10    Q.    But you said earlier that

11 Stan described to you what you had to do

12 with the badges; right?

13    A.    Yes.  But see, they have to

14 get -- but Stan don't have to get

15 information from safety.

16    Q.    They explained to Stan --

17    A.    Yes.

18    Q.    -- what the changes were?

19    A.    Yes.

20    Q.    They didn't explain them

21 directly to you?

22    A.    No.  No.

23    Q.    Any other occasions where

# FREEDOM COURT REPORTING

Page 112

1    they told you what to do that you

2    haven't already described?

3         A.    No.

4         Q.    Was there any other

5    departments at SMART that would tell you

6    what to do as part of your job?

7         A.    No.

8         Q.    Did you file for

9    unemployment compensation after you

10   didn't return?

11        A.    No.

12        Q.    Did you return to work for

13   ADI in March of '06?

14        A.    March of '06, I came -- I

15   had went up there and talked about a job

16   but I didn't work there.

17        Q.    What did you -- how did you

18   come about to go up there and talk about

19   a job?

20        A.    What you mean?

21        Q.    You said you went up to talk

22   about a job to --

23        A.    About me coming back, but I

## FREEDOM COURT REPORTING

Page 113

1    never came back.

2        Q.    Did they call you to do that

3    or you just go up there on your own?

4        A.    Well, I had got a call from

5    Charles.  'Cause see, Charles, even

6    though I didn't work there anymore, I

7    still used to call out there and talk to

8    him.

9        Q.    Who is Charles?

10       A.    He's also a security guard

11   out there.

12       Q.    Do you remember his last

13   name?

14       A.    Johnston.

15       Q.    You got a call from Charles.

16   What did he say?

17       A.    He was like have you

18   considered coming back.  I was like no,

19   not really.  And then he was just

20   telling me I should 'cause, you know, he

21   felt like I was a good guard and stuff

22   like that, but I wasn't going back.

23       Q.    But you went up there to

## FREEDOM COURT REPORTING

Page 114

1  talk about it?

2      A.    Yeah, I went up there to

3  talk about it.

4      Q.    Who did you talk about it to

5  when you got there?

6      A.    Stan and Misti.

7      Q.    If you weren't going back,

8  why did you go up to talk about the

9  job?

10     A.    I was considering it, but I

11 didn't do it 'cause once I got there, I

12 started thinking about what that man did

13 to me, you know.

14     Q.    Did you know if Mr. Maddox

15 was still employed at that time?

16     A.    I didn't know.  That's why I

17 didn't take the job because I didn't

18 know.

19     Q.    Did either Stan Adair or

20 Misti Dicks offer you the job?

21     A.    Yeah.  I mean, they asked me

22 if I wanted to come back.

23     Q.    You told them no?

# FREEDOM COURT REPORTING

Page 115

1          A.     Yes.

2          Q.     Did you tell them anything

3    else?

4          A.     Basically, she was like --

5    well, Misti asked me, she was like,

6    would you like to try it out.  And I

7    told her, I said, I had told her no.

8    She like -- she just like just try it

9    out and if you don't like it, you know,

10   if you don't feel comfortable, you don't

11   have to come back.  And I was like okay.

12   So I had -- Stan asked me -- well, he

13   was like would you try it out at least

14   one day.  I said yeah.  So I tried it

15   out that day.  But as night start to

16   approach, I didn't care for it.  And I

17   called Stan in and told him I didn't

18   want to do it, so I left and I haven't

19   been back.

20         Q.     Did you discuss with Stan

21   Adair or Misti Dicks anything about

22   Rance Maddox?

23         A.     You mean as far as -- what

# FREEDOM COURT REPORTING

Page 116

1  you mean?

2      Q.    Did his name come up?

3      A.    Did his name come up, no.

4      Q.    How come -- strike that.

5  Why did you not care for it once night

6  started to approach?

7      A.    It's just -- just me

8  thinking, you know what I'm saying, I

9  might run into him, you know.  'Cause I

10  didn't want to do it in the first place,

11  but it was just like I did it for them

12  but I didn't want to risk running into

13  him.  So that's why I called Stan and

14  told him I wasn't going to do it.

15      Q.    Did you tell Stan why you

16  weren't going to do it?

17      A.    No.  He -- anyway, I felt

18  like he already knew why I didn't want

19  to stay.

20      Q.    But you didn't express it to

21  him?

22      A.    No.

23      Q.    And you don't recall him

## FREEDOM COURT REPORTING

Page 117

1   mentioning Mr. Maddox's name at all when

2   you were talking to him in March of

3   '06?

4        A.    No.

5        Q.    So you did work just one day

6   during March of '06?

7        A.    Yes.

8        Q.    And you were paid for that

9   day?

10       A.    Yes.

11       Q.    Did you talk to Cliff

12   Eisenberger at all when you returned?

13       A.    No.  If I'm not mistaken,

14   Stan talked to Cliff, but I don't know

15   what about.  It might have been about me

16   trying to come back or whatever.  But

17   I'm not sure.

18

19        (Defendant's Exhibit No. 6 was

20         marked for identification and

21         attached hereto.)

22

23       Q.    I'm marking this document as

# FREEDOM COURT REPORTING

Page 118

1   Defendant's Exhibit 6.  Have you ever

2   seen the document marked as Defendant's

3   Exhibit 6?

4          A.     Have I ever seen it?

5          Q.     Uh-huh (affirmative

6   response).

7          A.     No.

8          Q.     Will you read the first page

9   for me on Defendant's Exhibit 6 and let

10  me know when you're done with it.

11         A.     The entire first page?

12         Q.     Just the handwritten

13  material on the first page.

14         A.     Okay.  In reference --

15         Q.     You don't have to read it

16  out loud.  Just read it to yourself.

17         A.     (Complied.)

18                MR. HORSLEY:  Did you read

19  the second page too?

20         A.     No, just the first one.

21                MR. HORSLEY:  Read the

22  second page.

23         Q.     Read the second page.

# FREEDOM COURT REPORTING

Page 119

1       A.    (Complied.)

2       Q.    Have you finished reading

3  the handwritten material in Defendant's

4  Exhibit 6?

5       A.    Yes, I have.

6       Q.    Do you agree with

7  Defendant's Exhibit 6, the handwritten

8  material?

9       A.    No, I don't.

10       Q.    What all is incorrect on

11  Defendant's Exhibit 6?

12       A.    Okay.  Well, okay, sure

13  enough they did have a meeting with HR

14  and the date is correct.  Well, I don't

15  know about the 30th but I know 1/28/06

16  is correct.  But -- let me see.  He

17  didn't tell me that he was supposed to

18  met with me.  Cliff wasn't even there

19  this particular day.  He wasn't even

20  there.

21       Q.    You didn't see him there or

22  how do you know he wasn't there?

23       A.    Because when I reported for

# FREEDOM COURT REPORTING

Page 120

1   my duty Stan was on duty.  Cliff wasn't

2   there.  He told me -- Stan had told me

3   they had the meeting and Cliff was not

4   there.  So I don't see how he was

5   supposed to meet with me if he wasn't

6   there.

7        Q.    Stan told you Cliff wasn't

8   there?

9        A.    Yeah.  I asked him where

10  Cliff was.  He was Cliff, he left for

11  the day.  I never even talked to Cliff.

12  Only one I talked to that day was Stan.

13           MR. HORSLEY:  Tell him about

14  that page too.  He wants you to tell him

15  everything that's incorrect.

16        Q.    Yeah, tell me everything

17  that's incorrect.

18        A.    Okay.  I never -- let me

19  see.  I didn't say anything about no

20  store.  I told -- what I told Stan was

21  I'm not about to work up under Rance.

22  And they saying there was nothing they

23  can do 'cause see I heard from Stan

**FREEDOM COURT REPORTING**

1    first.  There was nothing they can do

2    about Rance doing that to me because it

3    was a first time offense.  And he said

4    just act like it never happened.  I said

5    act like it never happened.  I'm not

6    about to work up under him and he's done

7    this to me and then I left.  This about

8    the store and all that, that's not true.

9    No one called me and they never said

10   anything about a meeting or anything.

11   'Cause when I was pulling in approaching

12   the job site, he told me right then what

13   happened inside the meeting.  So it

14   wasn't they met with me and told me

15   anything.  That's just a bunch of lies.

16        Q.    Were you checking your cell

17   phone messages at that time?

18        A.    I didn't get any messages.

19        Q.    But you regularly checked

20   your cell phone messages?

21        A.    I always have.

22        Q.    Who all had your cell phone

23   number in the guard shack?  Did Cliff

## FREEDOM COURT REPORTING

Page 122

1    have your cell phone number?

2         A.    I'm not sure.

3         Q.    Do you know who all --

4         A.    I mean, it's not like he

5    couldn't got it.  But I don't know if he

6    just had it.

7         Q.    Do you know who all at the

8    guard shack or the rest of the SMART

9    facility had your cell phone number?

10        A.    Just the guards because, you

11   know, in case like some emergency come

12   up, somebody don't show or something, we

13   can look on the thing and just try to

14   get in touch with somebody.

15        Q.    Were there documents kept in

16   the lockbox behind the receptionist's

17   desk?

18        A.    I don't think it was.  I

19   don't know.

20        Q.    Do you know if you had a

21   personnel file with ADI?

22        A.    No.

23        Q.    You don't know if you did or

# FREEDOM COURT REPORTING

Page 123

1    not?

2         A.    No.

3         Q.    Do you know if they kept

4    personnel files or documents anywhere in

5    the security shack or anywhere else?

6         A.    Personnel?

7         Q.    Like a folder with all your

8    information related to your employment.

9         A.    I don't know where they kept

10   that.

11        Q.    So you don't know where --

12   do you know if there were any documents

13   kept like that in the guard shack?

14        A.    I really didn't look to

15   see.

16        Q.    You don't know if there was

17   anything behind the receptionist's

18   desk?

19        A.    Just the lockbox.

20        Q.    Have you ever seen documents

21   related to your employment as a security

22   officer?

23        A.    Not I mean -- you mean the

## FREEDOM COURT REPORTING

Page 124

1    papers I filled out?

2          Q.      Like the papers you filled

3    out or --

4          A.      Once I filled them out, I

5    haven't never seen them again.

6          Q.      Did you give those papers to

7    Stan Adair or to Misti Dicks?

8          A.      I gave them back to Misti.

9          Q.      You have any idea why your

10   file of papers would be missing from the

11   other files?

12         A.      Why would they be missing?

13         Q.      (Nodded head affirmatively.)

14         A.      No.

15         Q.      Did you know Robin Atwell?

16         A.      Yes.

17         Q.      She worked in the safety

18   office?

19         A.      Yes.

20         Q.      When was the first time you

21   met her?

22         A.      I don't know exactly when I

23   first met her, but I know she was

## FREEDOM COURT REPORTING

Page 125

1    working in the safety office.

2         Q.    Did y'all develop a

3    relationship?

4         A.    No, just high and bye.

5         Q.    Did you ever do anything

6    with her outside of work?

7         A.    No.

8         Q.    Did y'all ever get together

9    during breaks or anything like that?

10        A.    No.

11        Q.    Did you ever talk about

12   Rance Maddox with her?

13        A.    Well, yes, I have.

14        Q.    Before you resigned your

15   employment?

16        A.    No.

17        Q.    Did you talk about it with

18   her since?

19        A.    I mean, like when I first

20   quit.

21        Q.    How soon after you quit did

22   you talk to her about it?

23        A.    I don't know.

## FREEDOM COURT REPORTING

Page 126

1      Q.    What all did you talk about

2 with her?

3      A.    She just asked me did, you

4 know, she just heard that he had did

5 something to me and just basically asked

6 me to -- was anything done about it.  I

7 was like, no, 'cause they said it was

8 his first offense and that it was

9 nothing they could do until he did it

10 again.

11      Q.    Did she say how she heard

12 that he'd done something to you?

13      A.    No, she didn't.

14      Q.    Did she say that he'd done

15 anything to her?

16      A.    Yes.

17      Q.    What all do you recall her

18 saying?

19      A.    Well, she didn't go into

20 detail.  She was just saying, you know,

21 he just, you know, did stuff to her, you

22 know, and it made her feel

23 uncomfortable.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 127

1          Q.      Did she talk about filing a

2    lawsuit against SMART at all?

3          A.      Well, no.

4          Q.      Did you talk to any

5    attorneys, and I don't want to know --

6    if you did talk to them, I don't want to

7    know what you said to them or they said

8    to you.  Did you talk to any attorneys

9    before the time you talked to Cliff

10   Eisenberger on the phone and told him

11   that you weren't returning to SMART?

12         A.      Did I talk to attorneys

13   before?

14         Q.      Before then about the Rance

15   Maddox incident.

16         A.      No.

17         Q.      How soon after you talked to

18   Cliff on the phone was the first time

19   you talked to an attorney?

20         A.      I don't know.

21         Q.      Was it a week or a month or

22   have any estimate as to how long?

23         A.      I don't think it was that

## FREEDOM COURT REPORTING

Page 128

1  soon.

2      Q.     Have you talked with Robin

3  Atwell since that time that you talked

4  to her after the first time you talked

5  to her after your employment as a

6  security guard ended?

7      A.     I talked to her a couple of

8  times.

9      Q.     Just a couple of times?

10     A.     Yes.

11     Q.     Did you talk about your

12  allegations against SMART with her?

13     A.     Allegations against SMART?

14     Q.     Your case against SMART.

15     A.     Well, no, not -- no.  I just

16  basically talked about what happened,

17  you know, about we both were violated

18  basically.

19     Q.     When was the last time you

20  spoke with her?

21     A.     It's been a while.  I don't

22  know.

23     Q.     Did she ever come to the

# FREEDOM COURT REPORTING

Page 129

1  guard shack?

2      A.    She came -- while I was

3  working there, I think she came at least

4  once.

5      Q.·   Do you recall why she came

6  in the guard shack?

7      A.    Just to go over some new

8  safety guidelines SMART I guess was

9  trying to --

10      Q.    Were you present at the

11  time?

12      A.    Yes, we had a meeting that

13  day.

14      Q.    You had a meeting?

15      A.    Yes.

16      Q.    So she was talking to the --

17      A.    The guards, yes.

18      Q.    Do you recall what the

19  guidelines were?

20      A.    No.

21      Q.    Besides the incident you

22  described earlier, were there any other

23  times when Rance Maddox came to the

**FREEDOM COURT REPORTING**

Page 130

1   guard shack?

2        A.    No.

3        Q.    At any time during the time

4   you were employed as a security guard,

5   did you keep a diary?

6        A.    No.

7        Q.    Did you keep notes about

8   your employment as a security guard?

9        A.    No.

10       Q.    Did you have a personal

11  calendar during 2006 that you kept?

12       A.    No.

13       Q.    Did you make any tapes of

14  any employees of ADI or SMART, like

15  audiotapes?

16       A.    No.

17       Q.    Do you have any documents

18  related to your employment as a security

19  guard in your possession at home or

20  elsewhere?

21       A.    Do I have any documents --

22       Q.    I'm not asking about

23  anything your attorney sent you.  Any

## FREEDOM COURT REPORTING

Page 131

1  documents you received during the time

2  you were employed as a security guard,

3  do you have any of those in your

4  possession?

5         A.    No.

6         Q.    None of them are at home or

7  anything like that?

8         A.    No.

9         Q.    Have you had any since the

10 time you resigned your employment as a

11 security guard?

12        A.    No.

13        Q.    Other than Robin Atwell,

14 have you talked to any employees of ADI

15 or SMART since your employment with ADI

16 ended?  I guess Misti Dicks and Stan

17 Adair, the time we spoke of.  Have you

18 spoken with anybody else?

19        A.    You mean, have I just talked

20 to them?

21        Q.    Yeah, have you talked to

22 anybody.

23        A.    Well, I think a couple

## FREEDOM COURT REPORTING

Page 132

1  months back I talked to Charles.  He

2  stays in Troy somewhere, so I talked to

3  him.

4        Q.    You talk about your case

5  against --

6        A.    No.

7        Q.    Have you talked with Misti

8  Dicks or Stan Adair since that time you

9  went back to the facility in March?

10        A.    No.

11        Q.    Have you talked with

12  anybody, any former current employees of

13  ADI or SMART about this case other than

14  Robin Atwell?

15        A.    No.

16        Q.    Do you know of anybody that

17  your attorney -- one of your attorney's

18  has talked to you about the case other

19  than Robin Atwell?

20        A.    No.

21        Q.    Do you know of anybody that

22  we haven't talked about today that would

23  have information related to your claims

# FREEDOM COURT REPORTING

Page 133

1   in this case?

2       A.    Not -- not at this very

3   moment, I don't.

4       Q.    What damages are you

5   alleging in your complaint that you've

6   suffered because of the allegations that

7   you made?

8           MR. HORSLEY:  Object to the

9   form.  Go ahead and answer.

10      Q.    I can reask that.  That

11  wasn't phrased very well.

12          In Defendant's Exhibit 3,

13  you're alleging that you suffered

14  damages; is that correct?

15      A.    Yes.

16      Q.    What damages are you

17  claiming in this action?

18          MR. HORSLEY:  Same

19  objection.  You can answer.

20      A.    Lost wages, pain and

21  suffering.

22      Q.    Anything else?  What all

23  pain and suffering have you gone through

# FREEDOM COURT REPORTING

Page 134

1  since the incident with Mr. Maddox and

2  the end of your employment as a security

3  guard?

4          A.    Well, for one, you know,

5  it's hard to work around other people,

6  you know.  It, you know, I try to keep

7  my distance away from people because,

8  you know, you think you can trust people

9  you work with and then for something

10 like that to happen, I keep my distance

11 from everybody.  It's hard to perform a

12 job when you have to work as a team

13 player and you're scared to get close to

14 people.

15         Q.    Have you seen any doctor,

16 physician, psychiatrist, psychologist,

17 or social worker about any pain and

18 suffering or emotional distress you

19 suffered since because of these

20 incidents?

21         A.    No.

22         Q.    Have you had -- have there

23 been any other effects than what you've

## FREEDOM COURT REPORTING

Page 135

1    described that you've suffered because

2    of the conduct of Mr. Maddox or you

3    resigning your employment as a security

4    guard?

5            MR. HORSLEY:  Object to the

6    form.  You can answer.

7        A.    Not that I can think of.

8        Q.    No other pain and suffering

9    or emotional distress that you suffered

10   that you can think of?

11       A.    No.

12           MS. EUBANK:  Was that a no

13   to the last issue?

14           MR. HORSLEY:  He asked you

15   if there was any other mental anguish or

16   emotional stress you can talk about.

17           MS. EUBANK:  You shook your

18   head.  I just couldn't hear you.

19       Q.    I thought I heard no, but

20   you tell me if I'm wrong.

21           MR. KELLY:  Heard not that I

22   can think of.

23       Q.    Am I correct that you said

## FREEDOM COURT REPORTING

Page 136

1    no or nothing I can think of to the last

2    question?

3         A.    Just mental anguish.

4         Q.    What?

5         A.    Mental anguish.

6         Q.    What forms of mental anguish

7    have you suffered?

8         A.    Basically, you know, it's --

9    things ain't been the same for me since

10   that day.

11        Q.    How have they been

12   different?

13        A.    Well, you know, I've had

14   previous job -- a previous job, but you

15   know, I feel like, you know, people out

16   to get me, you know. Just, just things

17   that, you know, you don't normally just

18   think about, you know, just don't

19   normally think about.

20        Q.    What things you don't

21   normally think about?

22        A.    I don't -- most of the time,

23   I used to be like go outside. I don't

## FREEDOM COURT REPORTING

Page 137

1   even go outside anymore. I don't go

2   anywhere at night. I stay inside.

3        Q.    What all did you do outside

4   before this happened?

5        A.    You know, I used to, you

6   know, do little stuff like -- like I

7   stay late in the evening in the park

8   with my kids and maybe at night we be

9   outside barbecuing, you know, just

10  little family activities and stuff.

11       Q.    So it's just you don't go

12  outside at night?

13       A.    No, at all.

14       Q.    You go outside during the

15  day?

16       A.    Yes, I will go out during

17  the day, but if I really don't have to,

18  I won't.

19       Q.    So other than staying at the

20  park at night, barbecues at night, are

21  there any other activities you don't

22  engage in since this occurred?

23       A.    Well, not -- well, you know,

## FREEDOM COURT REPORTING

Page 138

1  it's not really just the park and all

2  that.  Just the point about, you know,

3  the things I used to do, I just, you

4  know, just don't do them anymore.

5      Q.    What else is there that you

6  used to do that you don't do anymore?

7      A.    What else, I used to, you

8  know, I used to, you know, like to --

9  just daily activities, just regular

10 daily activities.

11     Q.    Which daily activities don't

12 you do anymore that you did before?

13     A.    Like I used to -- I used to

14 jog.  I used to ride bikes.  I used to,

15 you know, play kickball with the kids.

16 I mean, just other little stuff.

17     Q.    You don't jog, ride bikes,

18 or play kickball anymore because of what

19 happened?

20     A.    I really don't.

21     Q.    Anything else?

22     A.    That's it.

23     Q.    Any other mental anguish

# FREEDOM COURT REPORTING

Page 139

1   you've suffered other than what you've

2   described?

3        A.    No.

4        Q.    Did Ms. Atwell tell you

5   lawyers to contact regarding your

6   claims?

7        A.    She gave me -- she gave me a

8   number.

9        Q.    She gave you a number of an

10  attorney?

11       A.    Yes.

12       Q.    Had you contacted any

13  attorneys before she gave you that

14  number?

15       A.    No.

16       Q.    Would you like to be

17  reinstated to your position as a

18  security guard?

19       A.    No.

20             MR. FLOWERS:  That's all

21  I've got.

22

23        FURTHER DEPONENT SAITH NOT

# FREEDOM COURT REPORTING

1                    C E R T I F I C A T E

2

3       STATE OF ALABAMA:

4       JEFFERSON COUNTY:

5

6            I hereby certify that the above and

7       foregoing deposition was taken down by me

8       in stenotype, and the questions and answers

9       thereto were reduced to typewriting under

10      my supervision, and that the foregoing

11      represents a true and correct transcript of

12      the deposition given by said witness upon

13      said hearing.

14           I further certify that I am neither of

15      counsel nor kin to the parties to the

16      action, nor am I in any way interested in

17      the result of said cause.

18

19

20

21                    _Leslie Hutchfield_

22

23

# FREEDOM COURT REPORTING

**A**

access 86:22
87:2,8
**Accounting**
10:19
act 121:4,5
acting 5:18
action 72:15
97:15 100:7
133:17
activities 137:10
137:21 138:9
138:10,11
Adair 34:19
36:15 37:3
39:17 53:22
57:5 67:9 92:7
92:17 93:5,20
94:1,7 114:19
115:21 124:7
131:17 132:8
address 13:2,8
13:11 14:9
addressed 64:11
ADI 14:7,12
17:8,12,16,20
18:8 19:17,22
20:3,21 22:9
22:11 23:9
24:6,14,15
49:18,19 50:1
50:3 51:12,16
53:18 63:8,15
98:18 112:13
122:21 130:14
131:14,15
132:13
advances 102:1
affirmative 9:23
11:23 18:3
20:9 46:11
48:4 54:15
57:7,21 81:7
81:11 93:7

103:1 107:5
118:5
affirmatively
49:20 52:5
54:14 99:15
124:13
afternoon 91:4
age 12:11,12
ages 12:10
agree 119:6
AGREED 1:15
2:2,10,19
ahead 133:9
aide 21:23
ain't 136:9
Alabama 1:2,11
1:21 4:2,11,22
5:4,9,18 6:2
7:1 9:17 10:11
13:3,6
Alany 3:13
61:10 63:12
allegations
128:12,13
133:6
allege 73:17
100:13
alleged 100:9
alleging 72:18
100:2,21 133:5
133:13
allowed 110:11
110:17
anguish 135:15
136:3,5,6
138:23
answer 7:12,14
7:17,18 38:1,3
50:12 75:3
103:16 133:9
133:19 135:6
answering 48:21
74:15 99:21
answers 7:18

anybody 13:15
26:20 30:17,21
34:20 41:2,21
43:1,9 47:19
48:22 51:8,11
56:19 59:22
60:15,20 64:8
67:4 71:20
73:13 86:12
87:17 88:17
98:17 99:2,10
99:13 101:20
103:22 106:23
131:18,22
132:12,16,21
anymore 43:11
90:3 98:11
113:6 137:1
138:4,6,12,18
anyway 38:11
75:1 76:18
77:19 116:17
APPEARAN...
4:18
appearing 4:23
5:5,9
application
25:14 26:4,7,8
26:10 28:13
approach
115:16 116:6
approaching
78:4 80:3
91:15,17 94:15
104:17 121:11
approximately
18:20 81:21
area 70:11
arm 75:22,23
104:12,13
105:8
arrest 15:12
arrested 15:6
16:18

arrived 34:10,13
asked 8:6 25:11
25:13,17 27:22
55:21 75:17
78:21 96:2
114:21 115:5
115:12 120:9
126:3,5 135:14
asking 75:11,16
78:14 130:22
assign 2:15
assume 24:3
ate 70:23
attached 46:2
61:19 72:4
85:7 101:6
117:21
attempt 23:1
attended 9:8
10:15
attending 9:9
10:7 23:11
attorney 5:8
127:19 130:23
132:17 139:10
attorneys 127:5
127:8,12
139:13
attorney's
132:17
Atwell 124:15
128:3 131:13
132:14,19
139:4
audible 7:19
audiotapes
130:15
authority 49:14
available 24:22
25:1,12 26:2
68:3
A-L-A-N-Y
61:11
a.m 6:3 33:13

34:10,13

**B**

back 28:17
74:22 75:2
76:19 81:3
97:23 110:11
110:17 112:23
113:1,18,22
114:7,22
115:11,19
117:16 124:8
132:1,9
background 9:6
badge 58:3,8
65:10,14,18
66:2,9,14,18
67:2 111:6
badges 57:16,17
58:10,17,20
65:15 66:22
75:7 106:5,6
111:5,12
bankruptcy
16:21 17:1
barbecues
137:20
barbecuing
137:9
basic 35:15
basically 29:18
31:7 34:15
37:18 38:4
40:8 52:13
53:3,6 58:14
69:13,16 70:12
70:23 74:8
78:17 80:10
84:16 101:18
105:23 115:4
126:5 128:16
128:18 136:8
bathroom 45:9
began 19:20

# FREEDOM COURT REPORTING

23:23 44:20
**beginning** 6:3
83:11,13
**behalf** 4:23 5:5
5:10
**believe** 76:18
77:19 79:12
101:17 102:18
**best** 9:2 63:20
**big** 111:7
**bikes** 138:14,17
**Birmingham**
4:22 5:4
**birth** 11:4
**blocking** 30:10
37:12
**blue** 29:8 31:15
**bottom** 49:2
**break** 8:2 45:9
104:3
**breakroom**
70:21
**breaks** 125:9
**bricks** 12:19
**brief** 45:12
104:5
**briefly** 9:6
**brought** 8:16,18
**building** 94:13
94:16
**bunch** 121:15
**Burr** 1:20 4:19
5:23
**busy** 70:2
**bye** 125:4

_____ C _____
**Cahaba** 5:3
**Caldwell** 1:7,18
1:22 4:7 6:3,8
6:20,21 11:18
12:12,15 14:4
**calendar** 130:11
**call** 27:13,18,21

74:2 75:3
82:20 83:2
90:12 91:3,6
91:10 96:23
97:17 98:4,14
99:12 113:2,4
113:7,15
**called** 47:23
82:14 94:13
95:22 96:1,3
115:17 116:13
121:9
**calling** 38:12
74:14
**calls** 38:5,7,9,10
94:11 99:6,9
**call-ins** 38:6
**car** 74:17
**care** 115:16
116:5
**case** 1:5 4:5 6:23
7:23 122:11
128:14 132:4
132:13,18
133:1
**cashier** 18:6,9
19:2 20:13
21:1
**Cathy** 1:7,18,22
4:7 6:3,8,20
**cause** 6:4 87:19
89:2,14 94:12
96:3 100:14
113:5,20
114:11 116:9
120:23 121:11
126:7
**cell** 14:13,15,18
14:22 82:15,18
121:16,20,22
122:1,9
**certain** 87:4
110:3,10
**certify** 5:19

**chain** 49:13
57:14,19
**chair** 76:5
**chance** 46:7
62:1 72:9
**change** 51:20
52:7 57:9
111:3
**changed** 52:6,11
52:17 53:2
57:12 59:16
**changes** 111:8
111:18
**charge** 101:13
**charges** 8:17
**Charles** 9:12,13
9:14 113:5,5,9
113:15 132:1
**check** 30:1,5
37:8,14,15
57:17 58:2,6
58:16 62:11,12
62:15 63:2
66:10 75:7
106:5
**checked** 121:19
**checking** 57:16
58:10 68:15,22
106:5 121:16
**checkpoint**
65:15 66:5,7
**checks** 50:20,23
51:2 64:2
**children** 12:5
13:13,14
**Civil** 5:21
**claim** 8:21
**claiming** 133:17
**claims** 132:23
139:6
**clarify** 7:8
**classes** 56:12
57:2
**Clayton** 5:9

**clear** 66:6
**Cliff** 43:14 49:4
49:7 51:20
60:17,18,20
61:2 74:2,18
75:4,9 82:9,10
84:14 89:16
90:4 91:8 92:6
92:10,16 93:4
94:11,13
117:11,14
119:18 120:1,3
120:7,10,10,11
121:23 127:9
127:18
**Clifford** 60:23
**Cliff's** 75:3
**clock** 64:18
**close** 33:18,19
134:13
**closed** 37:11
**closer** 74:23
76:9
**clothing** 104:23
**code** 13:5
**college** 9:8 10:8
**come** 24:14
27:13,22 28:2
28:11,16 38:5
38:12 43:16,20
61:7 64:10
68:15 74:17
78:10 95:20
110:7,10,17
111:9 112:18
114:22 115:11
116:2,3,4
117:16 122:11
128:23
**comes** 37:19
**comfortable**
115:10
**coming** 38:7,10
65:14 66:1,4,6

66:17 77:7,8
77:12 97:23
108:6 112:23
113:18
**comment** 95:5
**Commissioner**
2:20 4:16 5:19
**company** 12:21
26:7 40:3 70:2
**compensation**
112:9
**complaint** 3:10
69:12 72:14,17
100:3,20 102:8
133:5
**compliance** 2:6
**Complied**
118:17 119:1
**concept** 52:8
**conditions** 17:4
17:7
**conduct** 135:2
**consider** 79:23
**considered**
113:18
**considering**
114:10
**contact** 139:5
**contacted**
139:12
**continue** 80:19
93:14
**conversation**
28:8 30:23
78:16 84:15
97:5
**conversations**
98:17
**convicted** 16:6,9
**correct** 14:9
26:14 29:1
33:5 42:22
46:22 49:5
51:21 67:2,3

# FREEDOM COURT REPORTING

Page 142

72:19 89:7
98:4,14 103:3
103:19 104:11
105:19 106:11
110:19,20
119:14,16
133:14 135:23
**corrective** 100:7
**counsel** 1:17
2:11,13 5:22
**county** 16:14
**couple** 128:7,9
131:23
**court** 1:1 2:7 4:1
5:8,17 7:21
16:1
**coworkers** 70:5
70:7
**current** 13:1
14:8 132:12
**currently** 17:3

**D**

**daily** 105:17
106:17,20
138:9,10,11
**damages** 133:4
133:14,16
**date** 5:20 11:4
119:14
**dating** 70:4,7
**day** 1:23 28:17
28:17 32:20
36:22 37:1,22
38:18,21 39:1
39:2,15 40:7
40:10,14 41:11
41:19 42:9
43:14 74:1,4
80:17,20,22
85:16,22 86:12
87:16 88:18,22
89:2,8,13
90:17 91:1

93:1 95:15
98:17 115:14
115:15 117:5,9
119:19 120:11
120:12 129:13
136:10 137:15
137:17
**days** 27:17
28:12 45:21
48:3 53:23
54:11,13 56:16
56:17,18 61:9
**Deana** 74:3 75:4
77:7,8,12 78:4
78:8,10 80:3
80:15,16 81:9
82:8,22 83:1
84:2 85:1,16
**Deana's** 75:6
84:19
**decided** 74:22
75:1 77:9
**decision** 60:4,8
**declare** 17:1
**declared** 16:20
**defendant** 1:12
4:12 5:1 8:13
**Defendant's** 3:7
45:23 46:5,14
49:3 51:14
52:2 61:17,22
62:7 63:12,18
72:2,7,11 81:3
85:5,10,13
89:5 101:4,9
101:11 117:19
118:1,2,9
119:3,7,11
133:12
**department**
8:22 71:15,18
102:23 103:7
103:13,18,23
106:9,15 107:8

107:13,20
108:4,18,23
109:3,6,15,20
109:22 110:5
110:23
**departments**
112:5
**depends** 19:8
**DEPONENT**
139:23
**deposition** 1:17
1:22 2:3,4,8,16
2:20 6:23 7:4
8:3
**describe** 9:5
40:16 73:16,19
91:12
**described** 27:16
57:4,5 68:17
83:9 91:7
102:18 109:18
111:11 112:2
129:22 135:1
139:2
**desk** 24:20 25:8
28:23 36:8,9
40:19,22 67:22
68:9,19 76:5
86:21 87:13,15
87:22 88:2,15
107:1,4 122:17
123:18
**detail** 126:20
**determine** 7:22
**determined**
65:20
**develop** 125:2
**diary** 130:5
**Dicks** 25:9 28:21
30:23 114:20
115:21 124:7
131:16 132:8
**Dietary** 21:23
**different** 42:13

42:15 54:7
61:1 109:8,10
136:12
**differently**
83:16
**direct** 97:3
**directly** 17:11
36:5,21 86:2
91:11 106:8,14
110:1 111:21
**Discount** 18:2
**discuss** 115:20
**distance** 134:7
134:10
**distress** 134:18
135:9
**DISTRICT** 1:1
1:2 4:1,2
**Division** 1:3
3:13 4:3
**Divisions** 61:11
63:13
**divorce** 75:21
**divorced** 11:10
11:12
**doctor** 134:15
**document** 41:6
46:4,6 61:21
61:23 62:2,7
62:10 72:6,8
72:10 85:9,11
85:12,21 101:8
101:10 117:23
118:2
**documents** 46:8
46:14 122:15
123:4,12,20
130:17,21
131:1
**doing** 38:21 39:4
39:5 77:17
78:20 93:23
121:2
**don'ts** 69:18,19

**door** 76:3 78:9
**doors** 30:2,5
37:9,12,16
67:19 68:22
**dos** 69:18,19
**drafted** 88:12
**drawer** 87:12
**drive** 34:6,6
**driving** 15:16,18
16:7 91:2
**due** 74:6
**duly** 6:9
**duties** 38:21
42:1 57:5,9
67:16 68:13
**duty** 3:11 74:4
91:16 105:17
106:9 107:9
120:1,1

**E**

**E** 4:20
**earlier** 57:4
68:17 94:15
102:18 111:10
129:22
**Earnings** 3:9
**earplugs** 88:5
**education** 9:7
**educational** 9:6
**EEOC** 3:12 8:17
101:13
**effect** 2:5
**effects** 134:23
**eight** 32:13,14
32:17,23 42:20
43:2
**Eisenberger**
43:14 49:5
51:20 60:18,21
61:1,2 74:3
82:10,13 83:17
86:3 91:9 92:6
92:16 93:4,20

# FREEDOM COURT REPORTING

94:1,7 95:11
95:13 96:12
97:17 98:13
99:7 117:12
127:10
**Eisenberger's**
49:8 83:20
**either** 23:2
48:18 67:17
93:19 114:19
**emergency**
122:11
**emotional**
134:18 135:9
135:16
**employed** 12:20
14:6,12 17:7
17:10,15,18
18:16,22 19:20
20:1 23:8 40:4
50:18 51:5,7,9
59:1,20 62:16
110:6 114:15
130:4 131:2
**employee**
102:20 106:10
**employees** 65:7
66:15,20
109:23 110:5
130:14 131:14
132:12
**employer** 8:17
**employment**
17:23 18:8
19:15,16,21
21:1 22:12
23:9 24:5,8
35:16 43:8
44:16 52:3
54:23 57:10
73:7 97:23
123:8,21
125:15 128:5
130:8,18

131:10,15
134:2 135:3
**ended** 128:6
131:16
**engage** 137:22
**enter** 111:6
**entire** 85:18
118:11
**entity** 1:11 4:11
**envelope** 64:10
**equipment** 30:9
**estimate** 79:5
127:22
**Eubank** 4:20
135:12,17
**evening** 137:7
**everybody** 66:1
66:6,12 70:23
134:11
**evidence** 2:17
**exactly** 49:9,12
83:23 94:22
97:3 102:10
124:22
**examination** 3:2
6:5,17
**examined** 6:9
**examples** 46:22
**Exhibit** 45:23
46:5,14 49:3
51:14 52:2
61:17,22 62:7
63:12,18 72:2
72:7,12 81:4
85:5,10,13
89:5 101:4,9
101:11 117:19
118:1,3,9
119:4,7,11
133:12
**EXHIBITS** 3:7
**exit** 30:2,5 37:9
37:12,15,15
67:19 68:22

**exits** 30:10
**explain** 39:3
111:20
**explained**
111:16
**express** 116:20
**extinguishers**
37:13,16 68:23
**ex-husband**
12:16

_____
**F**

**F** 5:3,7
**facilities** 53:20
**facility** 26:22
28:23 32:10
33:22 34:7
61:8 68:16
70:11,17,19
91:2 92:21
93:1 95:14
102:22 110:1
110:11,15
122:9 132:9
**fact** 74:6
**fall** 44:21
**family** 137:10
**far** 22:11 24:19
33:21 34:4
35:9 37:7 48:3
49:14 53:4
66:15 71:9
111:4 115:23
**Federal** 5:20
**feel** 50:18 77:16
96:7 102:11,14
115:10 126:22
136:15
**felt** 50:14 51:6
75:13 89:23
113:21 116:17
**female** 108:22
109:2,4
**field** 34:2

**file** 112:8 122:21
124:10
**filed** 6:23 72:15
101:14
**files** 123:4
124:11
**filing** 2:19 127:1
**fill** 26:10 35:6
40:17 41:2
64:14
**filled** 26:12
28:12 35:8,11
35:13 40:12
105:18 124:1,2
124:4
**find** 31:21
**fine** 78:20
**finished** 106:21
119:2
**fire** 37:12,16
68:22 107:17
**fired** 59:9 110:8
**first** 6:9 17:22
18:15 24:10
33:9 34:5 40:7
40:9 42:9 43:3
43:6,13 44:1
47:2 49:3 54:7
57:15 73:3
78:13 81:4
89:6,21 92:4
94:9,20,23
97:12 98:3,12
102:4 111:3
116:10 118:8
118:11,13,20
121:1,3 124:20
124:23 125:19
126:8 127:18
128:4
**fit** 24:18
**fits** 31:20
**five** 14:1 42:20
43:2

**five-minute**
104:3
**fixing** 91:15
**floor** 53:13 65:8
66:21
**Flowers** 3:3 4:20
6:15,17,22
45:10,14 104:2
104:7 139:20
**folder** 40:23
41:8 123:7
**follow** 38:20
41:21
**following** 6:5
33:3,3 43:15
**follows** 6:10
**football** 34:1
**force** 2:5
**forced** 101:17
102:11,15
**foregoing** 5:21
**forget** 96:16,17
98:8
**form** 2:12 7:19
133:9 135:6
**Forman** 1:20
4:19 6:1
**former** 132:12
**forms** 136:6
**four** 55:12 92:14
**Fred's** 18:1,2,9
18:11,23 19:9
24:7,10
**front** 28:22
33:20 76:10
78:9 104:18,20
105:8 106:23
**full** 2:5
**full-time** 10:20
10:22 23:19
**FURTHER** 2:1
2:9,18 139:23

_____
**G**

## FREEDOM COURT REPORTING

**Gary** 5:13 84:4
84:7 89:16
90:5 92:11
97:11 98:20
**GED** 10:3 11:2
24:2
**getting** 15:22
91:16
**give** 26:3 27:4
35:19 36:4
38:17 39:7
56:7,19 58:7
86:11 106:20
106:22 124:6
**given** 9:1 69:15
**giving** 58:11,19
**go** 9:10,21 25:5
49:15 50:15,20
50:22 59:3
70:10 71:4
75:6,17 76:2,4
76:23 78:15,21
87:7 91:16,21
102:5,6 107:12
107:19 108:3
110:9 112:18
113:3 114:8
126:19 129:7
133:9 136:23
137:1,1,11,14
137:16
**goes** 37:20 74:17
**goggles** 87:6
88:5
**going** 29:16 36:6
49:21 75:20
76:16 77:15
79:12 84:4,5
90:2 93:11,12
93:15 94:6,20
95:3 96:9,17
98:7,9,10
106:17 110:13
111:8 113:22

114:7 116:14
116:16
**good** 7:17
113:23
**GOOZEE** 5:2
**grabbed** 76:13
**graduate** 9:18
**ground** 7:7
76:23
**grounds** 2:15
**guard** 14:7,12
17:8,12,16,20
19:16,21 20:3
20:21 23:8,17
24:6,15,20
25:8,19 27:1
33:16,17 34:9
34:13,21 36:16
37:8 38:13
40:19,20 48:14
48:19 57:23
58:3 65:4 67:5
67:18 68:14
71:1 74:22,23
75:2,5,8 77:20
78:11 79:13
80:1 83:3
91:18 104:9
106:4 113:10
113:21 121:23
122:8 123:13
128:6 129:1,6
130:1,4,8,19
131:2,11 134:3
135:4 139:18
**guards** 49:14
58:21 87:5
122:10 129:17
**guess** 36:11 58:5
67:8 129:8
131:16
**guessing** 48:16
**guidelines** 129:8
129:19

**H**
**handbook** 69:9
**handbooks**
69:15
**handed** 69:16
**handle** 58:10
**handwritten**
118:12 119:3,7
**happen** 71:13
77:4 81:16
101:21 107:23
134:10
**happened** 30:12
31:12 32:7
33:6 34:12
68:5 71:6,8,10
73:20,22 74:7
74:11,21 76:15
77:10 80:4,11
82:7 86:7,8,10
89:3 91:13
92:15 97:14
98:21 99:3
100:12 102:3
103:21 107:15
121:4,5,13
128:16 137:4
138:19
**happens** 103:9
103:10,14,19
**harassed** 72:18
73:18 100:3
**harassment**
73:23 79:23
102:9
**hard** 77:2 134:5
134:11
**Hartsfield** 1:19
4:15 5:17
**head** 7:21 49:20
52:5 54:14
60:10 99:15
124:13 135:18
**headed** 89:14,15

**hear** 135:18
**heard** 27:12
100:15 120:23
126:4,11
135:19,21
**held** 17:23 19:15
20:18 21:10
22:8
**Henderson** 9:12
9:14
**hereto** 46:2
61:19 72:4
85:7 101:6
117:21
**high** 9:7,10,14
9:22 11:1
125:4
**higher** 67:13
**Highway** 13:3
21:19
**hire** 60:4,8
**hired** 29:23
**hold** 20:14 22:1
101:1 105:14
**home** 13:1 20:7
21:22 22:22
32:8 82:15
95:12,21 99:18
130:19 131:6
**Horsley** 5:2,3
6:14 23:5 45:8
46:9 62:3
81:13 118:18
118:21 120:13
133:8,18 135:5
135:14
**hour** 29:18
105:23
**hours** 19:4,7
22:17 56:1,15
**house** 82:18
95:22 96:1
99:6,10
**HR** 99:2 119:13

**Huh** 109:1
**huh-uh** 7:20
23:4 60:1
**human** 84:11
**hung** 75:10 97:4
**hurt** 71:11
107:17,18
108:12,15
**husband's** 11:14

**I**
**ID** 58:6
**idea** 18:18 20:20
33:23 68:4
124:9
**identification**
46:1 61:18
72:3 85:6
101:5 117:20
**image** 51:15
**immediately**
82:21 92:19
**incident** 71:12
74:20 80:1
81:19 82:19
86:9 88:19
104:8 127:15
129:21 134:1
**incidents** 102:21
102:21 106:11
109:17 134:20
**include** 109:11
**incorrect** 119:10
120:15,17
**INDEX** 3:1
**indicated** 75:23
104:18
**individual** 1:7
4:7
**information**
27:5 52:14
111:15 123:8
132:23
**injured** 107:14

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| injuries 102:20 106:10 | 135:21 | 68:7 69:14,17 69:23 70:1,1,2 | 136:16,17,18 137:5,6,9,23 | 16:7 |
| inside 36:7 | kept 15:22 65:7 | 70:4,13 71:11 | 138:2,4,8,8,15 | lies 121:15 |
| 48:20 50:20 | 122:15 123:3,9 | 71:12,12,13 | knowing 102:12 | little 76:5 111:4 |
| 53:13 66:16,21 | 123:13 130:11 | 72:8 73:5,9 | knowledge 9:3 | 137:6,10 |
| 75:6,8 86:17 | keys 87:5,10 | 74:9,12,17,20 | 53:11 88:11 | 138:16 |
| 87:7 91:15,18 | KFC 20:6 21:7 | 75:16,18,21 | | live 12:13,16 |
| 91:20 106:3 | 21:15 22:19 | 76:11 77:16 | ——— L ——— | 13:17,22 |
| 121:13 137:2 | 23:2 | 78:8 79:3,7 | | lived 13:7,10 |
| interaction | kickball 138:15 | 80:17 81:1,1 | L 1:14 | 14:1 |
| 109:18 | 138:18 | 82:17,17,18 | Labor 8:22 | living 14:8 |
| interfere 56:3,6 | kids 137:8 | 83:15 84:7 | late 137:7 | LLC 1:11 4:11 |
| 56:9 | 138:15 | 87:9 88:10,11 | LAW 5:8 | LLP 1:20 4:19 |
| interfered 57:1 | kind 29:4 54:3 | 89:1,1,3,21 | laws 2:6 | 5:2 6:1 |
| interview 27:23 | 83:10 | 90:18,23 92:1 | lawsuit 8:13 | lobby 51:1 |
| 28:4,5 | KING 5:2 | 92:14 93:13 | 127:2 | location 19:10 |
| involved 68:14 | kiss 105:12,15 | 94:2,12 96:5,7 | lawyers 139:5 | lockbox 86:14 |
| issue 135:13 | kissed 76:14 | 96:9,15,16 | lay 7:6 12:19 | 86:15,23 88:2 |
| | kissing 105:9 | 97:2,3,4 100:6 | laying 40:18,21 | 88:8,14 122:16 |
| ——— J ——— | knew 41:4 49:11 | 100:11,15,17 | layout 52:10,11 | 123:19 |
| jail 16:11 | 74:10 102:3,9 | 101:19,20,23 | 52:17 53:2 | long 11:11,19 |
| January 15:9 | 116:18 | 102:6,7,7,9 | leading 2:13 | 13:7,22 18:7 |
| 74:1 81:5 89:7 | know 8:3 16:15 | 105:16 106:1 | leave 22:23 23:3 | 20:14,20 21:9 |
| 90:9,14,20 | 21:2,9 24:18 | 107:18 108:20 | 77:3,9 95:7 | 22:1 27:15 |
| Jenkins 12:11 | 24:23 25:7 | 109:7 110:14 | 96:2 106:23 | 40:9 43:13 |
| job 12:18 20:15 | 28:1 29:16,17 | 110:18 111:7,9 | 107:3 | 44:10 78:2,23 |
| 24:11,17 28:2 | 30:1,3 31:23 | 111:9 113:20 | leaving 22:19,22 | 79:6 80:14 |
| 30:13,14,18 | 35:16,18 37:10 | 114:13,14,16 | left 18:7 19:16 | 82:19 100:17 |
| 31:6,9 35:3 | 37:19 40:3 | 114:18 115:9 | 36:11 40:11 | 105:14 127:22 |
| 57:6 109:19 | 42:14,16 44:14 | 116:8,9 117:14 | 75:8 77:12 | look 32:1 51:16 |
| 112:6,15,19,22 | 44:14 45:4,7 | 118:10 119:15 | 78:5,10 80:4 | 52:1,4 89:4 |
| 114:9,17,20 | 45:18 46:6 | 119:15,22 | 92:18,19,21 | 122:13 123:14 |
| 121:12 134:12 | 47:13,22 48:7 | 122:3,5,7,11 | 94:12 95:16 | looked 46:9 62:4 |
| 136:14,14 | 48:12 49:7,9 | 122:19,20,23 | 96:4 98:6 | 62:5,19,21 |
| jog 138:14,17 | 49:11,17 50:6 | 123:3,9,11,12 | 100:18 115:18 | looking 24:17,17 |
| Johnston 113:14 | 50:8,9,10,11 | 123:16 124:15 | 120:10 121:7 | 81:3 |
| Jr 4:20 5:7 | 51:4 52:16 | 124:22,23 | legal 1:11 4:11 | lookout 37:19 |
| June 1:23 | 53:1,4,5,18,21 | 125:23 126:4 | legs 76:8 104:10 | looks 81:4 |
| | 54:9 56:16 | 126:20,21,22 | 104:17,19 | Lost 133:20 |
| ——— K ——— | 59:12,15,21,22 | 127:5,7,20 | 105:8 | lot 37:15 67:19 |
| K 1:19 4:15 5:17 | 60:3,7,11,15 | 128:17,22 | Leslie 1:19 4:15 | 68:17 74:16 |
| keep 37:19 | 60:22 61:4,10 | 132:16,21 | 5:17 | lots 37:8 |
| 130:5,7 134:6 | 61:23 63:15 | 134:4,6,6,8 | Let's 104:2 | loud 118:16 |
| 134:10 | 64:4 65:6,20 | 136:8,13,15,15 | level 39:22 | |
| KELLY 5:7 | 66:16,17,19 | | license 15:20 | ——— M ——— |

# FREEDOM COURT REPORTING

machine 99:22
machines
  108:13
Maddox 72:19
  72:21,22 73:4
  73:10,18 92:3
  100:8 101:22
  103:23 109:11
  109:13 114:14
  115:22 125:12
  127:15 129:23
  134:1 135:2
Maddox's 117:1
mail 70:13,14
major 10:17
  106:11 111:7
making 53:5
  106:2
man 114:12
management
  99:2
manager 72:23
  73:1 84:12
  90:1 93:13
  101:23 106:18
manila 40:23
  41:8
Manor 20:6,8
  21:22 22:22
  23:2
March 112:13
  112:14 117:2,6
  132:9
Marcus 11:16
  12:15
marked 46:1,4
  61:18 62:7
  72:3 85:6,9,12
  101:5,10
  117:20 118:2
marking 61:21
  72:6 101:8
  117:23
marriage 12:3

married 11:9,19
  11:21 75:19
  76:2
Marshay 12:12
material 118:13
  119:3,8
mean 9:22 16:10
  30:7 48:2
  49:22 50:19
  52:8 65:12
  66:15 69:7
  71:7 83:8
  90:17 98:6
  100:23 107:16
  108:5,6 112:20
  114:21 115:23
  116:1 122:4
  123:23,23
  125:19 131:19
  138:16
Meaning 103:16
means 103:17
medical 17:4,6
  22:23 23:2
medications
  8:10
meet 43:14 61:6
  73:3 120:5
meeting 89:17
  89:18 90:5,12
  91:8,23,23
  92:2,9 96:7,19
  97:1,5,9,11
  119:13 120:3
  121:10,13
  129:12,14
mental 135:15
  136:3,5,6
  138:23
mentioning
  117:1
messages 121:17
  121:18,20
met 36:15 37:3

119:18 121:14
  124:21,23
Michael 12:11
MIDDLE 1:2
  4:2
minutes 79:4,5
missing 124:10
  124:12
mistaken 92:12
  117:13
Misti 25:9 27:19
  27:20 28:21
  29:13 35:21,22
  40:11 48:9,10
  51:3,4,9 52:16
  53:3,4 60:16
  60:21 64:8
  68:2 114:6,20
  115:5,21 124:7
  124:8 131:16
  132:7
Misti's 48:12
Misty 26:13
misunderstood
  94:14
mix 54:4
moment 133:3
Monroe 1:20 6:1
Montgomery
  1:21 6:2 12:17
month 18:13
  42:6 127:21
months 18:18,21
  45:1,6,15 73:8
  132:1
morning 32:14
  32:16,18 35:14
  35:23 36:2
  42:15,19 43:17
  81:10 91:4
mother 13:12
mouth 105:13
move 55:23
moved 43:12

55:19 76:2,4
moving 55:17
  76:9

_____N_____

N 1:14
name 6:19,21
  11:15,17 25:7
  41:1 61:13
  108:21 113:13
  116:2,3 117:1
named 99:13
names 12:9
  45:21
near 33:19
necessary 2:10
need 7:8 8:2
  87:5 96:10,11
needed 39:4
  87:1
negative 23:4
  60:1
negatively 60:10
never 48:18 61:6
  113:1 120:11
  120:18 121:4,5
  121:9 124:5
new 52:10 58:22
  129:7
night 115:15
  116:5 137:2,8
  137:12,20,20
Nodded 49:20
  52:5 54:14
  99:15 124:13
nodding 7:20
normally 136:17
  136:19,21
North 4:21
NORTHERN
  1:3 4:3
notes 130:7
notice 2:19
notified 46:18

notify 71:14,17
  74:9
number 1:5 3:2
  4:5 11:7 14:16
  21:3 99:18,19
  121:23 122:1,9
  139:8,9,14
numbers 49:4
Nursing 20:7
  21:22 22:22

_____O_____

O 1:14
Object 133:8
  135:5
objection 133:19
objections 2:11
  2:14
occasions
  107:12 108:3
  110:22 111:23
occur 31:2
occurred 32:21
  81:20 97:6
  102:22 104:8
  137:22
October 31:3
  44:17
offense 89:21
  92:4 94:20
  95:1 97:12
  121:3 126:8
offer 30:14
  114:20
offered 2:17
  30:18 31:6
office 38:8,11
  70:10,16,19
  71:4 73:11
  74:15 86:16
  109:14,16
  124:18 125:1
officer 39:22
  42:5 44:17

# FREEDOM COURT REPORTING

45:2 54:23
57:6,11 59:1
59:10,20 60:5
61:14 62:17
63:20 64:3,16
65:11,14 66:9
67:10,17 69:6
70:9,22 71:4
71:22 107:22
123:22
**officers** 39:14
42:11,22 52:1
53:19 58:23
59:8,13,18
60:9,12 65:3
65:23 66:8
67:6,14 68:14
69:2 88:9
105:18
**offices** 1:19 5:23
109:14
**Oh** 23:6
**okay** 7:2,10 8:4
115:11 118:14
119:12,12
120:18
**once** 25:10
106:21 108:1
114:11 116:5
124:4 129:4
**open** 25:18,19
25:22,23
**oral** 6:4
**order** 111:6
**outside** 125:6
136:23 137:1,3
137:9,12,14
**owner** 49:18,19
49:22,23

_____
**P**
**P** 1:14
**Packer** 21:8
**page** 3:2 49:3

81:4 89:5
118:8,11,13,19
118:22,23
120:14
**pages** 46:8 52:2
**paid** 65:21 117:8
**pain** 133:20,23
134:17 135:8
**pair** 88:4
**papers** 35:16,17
35:20 36:18,23
124:1,2,6,10
**paperwork** 35:7
35:12,13 38:18
40:10,17,21
41:6
**park** 13:19
137:7,20 138:1
**parking** 37:8,14
67:19 68:17
74:16
**part** 23:17,18
50:1,3 51:12
53:8 90:2
93:13 109:19
112:6
**particular**
119:19
**parties** 1:16
2:14
**part-time** 10:21
**pass** 58:11
**passed** 78:2,23
**pay** 29:18 59:16
63:19
**paychecks** 64:8
**paying** 15:23
**PC** 5:7
**penalty** 8:7
**people** 38:12
42:14,16 50:16
57:17 65:14
66:17 68:15
92:13 107:16

109:5,8,9,10
134:5,7,8,14
136:15
**perform** 134:11
**performing**
67:16
**perjury** 8:7
**person** 102:4,10
110:10
**personal** 75:11
130:10
**personnel**
122:21 123:4,6
**phone** 14:14,15
14:18,22 38:1
49:4 74:15,21
75:4,10 78:14
78:18 79:1
82:15,16 84:14
91:3,6 98:13
99:18,19
121:17,20,22
122:1,9 127:10
127:18
**phones** 38:3
48:21
**phrased** 133:11
**physician**
134:16
**pick** 50:21,22
**picked** 50:19
**Pike** 16:16 20:6
20:8 21:22
22:22 23:2
**Pineview** 13:19
**place** 17:14,22
18:15 24:11
87:4 116:10
**places** 19:19
20:5 24:7
**plaintiff** 1:8 4:8
5:6,10 8:13
**plans** 16:23
**plant** 30:2,6

37:9 38:12
66:16,21 68:20
68:21 71:10
74:7 75:7 77:7
77:8 87:8
102:4 106:4
108:7 111:8
**play** 138:15,18
**player** 134:13
**please** 6:18
**point** 96:22 97:3
138:2
**policies** 39:7
69:5
**policy** 70:3
**position** 18:5
20:11 21:6,10
21:21 22:2,8
22:11 24:21
25:19 27:2,5,9
27:12 39:18,21
40:1 48:13,23
49:8,10,12
67:12 139:17
**positions** 25:1
25:11,18,22,23
26:2
**possession**
130:19 131:4
**possible** 90:19
90:22
**posted** 47:2,4,7
47:11
**Prattville** 5:18
**present** 5:12
30:21 129:10
**presented** 64:12
**press** 38:6
**previous** 136:14
136:14
**primary** 33:22
**prior** 2:17
**problem** 47:23
71:21

**problems** 47:15
**procedure** 5:21
69:12
**proceedings** 6:6
**produced** 85:11
**production**
53:13 65:8
66:21
**programs** 39:11
**promoted** 59:13
**provided** 5:20
37:22 38:15
**provider** 15:3
**psychiatrist**
134:16
**psychologist**
134:16
**pulled** 76:13
**pulling** 121:11
**pushed** 76:21,21
77:11 78:3,7,8
105:15
**pushing** 79:2
**put** 57:13 86:13
87:5 88:13

_____
**Q**
**qualifications**
27:8
**quality** 106:8
**question** 7:8,12
7:14,15 56:11
63:23 66:6
101:2 136:2
**questions** 2:12
2:13 8:6 47:19
75:12
**quit** 22:14
100:15 102:11
102:15 110:8
125:20,21
**quitting** 22:16

_____
**R**
**raised** 8:21

Rance 72:19,21
72:22 73:18
74:6,9,13 75:8
81:20 82:3,7
83:12,12,23
89:17,20 90:6
92:3,11 93:12
95:4 98:8,22
99:3 101:22
102:5,6 103:23
104:8 115:22
120:21 121:2
125:12 127:14
129:23
read 118:8,15,16
118:18,21,23
reading 2:3
119:2
ready 91:16
really 41:9
51:15 69:21
78:18 106:18
113:19 123:14
137:17 138:1
138:20
reask 133:10
reason 22:15,18
22:21 55:22
reasons 50:17
71:2 88:6
102:14
recall 14:16 15:2
18:12 19:19,23
21:12,15 22:4
23:22 26:6
28:7 29:6
30:22 31:5
32:20 35:12
44:4 45:15
47:1 62:18
63:6,7,9 64:5
69:4 70:6 73:4
79:18 80:22
81:18 84:13

87:14 88:21
89:12 93:19
94:3 97:7,16
99:17 107:23
108:2 116:23
126:17 129:5
129:18
receive 40:10
41:18 62:15
63:3 64:7 69:8
69:11 99:5,9
received 40:17
63:19 64:2
131:1
receiving 69:4
receptionist
48:14 51:3
87:18
receptionist's
36:9 67:22
68:9,18 86:20
87:13,15,22
88:2,14 107:1
107:3 122:16
123:17
recess 45:12
104:5
recognize 46:13
72:11 85:12
101:9
recollection
63:21
record 3:9 6:19
7:12
records 64:15
64:17
reference
118:14
reflect 7:13
63:19
regarding 27:12
86:9 139:5
regular 35:15
138:9

regularly 103:12
103:17 121:19
reinstated
139:17
related 123:8,21
130:18 132:23
relating 2:7
relationship
125:3
relieved 42:16
remainder 90:8
remember 17:17
18:14 20:16,17
31:4,18 40:6
41:7,9,12,14
41:15 43:18
44:23 47:6
62:20 63:1
64:13 69:22
79:9,11,15
83:8 108:14,19
113:12
report 3:11
32:10 33:13,15
76:17 77:15
80:13 101:19
101:20 102:19
102:23 103:7
103:13,17,22
105:18,22
106:8,10,15,21
107:8,9 108:4
108:17
reported 105:21
108:9,10,11,20
119:23
reporter 5:18
6:12 7:21
reporting
106:19 109:17
reports 106:17
required 42:5
66:11 69:22
70:18 103:6

106:14 108:3
111:5
resign 101:17
resigned 17:19
125:14 131:10
resigning 135:3
resolved 16:4
84:6
resource 84:12
respective 1:17
response 7:22
10:1 12:1 18:4
20:10 23:4
25:15 46:12
48:5 54:16
57:8,22 60:2
80:12 81:8,12
83:21 93:4,8
96:13 103:2
107:6 118:6
responsibilities
71:3
responsive 7:14
rest 81:23 82:4
122:8
result 92:1
retaliated
100:21
return 23:1
92:23 112:10
112:12
returned 117:12
returning
127:11
review 46:5,7
61:22 62:1
72:7,9
Reviewed 62:2
72:10
revoked 15:17
15:18,21 16:8
Richard 5:3
ride 138:14,17
right 66:22 67:3

76:3 81:6,16
87:21 95:6,8
103:14 104:16
111:12 121:12
rights 96:8
risk 116:12
road 5:4 21:18
33:19
Robin 124:15
128:2 131:13
132:14,19
role 60:12,16
61:5
Ron 6:21
Ronald 4:19
room 30:22
round 106:3
rounds 75:6
106:2
routine 111:4
rubbed 104:10
104:13,19
105:5
rubbing 75:23
76:8 79:15
104:22 105:7
rules 2:7 5:20
7:7 58:9
run 116:9
running 116:12
Ruth 99:13,14
Ryan 99:13,14

___

**S**

S 1:14
safety 35:18
41:6 50:13
71:4,15,17
72:23 73:1,11
87:6 88:4 90:1
90:2 93:13,14
101:22 102:20
102:23 103:7
103:13,18,22

# FREEDOM COURT REPORTING

Page 149

| | | | | |
|---|---|---|---|---|
| 106:15,18 | 89:4 91:4 | 74:16 77:7 | 54:18,20,21,22 | 112:5 122:8 |
| 107:8,13,20 | 118:19,22,23 | 118:2,4 123:20 | 55:4,10,13 | 127:2,11 |
| 108:4,18,22 | **security** 11:6 | 124:5 134:15 | 57:1 | 128:12,13,14 |
| 109:3,6,15,20 | 14:7,12 17:8 | **self-employed** | **shook** 60:10 | 129:8 130:14 |
| 109:22 110:4 | 17:12,15,20 | 12:23 | 135:17 | 131:15 132:13 |
| 110:23 111:15 | 19:16,21 20:3 | **semester** 23:22 | **shoulders** | **SMART's** 50:16 |
| 124:17 125:1 | 20:21 23:8,17 | **sent** 130:23 | 104:11 | **smoke** 108:6 |
| 129:8 | 24:6,15 36:16 | **separate** 109:14 | **show** 64:1 | **social** 11:6 |
| **SAITH** 139:23 | 38:8,11,13 | **serve** 16:11 | 122:12 | 134:17 |
| **Saturday** 33:1,3 | 39:14,22 41:13 | **service** 15:2 | **showed** 37:6 | **somebody** 61:1 |
| 33:5,9 34:14 | 42:4,11,22 | **sexual** 73:22 | **showing** 38:4 | 107:13,14,18 |
| 36:13,15 81:6 | 44:17 45:2 | 79:23 102:1,9 | **side** 108:6 | 110:16,22 |
| 81:16 87:19 | 47:5,11 49:14 | **sexually** 72:18 | **sign** 35:17 36:18 | 122:12,14 |
| 89:3 90:8 | 52:1 53:19 | 73:18 100:3 | 36:21,23 | **son** 61:3,6,7 |
| **saw** 77:6,11 78:4 | 54:23 57:6,11 | **shack** 33:16,17 | **signature** 2:2 | **Sonya** 4:20 |
| 106:3 109:8 | 57:20 58:22 | 34:10,13,21 | **similar** 62:21 | **son's** 61:4 |
| **saying** 28:8 | 59:1,8,10,12 | 36:16 38:13 | **sit** 33:19 | **soon** 73:6 |
| 45:20 48:17 | 59:18,20 60:4 | 40:19,21 41:13 | **site** 121:12 | 125:21 127:17 |
| 73:22 79:9,12 | 60:8,12 61:14 | 47:5,11 57:20 | **sits** 33:18 | 128:1 |
| 79:15,18 93:20 | 62:17 63:20 | 57:23 58:3 | **sitting** 24:20 | **sorry** 23:6 |
| 97:12,17 116:8 | 64:3,15,23 | 64:23 65:4 | **six** 45:5 | **sort** 42:6 69:12 |
| 120:22 126:18 | 65:2,11,13,23 | 67:5,18 68:15 | **size** 31:19,20,22 | **sought** 24:8 |
| 126:20 | 66:4,7,8,9 67:5 | 71:1 74:22 | 32:1 | **sound** 31:7 |
| **scared** 134:13 | 67:10,13,17 | 75:1,2,5,9 | **slash** 48:14 | 81:15 |
| **schedule** 24:19 | 68:13 69:2,5 | 78:11 80:1 | **sleep** 75:18 | **speak** 80:14 |
| 48:8,10 51:17 | 70:9,22 71:3 | 83:3 91:19 | **SMART** 1:11 | **special** 65:13 |
| 53:5 56:5,8,21 | 71:22 86:16 | 104:9,9 106:4 | 4:11 7:1 8:19 | **specific** 12:20 |
| 56:23 60:13 | 88:9 102:21 | 121:23 122:8 | 14:8,13 25:6 | **specifically** 97:8 |
| **scheduled** 45:19 | 104:9 105:18 | 123:5,13 129:1 | 25:14,21 26:1 | 110:15 |
| 47:15 56:13 | 107:22 113:10 | 129:6 130:1 | 26:21 28:18 | **Speeding** 15:16 |
| 88:22 89:6 | 123:5,21 128:6 | **shaking** 7:20 | 33:20,20 35:18 | **spent** 26:17 |
| **schedules** 3:8 | 130:4,8,18 | **share** 43:9 | 36:7 48:20 | 48:20 |
| 46:17 47:2 | 131:2,11 134:2 | **sheet** 45:20 | 50:1,3,5,7,13 | **split** 78:6 |
| 51:23 | 135:3 139:18 | **Shelburne** 74:3 | 50:14,18,20 | **spoke** 82:22 |
| **scheduling** 48:1 | **see** 28:1 51:15 | 81:10 | 51:7,12 53:13 | 83:1,16 86:2 |
| 48:2 60:12 | 52:19 61:13 | **shift** 34:16 42:17 | 53:20 58:13 | 128:20 131:17 |
| **school** 9:7,11,15 | 63:11 82:3 | 42:18 43:2,9 | 63:3 65:8 | **spoken** 131:18 |
| 9:21,22 10:14 | 95:13,17 | 43:10 54:7 | 69:17 70:11 | **Sport** 5:13 84:5 |
| 11:1 23:11,14 | 101:21 111:13 | 80:18 81:10,19 | 71:13 73:1 | 84:7 89:17 |
| 24:19 56:3,4,8 | 113:5 119:16 | 82:1,4,8 89:6 | 86:18,19 91:11 | 90:5 92:11 |
| 56:16,17,20 | 119:21 120:4 | 90:8 91:4,5 | 91:15,18,20 | 97:11 98:21 |
| **schooling** 10:23 | 120:19,23 | 107:2 | 98:18 99:2,10 | **spring** 24:3 |
| **second** 40:14 | 123:15 | **shifts** 42:21 | 100:4,16,18,22 | **Square** 5:8 |
| 41:11,19 78:7 | **seen** 24:19 62:6 | 47:15,19 54:8 | 101:14 111:6 | **Stan** 34:19,21 |

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 35:19 41:15,17 | stays 132:2 | supervisor | talked 29:13 | thing 27:11 |
| 53:22 55:18 | STIPULATED | 39:20 67:10 | 75:9 95:21 | 29:23 34:5 |
| 56:20 57:5 | 1:15 2:1,9,18 | 73:14 | 112:15 117:14 | 35:9 57:12 |
| 58:18 59:6 | stipulation 5:22 | supervisory | 120:11,12 | 78:18 79:11 |
| 67:8,9 68:12 | stipulations | 40:1 | 127:9,17,19 | 96:21 106:7 |
| 71:19 89:16 | 6:13 | suppose 96:3 | 128:2,3,4,7,16 | 108:11 122:13 |
| 90:4 92:6,10 | stocker 18:6,9 | supposed 37:7 | 131:14,19,21 | things 103:6 |
| 92:16 93:5 | 19:2 | 68:8 69:14 | 132:1,2,7,11 | 109:23 110:3 |
| 94:9,10,16 | stood 63:16 | 70:10,16 71:17 | 132:18,22 | 136:9,16,20 |
| 96:3,5,6,21 | stop 14:21 | 119:17 120:5 | talking 46:18 | 138:3 |
| 111:11,14,16 | store 18:2 19:11 | sure 6:14 7:18 | 69:20 93:23 | think 14:23 |
| 114:6,19 | 21:2 120:20 | 15:1 24:4 30:1 | 94:5,8 117:2 | 21:13 22:10 |
| 115:12,17,20 | 121:8 | 30:3,6,9 32:17 | 129:16 | 32:16,17 34:4 |
| 116:13,15 | story 83:10 | 37:9,10,11,12 | tapes 130:13 | 44:12 50:2 |
| 117:14 120:1,2 | street 1:20 4:21 | 37:16 44:13,19 | tax 41:5 | 84:11 87:17 |
| 120:7,12,20,23 | 6:1 21:18 | 45:3 47:8,9 | taxes 35:9,12 | 88:23 89:2 |
| 124:7 131:16 | stress 135:16 | 49:23 90:11 | team 134:12 | 92:12 108:12 |
| 132:8 | strike 116:4 | 92:13 117:17 | tell 25:10 27:7 | 122:18 127:23 |
| standing 76:3 | stub 62:11,12 | 119:12 122:2 | 28:10 29:14 | 129:3 131:23 |
| start 55:7 57:17 | stubs 62:16 63:2 | Surgery 22:20 | 32:9 35:2 38:2 | 134:8 135:7,10 |
| 58:23 78:14 | student 10:21 | sworn 6:9 9:1 | 39:17 41:2 | 135:22 136:1 |
| 115:15 | 23:19 | | 48:16,22 51:8 | 136:18,19,21 |
| started 18:10 | stuff 30:3,4,6 | **T** | 51:11 52:21 | thinking 50:1 |
| 20:2,21 33:8 | 35:8,10,16 | T 1:14,14 | 55:20 62:3 | 114:12 116:8 |
| 35:3 43:3,6 | 53:5 68:23 | take 6:22 26:11 | 68:11 71:20 | THOMAS 5:7 |
| 50:9,12 54:17 | 69:23 70:5 | 38:6 45:8 | 73:13 74:18 | thought 135:19 |
| 55:6,9 56:16 | 75:16,21 111:7 | 70:13 84:4 | 82:6,12 83:5 | three 10:2 11:13 |
| 57:15 73:7 | 113:21 126:21 | 97:15 104:2 | 83:10 92:8 | 11:20 18:21 |
| 75:11,22 76:6 | 137:6,10 | 114:17 | 95:23 96:23 | 27:17 28:12 |
| 76:8 79:14 | 138:16 | taken 1:18,23 | 97:19,22 | 42:21 49:4 |
| 111:2,3 114:12 | subject 51:20 | 7:4 8:9 45:12 | 101:16 107:13 | 55:12 109:8,10 |
| 116:6 | suffered 133:6 | 100:7 104:5 | 109:23 110:5,7 | ticket 15:13,15 |
| state 6:18 | 133:13 134:19 | talk 26:20 28:19 | 110:9,15,16 | 16:2 |
| statement 84:2 | 135:1,9 136:7 | 30:17 80:6 | 112:5 115:2 | tickets 15:22 |
| 84:18,19,22 | 139:1 | 88:17 95:10 | 116:15 119:17 | time 2:15,16 |
| 85:2,15,18 | suffering 133:21 | 96:18 98:20 | 120:13,14,16 | 13:11 14:11,22 |
| 86:1,5,8 | 133:23 134:18 | 99:1 112:18,21 | 135:20 139:4 | 16:12,17 17:7 |
| statements | 135:8 | 113:7 114:1,3 | telling 24:21 | 17:11,13 20:2 |
| 86:12 88:13 | Suite 1:21 4:21 | 114:4,8 117:11 | 77:14,15,18 | 23:7,12,12,16 |
| STATES 1:1 4:1 | 5:4 6:1 | 125:11,17,22 | 113:20 | 23:18 26:17 |
| stay 70:2,16,19 | Summer 24:1 | 126:1 127:1,4 | testified 6:10 | 29:22 42:15 |
| 116:19 137:2,7 | Sunday 40:13 | 127:6,8,12 | testimony 9:2 | 44:1,7 48:20 |
| stayed 77:6 | 43:23 89:7,10 | 128:11 132:4 | Thanks 23:7 | 55:14 56:14 |
| staying 137:19 | 90:12,20 | 135:16 | thereto 2:17 | 57:10,15 58:23 |

59:9,19 64:14
64:17,18,19,20
65:3,6 70:12
77:11,14,23
78:3,3,7 79:1
79:10 81:18
84:10 89:21
96:22 98:3,12
99:18 107:10
107:21 114:15
121:3,17
124:20 127:9
127:18 128:3,4
128:19 129:11
130:3,3 131:1
131:10,17
132:8 136:22
**times** 68:4
107:22 128:8,9
129:23
**title** 48:23
**today** 8:6,10
83:18 85:11
132:22
**told** 28:16 30:11
33:12 37:17
50:10 55:16
58:14,16,19,21
70:4,6 71:14
71:16 73:15
76:1,10,16,17
79:20 80:10
82:9 83:6,16
83:22 84:1,1,3
84:14,18 86:4
89:16,18 91:8
91:11,22 92:1
92:5,16 93:5
94:5,9,10,16
94:19 96:4,6
96:20,21 97:8
97:10 98:1,3,5
98:6,7,9,12
100:1,12

110:23 112:1
114:23 115:7,7
115:17 116:14
120:2,2,7,20
120:20 121:12
121:14 127:10
**top** 51:16 63:11
104:22
**touch** 74:6,13,19
74:19 76:1,10
105:9 122:14
**touching** 75:22
**Tower** 4:22
**town** 13:4
**traffic** 15:13,14
**Trailer** 13:19
**train** 34:16,17
37:4,5
**training** 35:3
37:21 38:14
39:11 41:19
42:6,9 59:4
**trial** 2:15
**tried** 24:11
74:14 115:14
**Troy** 9:17 10:11
10:12 13:6,20
19:12 21:4,16
23:15,20,23
132:2
**true** 121:8
**trust** 134:8
**try** 84:5 96:14
96:15 98:8
115:6,8,13
122:13 134:6
**trying** 74:5,18
117:16 129:9
**Tuesday** 90:13
**turn** 75:6
**turned** 26:13
76:12
**twice** 108:1
**two** 10:16 12:8

22:3 46:8,8,13
46:21,22 52:1
54:20,21,22
55:4 77:22
**two-page** 101:10
**type** 15:14
**typically** 54:19
55:11

**U**

**U** 1:14
**uh-huh** 7:19
9:23 11:23
18:3 20:9
46:11 48:4
54:15 57:7,21
81:7,11 93:7
103:1 107:5
118:5
**uncomfortable** 126:23
**understand** 7:7
7:15,23 8:5
16:10 56:10
63:22 100:10
**understanding** 106:16
**understood** 7:13
**unemployment** 112:9
**Unicell** 15:4
**uniform** 29:3,7
29:9 31:14,15
32:7 48:19
105:2
**uniforms** 53:14
53:16
**UNITED** 1:1 4:1
**University** 10:12
23:15,20,23
**Usual** 6:12
**usually** 43:16
54:6
**U.S** 21:19

**V**

**varied** 56:15
**videos** 39:10
**Vinson** 9:13
**violated** 77:17
96:8 128:17
**visit** 26:21 27:15
**visitor** 58:8,20
**visitors** 58:5
66:1,8 67:1
**visitor's** 58:11
**vs** 1:9 4:9

**W**

**Wachovia** 4:22
**wages** 133:20
**waist** 76:9
104:17,20
**waived** 2:4,21
**walk** 30:2,5 37:8
37:15 70:20
74:22 75:1
**walked** 28:23
**walking** 67:18
68:16,21 78:9
**Wal-Mart** 20:6
20:12,23 22:10
22:13
**want** 18:20 31:8
31:8 73:19
90:15 115:18
116:10,12,18
127:5,6
**wanted** 28:1,2
55:23 56:1
58:14 74:12
110:3,14,14
114:22
**wants** 120:14
**wasn't** 15:23
32:15 41:17
52:10 57:15
68:2 69:15
70:18 74:15

77:2 90:2 94:4
98:9,10 110:17
113:22 116:14
119:18,19,22
120:1,5,7
121:14 133:11
**watch** 39:10
**way** 7:11 30:4,7
36:10 52:9
73:17 83:15
100:1 101:16
105:10
**wear** 53:14,16
**wearing** 29:3
**week** 19:5,7
32:21 33:4,7
43:15,20,22
44:3 53:23
54:18,19,21,22
56:13 60:13
80:23 127:21
**weekday** 53:7
**weekdays** 43:12
43:17 44:6
54:2,3,5 55:7
55:10,17,20,23
56:2,14
**weekend** 29:17
33:7 38:10
42:12 43:2,10
44:1,2,8,9
54:12
**weekends** 25:20
27:2 32:19
42:19 43:11
44:11,12 45:16
53:10 54:3,11
55:2,4,14
87:20,23
**weeks** 46:22
55:7 73:8
**went** 24:16 25:1
25:4 28:17
31:23 32:8

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 33:6,12 40:20 | 55:4 61:9 | 114:2,21 | **2000** 21:14 | 118:9 119:4,7 |
| 56:17 69:14 | 64:19 65:7 | 115:14 120:9 | **2001** 11:22 | 119:11 |
| 76:11 112:15 | 80:16 90:7,20 | 120:16 131:21 | **2005** 31:3 | **6053** 13:3 |
| 112:21 113:23 | 100:18 107:21 | **year** 15:10 18:11 | **2006** 74:2 81:5 | **61** 3:9 |
| 114:2 132:9 | 124:17 | 20:18 21:11 | 130:11 | _____ |
| **weren't** 114:7 | **worker** 134:17 | **years** 9:21 10:14 | **2007** 1:23 18:12 | **7** |
| 116:16 127:11 | **workers** 53:12 | 11:13,20 13:9 | **201** 1:20 6:1 | **72** 3:10 |
| **we're** 93:13 | **working** 14:7,13 | 14:2 20:17 | **231** 21:20 | _____ |
| 106:4 | 18:10,19 19:9 | 22:3,4 | **26** 19:7 | **8** |
| **we've** 108:5 | 19:11 28:22 | **y'all** 125:2,8 | **27th** 1:23 | **8** 12:11 33:13 |
| **winter** 44:22 | 32:18 41:12 | _____ | **28** 74:2 | 34:10,13 |
| **witness** 2:3 6:4 | 43:21 50:5,7,9 | **Z** | **28th** 81:2,5 | **85** 3:11 |
| **woman** 75:19 | 50:12,14 54:10 | **zip** 13:4 | 85:16 90:9,21 | **87** 13:3 |
| **wore** 48:18 | 54:17 55:1,3,6 | _____ | **29th** 89:7 90:13 | _____ |
| **work** 19:4,6,7,8 | 55:9 56:14 | **0** | 90:16 | **9** |
| 24:15 36:13,14 | 66:20 68:18 | **05** 10:6 24:1,3 | _____ | **9/20/1979** 11:5 |
| 37:13,17 43:1 | 71:22 80:20 | 44:18,21,22 | **3** | |
| 43:11 44:3,5 | 81:10 87:15 | **06** 112:13,14 | **3** 3:10 72:2,7,12 | |
| 44:10 45:2,19 | 91:3 100:16 | 117:3,6 | 133:12 | |
| 45:21 46:19 | 125:1 129:3 | _____ | **30th** 15:9 119:15 | |
| 47:20 48:3 | **works** 36:10 | **1** | **3058** 19:11 | |
| 53:7,10,22 | 87:21 | **1** 3:8 45:23 46:5 | **31st** 90:14 | |
| 54:2,11,19 | **wouldn't** 34:3 | 46:15 49:3 | **3300** 5:3 | |
| 55:11 56:2,4 | 56:8 66:13 | 51:14 52:2 | **3400** 4:21 | |
| 57:1 60:13 | 76:17 | 81:4 89:5 | **35203** 4:23 | |
| 67:4,21 68:8 | **write** 64:19,22 | **1/2** 13:9 | **35223** 5:5 | |
| 68:10 70:2 | 65:3 83:22,23 | **1/28/06** 119:15 | **36016-0605** 5:9 | |
| 73:10 81:23 | 84:1,2,18,21 | **10:06** 6:3 | **36079** 13:6 | |
| 88:22 89:8,9 | 85:1 86:1,5 | **101** 3:12 | **36104** 1:21 6:2 | |
| 89:13,23 90:3 | 106:1,2 | **11:15** 81:22 | _____ | |
| 93:12,15,15 | **writing** 29:10 | **11:45** 81:22 | **4** | |
| 95:3 96:10,11 | 31:17 76:6 | **117** 3:13 | **4** 3:11 85:5,10 | |
| 96:15 98:7,10 | **written** 58:9,15 | **14** 19:8 | 85:13 | |
| 102:12 109:5 | 59:19,23 63:3 | **15** 79:4 | **420** 4:21 | |
| 112:12,16 | 63:8 | **17** 5:8 | **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** | |
| 113:6 117:5 | **wrong** 77:17 | **1950** 1:21 6:2 | 11:8 | |
| 120:21 121:6 | 135:20 | _____ | **45** 3:8 | |
| 125:6 134:5,9 | **wrote** 64:20 | **2** | _____ | |
| 134:12 | 85:16,19 86:5 | **2** 3:9 13:9 61:17 | **5** | |
| **worked** 21:11 | 86:8 102:8 | 61:22 62:7 | **5** 3:12 101:4,9 | |
| 22:3,5 39:14 | _____ | 63:12,18 | 101:11 | |
| 42:12,14 43:23 | **Y** | **2:06CV1088-...** | _____ | |
| 44:2,7,12 | **yeah** 39:23 40:2 | 1:5 4:5 | **6** | |
| 45:16 53:12,19 | 54:1 98:1 | **20th** 4:21 | **6** 3:3,13 12:12 | |
| | | **200** 5:4 | 117:19 118:1,3 | |

# DX 1
# TO PLAINTIFFS
# DEPOSITION

SUBJECT TO CHANGE PER CLIFF EISENBERGER



**SECURITY OFFICER SCHEDULE**
**LOCATION: SMART ALABAMA LLC**
**WEEK ENDING: Jan. 28, 2006**

| SHIFT | SUN 22nd | MON 23rd | TUES 24th | WED 25th | THUR 26th | FRI 27th | SAT 28TH |
|-------|----------|----------|-----------|----------|-----------|----------|-----------|
| 0800-1600 | A | B ~ D | B ~ D | B ~ D | B ~ D | B ~ D | F (8PM) ~ A |
| 1600-2400 | C | C ~ I | C ~ A | C ~ G | I ~ G | J ~ G | G (8PM) ~ J |
| 2400-0800 | J | J | E | E | E | E | G |

* Training

| OFFICER | PHONE NUMBERS |
|---------|---------------|
| A. CATHY CALDWELL | |
| B. MYSTI DICKS | 496-3174 HOME 429-8314 CELL |
| C. | |
| D. STAN ADAIR | 484-9179 HOME 672-1206 CELL |
| E. HELEN FERRELL | 469-2039 HOME 804-5563 CELL |
| F. BRIAN EISENBERGER | 222-9873 HOME 504-1464 CELL |
| G. CHARLES JOHNSTON | 566-6942 HOME |
| H. | |
| I. DEANA SHELBURNE | 504-4342 CELL |
| J. ESSENCE HEARNS | 335-2870 HOME |

| CLIFF EISENBERGER | 222-9873 | 222-9208 | 488-6548 |
| CLIFFORD EISNEBERGER | 488-4525 | | |

SUBJECT TO CHANGE PER CLIFF EISENBERGER



**SECURITY OFFICER SCHEDULE**
**LOCATION: SMART ALABAMA LLC**
**WEEK ENDING: Jan. 28, 2006**

| SHIFT | SUN 22nd | MON 23rd | TUES 24th | WED 25th | THUR 26th | FRI 27th | SAT 28TH |
|-------|----------|----------|-----------|----------|-----------|----------|----------|
| 0800-1600 | A | B ~ D | B ~ D | B ~ D | B ~ D | B ~ D | F(8PM) ~ A |
| 1600-2400 | C | C ~ I | C ~ A | C ~ G | I ~ G | J ~ G | G (8PM) ~ J |
| 2400-0800 | J | J | E | E | E | E | G |

* Training

| OFFICER | PHONE NUMBERS |
|---------|---------------|
| A. CATHY CALDWELL | |
| B. MYSTI DICKS | 496-3174 HOME 429-8314 CELL |
| C. | |
| D. STAN ADAIR | 484-9179 HOME 672-1206 CELL |
| E. HELEN FERRELL | 469-2039 HOME 804-5563 CELL |
| F. BRIAN EISENBERGER | 222-9873 HOME 504-1464 CELL |
| G. CHARLES JOHNSTON | 566-6942 HOME |
| H. | |
| I. DEANA SHELBURNE | 504-4342 CELL |
| J. ESSENCE HEARNS | 335-2870 HOME |

| CLIFF EISENBERGER | 222-9873 | 222-9208 | 488-6548 |
| CLIFFORD EISNEBERGER | 488-4525 | | |

# DX 2
# TO PLAINTIFFS
# DEPOSITION



IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

|  |  |  |  |
|---|---|---|---|
| CATHY CALDWELL, an individual | ) | | 2006 DEC -8  A 10: 10 |
| | ) | | |
| **Plaintiff,** | ) | | DEBRA P. HACKETT... |
| | ) | | U.S. DISTRICT COURT |
| **v.** | ) | | MIDDLE DISTRICT ALA |
| | ) | Civil Action No.: | 2:06 cv 1088 - mHT |
| SMART ALABAMA, LLC, a legal | ) | ***JURY DEMAND*** | |
| entity, | ) | | |
| | ) | | |
| **Defendant.** | ) | | |

## COMPLAINT

1.      This is an action at law pursuant to 42 U.S.C. § 2000e *et seq.*, to redress unlawful employment practices. The jurisdiction of this court is invoked under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4), as this matter in controversy involves a federal question and is an action by Federal law to redress civil rights secured to the plaintiff.

2.      On May 31, 2006, the plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter referred to as "EEOC"). The plaintiff filed her Charge of Discrimination within 180 days of the most recent discriminatory act. On October 16, 2006, the plaintiff received from the EEOC a Notice of Right to Sue. The plaintiff has filed her lawsuit within 90 days of the receipt of the Notice of Right to Sue and therefore has met all administrative prerequisites to the filing of this action.

## PARTIES

3.      The plaintiff, Cathy Caldwell, is over the age of 21 years, and is a citizen of the

United States and is a resident of the State of Alabama.

4.  The defendant, Smart Alabama, LLC, at all times pertinent to the allegations contained in this complaint, was doing business in Crenshaw County, Alabama. At all times relevant hereto, the defendant was plaintiff's employer, and is an employer within the meaning of 42 U.S.C. § 2000e-9(b).

## FACTS

5.  In or about December 2005 and January 2006, the Plaintiff was employed with the defendant, Smart Alabama, LLC.

6.  During the time that the Plaintiff was employed by the defendant, the Plaintiff made complaints of unwelcomed sexual harassment. The Plaintiff complained that she was being subjected to unwelcomed and uninvited sexual harassment by Rance Maddox who, at that time, was a supervisory employee of the defendant.

7.  The defendant did not take reasonable and sufficient corrective action in response to the Plaintiff's complaints and the sexual harassment continued unabated.

8.  Instead of taking necessary and reasonable corrective action in response to the Plaintiff's complaints, the defendant ratified and condoned the unlawful acts and did so despite having actual and legal knowledge and notice of those unlawful and discriminatory acts; or, if the defendant did take corrective action then such action was inadequate and did not end the unlawful acts or correct the adverse effects of the unlawful acts.

9.  The unlawful acts complained of were malicious and were perpetrated again the Plaintiff with a reckless indifference to the Plaintiff's protected civil rights.

10. Following the Plaintiff's complaints and notice to the defendant as described

hereinabove, and the defendant's ratification of the harassment, the Plaintiff was

forced to resign from her employment with the defendant on January 28, 2006 due

to the hostile environment and the defendant's refusal to address the sexual

harassment.

**COUNT I**

11.    Plaintiff realleges and readopts paragraphs 1 through 10 above as if fully set forth

herein.

12.    The plaintiff was subjected to unlawful discrimination and harassment in violation

of 42 U.S.C. § 2000(e) *et seq.*, in that plaintiff was subjected to an unwelcomed

and uninvited sexual harassment and when plaintiff brought this to the attention of

her supervisors, nothing was done to remedy the situation; or, if steps were taken

in attempt to remedy the situation, then such steps were inadequate, causing the

plaintiff to resign from her employment with the defendant.

13.    As a direct and proximate result of the defendant's discriminatory and harassing

actions, the plaintiff has been deprived of economic and non-economic benefits,

including, but not limited to lost wages, mental anguish, emotional distress,

humiliation, embarrassment and loss of training and job education.

**WHEREFORE, PREMISES CONSIDERED,** plaintiff prays that this Honorable Court

will grant the following relief:

(i)    Declare the defendant's conduct to constitute a violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*;

(ii)    Order the defendant to pay compensatory and punitive damages to the plaintiff in

such an amount to be determined by a jury of the plaintiff's peers;

(iii)    Order the defendant to pay plaintiff's attorney's fees and costs relative to this action pursuant to U.S.C. § 2000e-5(k) and other lawful authority;

(iv)    Order the defendant to pay to the plaintiff all the pay and benefits she has lost as a result of the discriminatory and unlawful acts complained herein;

(v)    Order the defendant to cease and desist from the discriminatory and unlawful acts complained of herein;

(vi)    Order and award such other and further relief to which plaintiff is entitled and which this Honorable Court deems just and proper.

### COUNT II

14.    Plaintiff adopts and realleges paragraphs 1 through 13 above as if fully set forth herein.

15.    The Plaintiff was subjected to a hostile environment and sexually charged environment in violation 42 U.S.C. § 2000(e) *et seq.*, in that the defendant had actual and legal knowledge and notice that unlawful and discriminatory and sexually harassing practices were being perpetrated toward the Plaintiff in the workplace, yet the defendants failed to prevent or stop the unlawful and discriminatory practices.

16.    The Plaintiff was subjected to sexual harassment in the workplace so severe and pervasive as to alter the terms and conditions of the Plaintiff's employment and to create an abusive and hostile working environment.

17.    As a direct and proximate result of the sexual harassment and the sexually charged workplace and the hostile working environment as described above, the Plaintiff has been deprived of economic and non-economic benefits, including but not

limited to lost wages, emotional distress, mental anguish, humiliation, embarrassment and loss of training and job education.

**WHEREFORE, PREMISES CONSIDERED,** plaintiff prays that this Honorable Court will grant the following relief:

(i)     Declare the defendant's conduct to constitute a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*;

(ii)    Order the defendant to pay compensatory and punitive damages to the plaintiff in such an amount to be determined by a jury of the plaintiff's peers;

(iii)   Order the defendant to pay plaintiff's attorney's fees and costs relative to this action pursuant to U.S.C. § 2000e-5(k) and other lawful authority;

(iv)    Order the defendant to pay to the plaintiff all the pay and benefits she has lost as a result of the discriminatory and unlawful acts complained herein;

(v)     Order the defendant to cease and desist from the discriminatory and unlawful acts complained of herein;

(vi)    Order and award such other and further relief to which plaintiff is entitled and which this Honorable Court deems just and proper.

_Lindsey O. Hill_

Richard F. Horsley (HOR023)
Lindsey O. Hill (HIL055)
Attorneys for Plaintiff

**OF COUNSEL:**

**GOOZEE, KING & HORSLEY**
**Shades Brook Bldg., Suite 200**
**3300 Cahaba Road**
**Birmingham, Alabama 35223**
**(205) 871-1310**

\*\*Plaintiff hereby demands a trial by struck jury on all issues of this case.\*\*

_Lindsey O. Hill_
Of Counsel

**SERVE DEFENDANT AS FOLLOWS:**

Smart Alabama, LLC                                    \*        **BY CERTIFIED MAIL**
c/o George B. Harris
401 Adams Ave., Ste. 780
Montgomery, Alabama 36104

**A.D.I**
**EXTENDED DUTY REPORT**

SECURITY OFFICER: _____          PAGE: ___ OF ___

DATE: _____          OPERATION: _____

DAY OF WEEK: _____          SHIFT: _____ TO _____

On January 28, 2006 at approx. 1145
Cliff Cisenberger called the plant.
Asked to talk Chancie Madow. Chancie was
in the parking lot. Officer Caldwell went
to go get Chancie. He spoke to Cliff Cisenberger
at 1153. I went to make round of plant.
When I returned to the guard shack
at approx. 1245 Officer Caldwell told
me that Chancie had a conversation
with her and kissed her on the mouth.
Officer Caldwell then called Cliff Cisenberger
and told him the situation that had
just occured.

_____
_____

OFFICERS SIGNATURE: _Deana Shelburne_

SUPERVISORS SIGNATURE: _____

CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 420-2006-03674 |
| ☒ EEOC | |

_____ and EEOC

*State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mrs. Cathy Caldwell | (334) 672-0676 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6053 AL Hwy 87, Troy, Alabama 36079 | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Smart Alabama LLC | | (334) 355-5800 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 121 Shin Young Drive | Luverne, Alabama 36049 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)).

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| / / | 1 /28/2006 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

See Attachment

(RESERVED)

☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

*Cathy Caldwell*

Date 05-31-06   Charging Party (Signature)

EEOC FORM 5 (REV. 06/92)

NOTARY - (When necessary for State and Local Requirements)

*Virginia D. Green* - Expires March 18, 2010

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

*Cathy Caldwell*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)

CALDWELL V. SMART
FOIA 003

While employed at Smart, I was repeatedly harassed in a sexual manner by Rance Maddox. On or about January, 2006, Mr. Maddox touched me in an area below my waist and rubbed that area with his hand. On this same occasion, Mr. Maddox kissed me without my consent. At times prior to January, 2006, Mr. Maddox made "passes" at me and asked if I would go on a date with him. He also asked me if I would spend the night with him. I reported these events to management personnel, and they informed me that there was nothing they could do. As a result, I was forced to quit my job on January 28, 2006. I quit as a direct result of the sexual advances by Mr. Maddox, the hostile environment created by those sexual advances and management's refusal to stop this conduct.

RECEIVED

JUN - 5 2006

## ALANY DIVISIONS INC.

PAGE __1__ of __2__

CLIENT'S COPY

**DAILY SECURITY REPORT**

| Security Officer | Operation | Client Notes: |
|---|---|---|
| Eisenberger | SMART Al. LLC | |

| Date | Day of Week | Shift | |
|---|---|---|---|
| 2-8-06 | Wed. | | 10 |

| Relieved | | Post | |
|---|---|---|---|
| Relieved By | | Post | |
| Keys Received From | | Keys Passed To | |

| DID YOU OBSERVE, DETECT OR WERE THERE ANY | YES | NO |
|---|---|---|
| 1 Tours, Stations Missed | | |
| 2 New Instructions Received | | |
| 3 Classified Information Violations | | |
| 4 Suspicious Activities | | |
| 5 Trespassers, Intrusion Alarms | | |
| 6 Windows, Doors, Offices Unlocked | | |
| 7 Thefts, Attempted Thefts | | |
| 8 Maintenance Required, Lights Out | | |
| 9 Broken Locking Devices | | |
| 10 Perimeter Barrier Hazards | | |
| 11 Parking Lot Violations | | |
| 12 Outside Security Hazards | | |
| 13 Fire Hazards, Poor Housekeeping | | |
| 14 Fire Doors, Lanes, Exits Blocked | | |
| 15 Fires, Fire Alarms | | |
| 16 Sprinkler Heads, Risers Blocked | | |
| 17 Smoking Violations | | |
| 18 Fire Extinguisher Check | | |
| 19 Unusual Odors | | |
| 20 Noisy Machinery | | |
| 21 General Safety Hazards | | |
| 22 Machinery Guards Broken | | |
| 23 Machinery Left Running | | |
| 24 Hazardous Stacking | | |
| 25 Electrical Equipment Box Violations | | |
| 26 Unsafe Vehicle Operation | | |
| 27 Unsafe Practices | | |
| 28 Health Hazards | | |
| 29 Complaints Other Than Above | | |

**SECURITY OFFICER'S REMARKS**
(Please Print)

In reference to C. Caldwells report of Sat. 1-28-06.
I met with HR on the morning of the 30th to discuss the events of Sat. 1-28-06. HR told me this would be dealt with properly, and to inform C. Caldwell that there will not be any more contact between the two parties, and if there is to inform them immediately.
C. Caldwell had already returned to work on Sunday 1-29-06 and was scheduled to return on Tuesday 1-31-06. I was to meet with C. Caldwell at 1600 when she reported for her shift. On 1-31-06 @ 1525 C. Caldwell drove to the gate, I asked her to come to the guard house instead of reporting to the reception desk so I could tell her what was going on with her situation from 1-28-06. She replied OK and drove into the parking lot.

| Inspected By | Time In |
|---|---|
| | Time Out |
| Training Topic | |

Total Hours Worked _____ Hrs. _____ Minutes

Security Officer's Signature _____

employees are instructed to observe safety and security hazards, the company does not assume any responsibility for the failure of its employees to detect and indicate hazards in the course of their inspections.

Supervisor's Signature _____

**A.D.I.**
**EXTENDED DUTY REPORT**

SECURITY OFFICER: _Eisenberger_          PAGE _2_ OF _2_

DATE: _2-8-06_                            OPERATION: _SMART AL. LLC_

DAY OF WEEK: _Wed_                        SHIFT _1600_ TO _2400_

She drove back to the main gate a few minutes later and said she had forgotten her drink, she was going to run to the store and be right back. She left at 1529 and never returned until a week later to pick up her check. Numerous calls where made to C. Caldwells home + cell phones, messages were left, we never got any response. Our meeting with C. Caldwell to tell her about the action taken never happened because of her leaving. She never gave us an opportunity to explain how this matter was dealt with

OFFICERS SIGNATURE: _Clff A Eisenberger / President / Operations_

SUPERVISOR SIGNATURE: _____

# TAB "B"

## DECLARATION OF CLIFF EISENBERGER

1.    My name is Cliff Eisenberger. I am over the age of twenty-one and I have personal knowledge of the facts in this declaration, which I give voluntarily and without coercion.

2.    I am Owner and President of Operations of Alany Divisions, Inc. ("ADI"), an industrial security supply service located out of Andalusia, Alabama. ADI supplies security guards to manufacturing facilities such as SMART Alabama, LLC, in Luverne, Alabama.

3.    ADI, not SMART, employes the security guards supplied by ADI to the SMART facility. No SMART employees supervise the guards, direct their work, train them, determine their pay, pay them, deduct taxes, schedule the hours or days they will work, or maintain responsibility for hiring, firing, or adjusting the terms of employment of the guards.

4.    ADI, not SMART, was Cathy Caldwell's sole employer when she worked as an ADI guard at the SMART facility.

    a.    ADI, not SMART, paid wages to Cathy Caldwell, deducted taxes from her checks, and determined the rate of pay she would receive. Attached as "Attachment A" is a summary of the pay Ms. Caldwell received from ADI.

    b.    ADI, not SMART, scheduled the work of Cathy Caldwell and the other security guards and trained Ms. Caldwell and the other guards. Attached as "Attachment B" are schedules created by ADI for the security guards while Ms. Caldwell was an ADI employee.

    c.    ADI, not SMART, directed and supervised the work of Cathy Caldwell and the other security guards. Ms. Caldwell's work was directed by either me or Stan Adair, an ADI Supervisor who worked weekdays at the SMART facility.

    d.    ADI, not SMART, set the terms and conditions of Cathy Caldwell's and the other security guards' employment.

1588439 v1

e.    ADI, not SMART was responsible for hiring and firing guards such as Cathy Caldwell. I made the decision to hire Ms. Caldwell.

f.    ADI was responsible for workers compensation insurance for Cathy Caldwell and the other security guards.

5.    As President and Owner of ADI, I am not employed by nor do I have an ownership interest in SMART. SMART and ADI are separately owned companies. No SMART employee, officer, or manager maintains any ownership interest or management position with ADI. ADI provides security services to other business besides SMART.

6.    ADI, not SMART, employed Misty Dix during the time she was working as a guard at the SMART facility. Ms. Dix frequently performed the position of receptionist, which was a position filled by ADI employees.

7.    I declare under penalty of perjury that the foregoing is true and correct.


_____
CLIFF EISENBERGER


7-26-07
_____
DATE

# ATTACHMENT
# "A"
# To TAB "B"



IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

| | | |
|---|---|---|
| CATHY CALDWELL, an individual | ) | 2006 DEC -8  A 10: 10 |
| | ) | |
| Plaintiff, | ) | DEBRA P. HACKETT |
| | ) | U.S. DISTRICT COURT |
| v. | ) | MIDDLE DISTRICT ALA |
| | ) | Civil Action No.: 2:06 cv 1088 - MHT |
| SMART ALABAMA, LLC, a legal | ) | *JURY DEMAND* |
| entity, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

1.    This is an action at law pursuant to 42 U.S.C. § 2000e *et seq.*, to redress unlawful

employment practices.  The jurisdiction of this court is invoked under 28 U.S.C. §

1331 and 28 U.S.C. § 1343(a)(4), as this matter in controversy involves a federal

question and is an action by Federal law to redress civil rights secured to the

plaintiff.

2.    On May 31, 2006, the plaintiff filed a Charge of Discrimination with the Equal

Employment Opportunity Commission (hereinafter referred to as "EEOC").  The

plaintiff filed her Charge of Discrimination within 180 days of the most recent

discriminatory act.  On October 16, 2006, the plaintiff received from the EEOC a

Notice of Right to Sue.  The plaintiff has filed her lawsuit within 90 days of the

receipt of the Notice of Right to Sue and therefore has met all administrative

prerequisites to the filing of this action.

## PARTIES

3.    The plaintiff, Cathy Caldwell, is over the age of 21 years, and is a citizen of the

United States and is a resident of the State of Alabama.

4.    The defendant, Smart Alabama, LLC, at all times pertinent to the allegations contained in this complaint, was doing business in Crenshaw County, Alabama. At all times relevant hereto, the defendant was plaintiff's employer, and is an employer within the meaning of 42 U.S.C. § 2000e-9(b).

## FACTS

5.    In or about December 2005 and January 2006, the Plaintiff was employed with the defendant, Smart Alabama, LLC.

6.    During the time that the Plaintiff was employed by the defendant, the Plaintiff made complaints of unwelcomed sexual harassment. The Plaintiff complained that she was being subjected to unwelcomed and uninvited sexual harassment by Rance Maddox who, at that time, was a supervisory employee of the defendant.

7.    The defendant did not take reasonable and sufficient corrective action in response to the Plaintiff's complaints and the sexual harassment continued unabated.

8.    Instead of taking necessary and reasonable corrective action in response to the Plaintiff's complaints, the defendant ratified and condoned the unlawful acts and did so despite having actual and legal knowledge and notice of those unlawful and discriminatory acts; or, if the defendant did take corrective action then such action was inadequate and did not end the unlawful acts or correct the adverse effects of the unlawful acts.

9.    The unlawful acts complained of were malicious and were perpetrated again the Plaintiff with a reckless indifference to the Plaintiff's protected civil rights.

10.    Following the Plaintiff's complaints and notice to the defendant as described

hereinabove, and the defendant's ratification of the harassment, the Plaintiff was forced to resign from her employment with the defendant on January 28, 2006 due to the hostile environment and the defendant's refusal to address the sexual harassment.

### COUNT I

11.    Plaintiff realleges and readopts paragraphs 1 through 10 above as if fully set forth herein.

12.    The plaintiff was subjected to unlawful discrimination and harassment in violation of 42 U.S.C. § 2000(e) *et seq.*, in that plaintiff was subjected to an unwelcomed and uninvited sexual harassment and when plaintiff brought this to the attention of her supervisors, nothing was done to remedy the situation; or, if steps were taken in attempt to remedy the situation, then such steps were inadequate, causing the plaintiff to resign from her employment with the defendant.

13.    As a direct and proximate result of the defendant's discriminatory and harassing actions, the plaintiff has been deprived of economic and non-economic benefits, including, but not limited to lost wages, mental anguish, emotional distress, humiliation, embarrassment and loss of training and job education.

**WHEREFORE, PREMISES CONSIDERED,** plaintiff prays that this Honorable Court will grant the following relief:

(i)    Declare the defendant's conduct to constitute a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*;

(ii)    Order the defendant to pay compensatory and punitive damages to the plaintiff in such an amount to be determined by a jury of the plaintiff's peers;

(iii)   Order the defendant to pay plaintiff's attorney's fees and costs relative to this

action pursuant to U.S.C. § 2000e-5(k) and other lawful authority;

(iv)   Order the defendant to pay to the plaintiff all the pay and benefits she has lost as a

result of the discriminatory and unlawful acts complained herein;

(v)   Order the defendant to cease and desist from the discriminatory and unlawful acts

complained of herein;

(vi)   Order and award such other and further relief to which plaintiff is entitled and

which this Honorable Court deems just and proper.

## COUNT II

14.   Plaintiff adopts and realleges paragraphs 1 through 13 above as if fully set forth

herein.

15.   The Plaintiff was subjected to a hostile environment and sexually charged

environment in violation 42 U.S.C. § 2000(e) *et seq.*, in that the defendant had

actual and legal knowledge and notice that unlawful and discriminatory and

sexually harassing practices were being perpetrated toward the Plaintiff in the

workplace, yet the defendants failed to prevent or stop the unlawful and

discriminatory practices.

16.   The Plaintiff was subjected to sexual harassment in the workplace so severe and

pervasive as to alter the terms and conditions of the Plaintiff's employment and to

create an abusive and hostile working environment.

17.   As a direct and proximate result of the sexual harassment and the sexually charged

workplace and the hostile working environment as described above, the Plaintiff

has been deprived of economic and non-economic benefits, including but not

limited to lost wages, emotional distress, mental anguish, humiliation, embarrassment and loss of training and job education.

**WHEREFORE, PREMISES CONSIDERED**, plaintiff prays that this Honorable Court will grant the following relief:

(i)     Declare the defendant's conduct to constitute a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*;

(ii)    Order the defendant to pay compensatory and punitive damages to the plaintiff in such an amount to be determined by a jury of the plaintiff's peers;

(iii)   Order the defendant to pay plaintiff's attorney's fees and costs relative to this action pursuant to U.S.C. § 2000e-5(k) and other lawful authority;

(iv)    Order the defendant to pay to the plaintiff all the pay and benefits she has lost as a result of the discriminatory and unlawful acts complained herein;

(v)     Order the defendant to cease and desist from the discriminatory and unlawful acts complained of herein;

(vi)    Order and award such other and further relief to which plaintiff is entitled and which this Honorable Court deems just and proper.

Richard F. Horsley (HOR023)
Lindsey O. Hill (HIL055)
Attorneys for Plaintiff

**OF COUNSEL:**

**GOOZEE, KING & HORSLEY**
**Shades Brook Bldg., Suite 200**
**3300 Cahaba Road**
**Birmingham, Alabama 35223**
**(205) 871-1310**

**\*\*Plaintiff hereby demands a trial by struck jury on all issues of this case.\*\***

_Of Counsel_

<u>**SERVE DEFENDANT AS FOLLOWS:**</u>

Smart Alabama, LLC
c/o George B. Harris
401 Adams Ave., Ste. 780
Montgomery, Alabama 36104

\*     **BY CERTIFIED MAIL**

**A.D.I**
**EXTENDED DUTY REPORT**

SECURITY OFFICER: _____     PAGE: ___ OF ___

DATE: _____

OPERATION: _____

DAY OF WEEK: _____

SHIFT: _____ TO _____

On January 28, 2006 at approx. 1145
Cliff Cisenberger called the plant.
Asked to talk to Chance Maddux. Chance was
in the parking lot. Officer Caldwell went
to go get Chance. He spoke to Cliff Cisenberger
at 1153. I went to make rounds of plant.
When I returned to the guard shack
at approx. 1245 Officer Caldwell told
me that Chance had a conversation
with her and kissed her on the mouth.
Officer Caldwell then called Cliff Cisenberger
and told him the situation that had
just occurred.

OFFICERS SIGNATURE: _Deana Shelburne_

SUPERVISORS SIGNATURE: _____

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 420-2006-03674 |
| ☒ EEOC | |

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mrs. Cathy Caldwell | (334) 672-0676 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 6053 AL Hwy 87, Troy, Alabama 36079 | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Smart Alabama LLC | | (334) 355-5800 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 121 Shin Young Drive | Luverne, Alabama 36049 | |

| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| / / | 11/28/2006 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

See Attachment

RECEIVED

☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

*Cathy Caldwell*
Charging Party *(Signature)*

Date 05-31-06

NOTARY - (When necessary for State and Local Requirements)

*Virginia D. Green - Expir March 18, 2010*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

*Cathy Caldwell*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

EEOC FORM 5 (Rev. 06/92)

CALDWELL V. SMART
FOIA 003

While employed at Smart, I was repeatedly harassed in a sexual manner by Rance Maddox. On or about January, 2006, Mr. Maddox touched me in an area below my waist and rubbed that area with his hand. On this same occasion, Mr. Maddox kissed me without my consent. At times prior to January, 2006, Mr. Maddox made "passes" at me and asked if I would go on a date with him. He also asked me if I would spend the night with him. I reported these events to management personnel, and they informed me that there was nothing they could do. As a result, I was forced to quit my job on January 28, 2006. I quit as a direct result of the sexual advances by Mr. Maddox, the hostile environment created by those sexual advances and management's refusal to stop this conduct.

RECEIVED

JUN - 5 2006

CALDWELL V. SMART
FOIA 004

# ALANY DIVISIONS INC.

PAGE ___1___ of ___2___

CLIENT'S COPY

DAILY SECURITY REPORT

| Security Officer Eisenberger | Operation SMART AL. LLC | Client Notes: |
|---|---|---|
| Date 2-8-06 | Day of Week Wed. | Shift ___ to ___ |
| Relieved | Post ___ | |
| Relieved By | Post ___ | |
| Keys Received From | Keys Passed To ___ | |

| DID YOU OBSERVE, DETECT OR WERE THERE ANY | YES | NO |
|---|---|---|
| 1 Tours, Stations Missed | | |
| 2 New Instructions Received | | |
| 3 Classified Information Violations | | |
| 4 Suspicious Activities | | |
| 5 Trespassers, Intrusion Alarms | | |
| 6 Windows, Doors, Offices Unlocked | | |
| 7 Thefts, Attempted Thefts | | |
| 8 Maintenance Required, Lights Out | | |
| 9 Broken Locking Devices | | |
| 10 Perimeter Barrier Hazards | | |
| 11 Parking Lot Violations | | |
| 12 Outside Security Hazards | | |
| 13 Fire Hazards, Poor Housekeeping | | |
| 14 Fire Doors, Lanes, Exits Blocked | | |
| 15 Fires, Fire Alarms | | |
| 16 Sprinkler Heads, Risers Blocked | | |
| 17 Smoking Violations | | |
| 18 Fire Extinguisher Check | | |
| 19 Unusual Odors | | |
| 20 Noisy Machinery | | |
| 21 General Safety Hazards | | |
| 22 Machinery Guards Broken | | |
| 23 Machinery Left Running | | |
| 24 Hazardous Stacking | | |
| 25 Electrical Equipment Box Violations | | |
| 26 Unsafe Vehicle Operation | | |
| 27 Unsafe Practices | | |
| 28 Health Hazards | | |
| 29 Complaints Other Than Above | | |

**SECURITY OFFICER'S REMARKS**
(Please Print)

In reference to C. Caldwells report of Sat. 1-28-06. I met with HR on the morning of the 30th to discuss the events of Sat. 1-28-06. HR told me this would be dealt with properly and to inform C. Caldwell that there will not be any more contact between the two parties, and if there is to inform them immediately.

C. Caldwell had already returned to work on Sunday 1-29-06 and was scheduled to return on Tuesday 1-31-06. I was to meet with C. Caldwell at 1600 when she reported for her shift. On 1-31-06 @ 1525 C. Caldwell drove to the gate, I asked her to come to the guard house instead of reporting to the reception desk so I could tell her what was going on with her situation from 1-28-06. She replied OK and drove into the parking lot.

| Inspected By | Time In Time Out | Total Hours Worked ___ Hrs. ___ Minutes | Security Officer's Signature |
|---|---|---|---|
| Training Topic | | | |

employees are instructed to observe safety and security hazards, the company does not assume any responsibility for the failure of its employees to detect and indicate hazards in the course of their inspections.

Supervisor's Signature _____

**A.D.I.**
**EXTENDED DUTY REPORT**

SECURITY OFFICER: _Eisenberger_          PAGE _2_ OF _2_

DATE: _2-8-06_          OPERATION: _SMART AL. LLC_

DAY OF WEEK: _Wed_          SHIFT _1600_ TO _2400_

She drove back to the main gate a few minutes later and said she had forgotten her drink, she was going to run to the store and be right back. She left at 1529 and never returned until a week later to pick up her check. Numerous calls where made to C. Caldwells home + cell phones, messages were left, we never got any response. Our meeting with C. Caldwell to tell her about the action taken never happened because of her leaving. She never gave us an opportunity to explain how this matter was dealt with.

OFFICERS SIGNATURE: _Cliff Eisenberger / President / Operations_

SUPERVISOR SIGNATURE: _____

# ATTACHMENT
# "B"
# To TAB "B"

SUBJECT TO CHANGE PER CLIFF EISENBERGER



**SECURITY OFFICER SCHEDULE**
**LOCATION: SMART ALABAMA LLC**
**WEEK ENDING: FEB. 4TH, 2006**

| SHIFT | SUN 29TH | MON 30TH | TUES 31ST | WED 1ST | THUR 2ND | FRI 3RD | SAT 4TH |
|---|---|---|---|---|---|---|---|
| 0800-1600 | A | B ~ D | B ~ D | B ~ D | B ~ D | B ~ D | F (8PM) ~ I |
| 1600-2400 | C | C ~ I | C ~ A̶G̶ | C ~ G | I ~ G | J ~ G | G (8PM) ~ J |
| 2400-0800 | J | J | E | E | E | E | G |

\* Training

| OFFICER | PHONE NUMBERS |
|---|---|
| A. CATHY CALDWELL | |
| B. MYSTI DICKS | 496-3174 HOME 429-8314 CELL |
| C. | |
| D. STAN ADAIR | 484-9179 HOME 672-1206 CELL |
| E. HELEN FERRELL | 469-2039 HOME 804-5563 CELL |
| F. BRIAN EISENBERGER | 222-9873 HOME 504-1464 CELL |
| G. CHARLES JOHNSTON | 566-6942 HOME |
| H. | |
| I. DEANA SHELBURNE | 504-4342 CELL |
| J. ESSENCE HEARNS | 335-2870 HOME |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

| CLIFF EISENBERGER | | 222-9873 | 222-9208 | 488-6548 |
|---|---|---|---|---|
| CLIFFORD EISENBERGER | | 488-4525 | | |

**SUBJECT TO CHANGE PER CLIFF EISENBERGER**



## SECURITY OFFICER SCHEDULE
### LOCATION: SMART ALABAMA LLC
### WEEK ENDING: FEB. 4TH, 2006

| SHIFT | SUN 29TH | MON 30TH | TUES 31ST | WED 1ST | THUR 2ND | FRI 3RD | SAT 4TH |
|---|---|---|---|---|---|---|---|
| 0800-1600 | A | B ~ D | B ~ D | B ~ D | B ~ D | B ~ D | F (8PM) ~ I |
| 1600-2400 | C | C ~ I | C ~ X G | C ~ G | I ~ G | J ~ G | G (8PM) ~ J |
| 2400-0800 | J | J | E | E | E | E | G |

\* Training

| OFFICER | PHONE NUMBERS |
|---|---|
| A. CATHY CALDWELL | |
| B. MYSTI DICKS | 496-3174 HOME 429-8314 CELL |
| C. | |
| D. STAN ADAIR | 484-9179 HOME 672-1206 CELL |
| E. HELEN FERRELL | 469-2039 HOME 804-5563 CELL |
| F. BRIAN EISENBERGER | 222-9873 HOME 504-1464 CELL |
| G. CHARLES JOHNSTON | 566-6942 HOME |
| H. | |
| I. DEANA SHELBURNE | 504-4342 CELL |
| J. ESSENCE HEARNS | 335-2870 HOME |

| CLIFF EISENBERGER | 222-9873 222-9208 488-6548 |
| CLIFFORD EISNEBERGER | 488-4525 |

# TAB "C"

## DECLARATION OF GARY SPORT

1.    My name is Gary Sport. I am over the age of twenty-one and I have personal knowledge of the facts in this declaration, which I give voluntarily and without coercion.

2.    I am employed as General Manager of Administration for SMART Alabama, LLC, in Luverne, Alabama. SMART Alabama is an automobile parts manufacturing plant which supplies parts to Hyundai Motor Manufacturing of Alabama.

3.    SMART maintains a contractual relationship with Alany Divisions, Inc. ("ADI") to supply security guards to work on the SMART premises. ADI hires, pays, and supervises the security guards. Attached as "Attachment A" to this affidavit are the terms of the agreement between SMART and ADI.

4.    SMART does not employ the security guards supplied by ADI. No SMART employees supervise the guards, direct their work, train them, determine their pay, pay them, deduct taxes, schedule the hours or days they will work, or maintain responsibility for hiring, firing, or adjusting the terms of employment of the guards.

5.    ADI, not SMART, was Cathy Caldwell's sole employer when she worked as an ADI guard at the SMART facility.

    a.    A review of payroll records and other business records kept under my custody and control in the ordinary course of business reveals SMART has never paid any wages to Cathy Caldwell nor any other security guard employed by ADI.

    b.    A review of benefit records and other business records kept under my custody and control in the ordinary course of business reveals SMART has never paid any benefits to Cathy Caldwell nor any other security guard employed by ADI.

c.    No one out of SMART directed the work of Cathy Caldwell nor any other security guard; any concerns regarding any performance of the agreement between SMART and ADI are directed by me to ADI President Cliff Eisenberger.

d.    SMART did not prohibit Cathy Caldwell or other ADI employees from serving other ADI customers or having other jobs while serving SMART, and does not set the hours of any specific guard; SMART only looks to ADI for coverage by someone during a particular time.

e.    SMART is not responsible for withholding or workers' compensation for the ADI security guards.

6.    SMART has never employed Stan Adair or Misty Dix. Mr. Adair is currently employed as a Supervisor for ADI working on the SMART premises and Ms. Dix was formerly employed as a guard for ADI.

7.    SMART and ADI are separately owned companies. No SMART officer, manager, or employee maintains an ownership interest of or management position with ADI. No ADI officer, manager, or employee participates in the ownership or the management of SMART.

8.    I declare under penalty of perjury that the foregoing is true and correct.

_____
GARY SPORT

_7/26/07_____
DATE

2

# ATTACHMENT
# "A"
# To TAB "C"

## Approval Letter

| Approval (1) | Approval (2) | Approval (3) | | |
|---|---|---|---|---|
| 권이용 이사 | 홍호만 공장장 | 김종철 사장 | | |
| 2005/06/04 | 2005/06/05 | 2005/06/05 | | |

| | | | |
|---|---|---|---|
| Document ID | (기)제2005-06-0106 | Sending Date | 2005/06/04 |
| Keeping Term | 3년 | Sending Department | H/R |
| Writer | Gary Sport | Phone Number | |
| Subject | (기)Change of Security Services Company | | |

**Scope:** SMART, AL has recently negotiated to transfer security services from R&R Security to ADI Security Services. Below is the scope and cost comparisons as submitted by Mr. Rance Maddox, Safety Manager of SMART. The transfer of services took effect on May 23, 2005.

**Subject:** The overall scope for SMART ALABAMA, LLC Security
The purpose of this policy is to establish a standard of operation and administration for Security at SMART ALABAMA.
1. Procedure for overall scope
   A.   Preparation For The Guard House
      Furniture
        1.) Counters (window high)
        2.) One Desk
        3.) Two High Chairs
        4.) One regular desk chair
        5.) Two way radios (for communications with management)
        6.) Phone System
        7.) Air Conditioner/Heater
        8.) Electric Outlets
        9.) Access to control arms (drop arms)
B. Security Force Operations
      1.) ADI Security Force at the SMART Alabama, LLC Plant consists of two primary posts, one at the main gate and one receptionist in the daytime.
      2.) Second shift there will be one officer at the main gate also during shift change there will be one hour over lap for roving.
      3.) Third shift there will be one officer at the main gate also during shift change there will be one hour over lap for roving.
      4.) Weekends and Holidays there will be one officer at the main gate also during shift change there will be one hour over lap for roving.
C. Visitors Policy
      1.) Any person entering SMART Alabama, LLC property must be logged accordingly. Off duty SMART Alabama, LLC employees and their visitors must be treated as visitors and comply with all of the same requirements as stated. SMART Alabama, LLC employees visiting from other facilities will be issued a gold badge. Visitors entering the property with white badges are allowed access to the following only: Lobbies, Receiving, and Shipping. Employees with white visitors' badges are also allowed access to the employee support offices in front of the plant. At no time should an off shift employee be allowed to enter production areas without supervisors permission.
D. ADI carries out services which switch form R&R Security into ADI. The condition has been changed into the following.
**Cost Comparison**

| CLASSIFIELD | PREVIOUS | CURRENT CHANGE |
|---|---|---|
| SECURITY COMPANY | R & R | ADI |
| TERMS OF PAYMENT | $ 12.00/HR FOR GUARDS<br>$ 9.40/HR FOR RECEPTIONIST | $10.00/HR FOR GUARDS<br>$8.50/HR FOR RECEPTIONIST |
| DURATION | ONE YEAR CONTRACT | ONE YEAR CONTRACT |
| OTHERS | WITHOUT UNIFORMS | WITH UNIFORMS |
| JOB DESCRIPTIONS | SEE ATTACHMENTS | SEE ATTACHMENTS |

| | |
|---|---|
| Receipient Dept. | |

Caldwell v. Smart
26a & RFP
00037

 **ALANY DIVISIONS INC.** • INDUSTRIAL SECURITY SERVICES

RT. 6 BOX 368 • ANDALUSIA, ALABAMA 36420 • (334)222-9208

**SECURITY SERVICES**
**PROPOSAL**
**FOR**
**SMART Alabama, LLC**

Caldwell v. Smart
26a & RFP
00038



**ALANY DIVISIONS INC. • INDUSTRIAL SECURITY SERVICES**
RT. 6 BOX 368  •  ANDALUSIA, ALABAMA 36420  •  (334)222-9208

January 3, 2005

Carolyn Pierce
Safety Manager
SMART Alabama, LLC
121 Shinyoung Drive
Luverne, Alabama 36049

Dear Carolyn,

It was a pleasure meeting with you to discuss the security program for your facility. Per our conversation, I am submitting a proposal and information about ADI.

ADI is a contract security company. Our company carefully develops each package for its clients to ensure that all needs are accomplished. The Quality Control Manager will periodically review and update these specifications to ensure that we are constantly conforming to the requirements of SMART Alabama, LLC. As always, these plans will be developed and coordinated with the approval of SMART Alabama, LLC management.

ALANY believes that the key to any successful security operation is proper supervision and training of security officers. We provide this supervision with one on-site field officer that will maintain daily supervision. We will have daily contact with SMART Alabama management to guarantee that our service conforms to your requirements.

Training is also an essential ingredient for a successful security program, because without training, the security officer cannot remain as alert, efficient or knowledgeable as is necessary in such a position of responsibility. ALANY Division Security will maintain a continuous training program for our officers to make certain they understand their responsibilities, duties and powers as a security officer. Each security officer is required to complete four ( 4 ) units of training per month (one per week) as long as they work for ALANY. These may include written exams, reading assignments, video tape and classroom lectures.

Certain standards and procedures exist in out company for all services we render:

Caldwell v. Smart
26a & RFP
00039



**ALANY DIVISIONS INC.** • INDUSTRIAL SECURITY SERVICES

RT. 6 BOX 368  •  ANDALUSIA, ALABAMA 36420  •  (334)222-9208

**Employee Selection:**

At ADI, we recognize that service depends on people and that a service company is ultimately judged by the people. The ability to select, communicate with and organize employees is the basic requirement of any service company. ADI's staff of certified managers has the right combination of education and experience to excel in meeting these requirements.

### Hiring

By offering attractive working conditions and flexible hours, ADI is able to hire top-notch workers. Many of our staff members are technicians, factory workers, teachers and others already working who supplement their regular income with additional hours of employment as ADI personnel.

The ADI management team emphasizes competence and cooperativeness in its selection of personnel. Our employees are trained to be team players. One of our primary goals is to instill a sense of dedication to good job performance in every ADI employee.

A background check is made on each employee. Hiring the right person for the job is one of the most important factors in providing quality service for our customers. Our system works well for us and for our employees. Our people take pride in doing a good job.

### Training - A Proven System

ADI has developed proven training methods to let employees know exactly what is expected at each job and within each task. We have found that when shortcomings occur, inadequate training is usually the cause. **That is why training plays such an important role in our contract management system.** We take considerable pride in ensuring that only a properly trained security staff is involved in the security of your property. ADI's training typically involves three steps, which are:

    **A.**    **Orientation:** A new employee is welcomed to the company through our orientation program. We recognize that the first two weeks on the job create a powerful and lasting impression, and orientation training is designed to teach basic security procedures and to show new workers the meaning of teamwork. We also give them a set of written rules and specific information on their job assignments.

Caldwell v. Smart
26a & RFP
00040



**ALANY DIVISIONS INC. • INDUSTRIAL SECURITY SERVICES**
RT. 6 BOX 368  •  ANDALUSIA, ALABAMA 36420  •  (334)222-9208

    **B.**   **On-The-Job-Training / Apprenticeships:** This form of training starts when a new worker begins his or her job assignment. We often use the apprentice system, in which a new worker learns the ropes through pairing with a veteran worker or supervisor.

    **C.**   **Supervisory Support:** Our operations manager then trains employees in state-of-the-art techniques and security procedures. Our employees receive detailed instructions on safety procedures and compliance with OSHA standards. All employees are briefed on conduct, security procedures, appearance and customer-client relationships.

## SUPERVISION:

ADI believes that the key to any successful security is proper supervision and well trained personnel. Out company employs Operations Managers and site supervisors who are required to ensure that our technicians are trained and properly performing their duties.

A site supervisor who meets your requirements and approval will be selected for your location. The site supervisor will serve as the client contact and will be responsible for:

* Overall supervision of the account
* Planning and scheduling of all work
* Accountability for all supplies and equipment used
* Coordinating all unscheduled work
* Selection of personnel
* Insuring that quality work is performed
* Justifying hours required to accomplish the work
* Being on call and available to handle emergencies

## EMPLOYEE BENEFITS:

Time and one-half is paid employees if work is performed on the following seven paid holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Eve and Christmas Day.

All ADI hourly employees receive one week paid vacation after one year of employment.

ADI is currently working on a health care package to offer our employees. A plan is expected to be available during early 2005.

 **ALANY DIVISIONS INC. • INDUSTRIAL SECURITY SERVICES**
RT. 6 BOX 388  •  ANDALUSIA, ALABAMA 36420  •  (334)222-9208

## WAGE SCALE:

ADI's wage scale is designed to attract the best qualified security personnel available and provide continuity of personnel.

### ALANY DIVISIONS INC.
### SERVICE PHILOSOPHY

*   We believe in being consistently customer oriented, and our organization is structured to be customer friendly. Satisfying customer needs is the driving force behind our growth and success.

*   We anticipate customer need and respond quickly to resolve problems.

*   We are committed to earning the trust of every customer through hard work and integrity.

*   Constant communication with each customer is vitally important to our success. good communication enables us to obtain the information we need to provide the services that really count to each customer.

*   We believe that we should always treat a customer's property as carefully as we would treat our own.

*   Efficient, effective service and competitive pricing translate customer satisfaction and company success.

### ALANY'S SUPERIOR PERFORMANCE

ADI's job performance will be outstanding. Maintaining your facility in peak condition is our job.

ADI's success is an outgrowth of our unique assets:

*   **EXPERIENCE:** Our company officials have worked with all types of commercial and industrial establishments since 1984.

*   **RELIABILITY:** Corporate officials you have dealt with for years; knowing the job, and any extras you need done, are taken care of immediately.

Caldwell v. Smart
26a & RFP
00042



**ALANY DIVISIONS INC. • INDUSTRIAL SECURITY SERVICES**
RT. 6 BOX 368  •  ANDALUSIA, ALABAMA 36420  •  (334)222-9208

\* **PERSONNEL:**  Experienced management with business backgrounds and a motivated, responsible work force.

\* **QUALITY CONTROL:**  Measurable, defined performance standards to meet the needs of each customer.

\* **FLEXIBILITY:**  To provide the extra services every company needs from time to time.

\* **EQUIPMENT:**  Modern, industrial equipment and supplies to get your job done thoroughly and efficiently.

\* **TRAINING:**  Proven training methods to let employees know exactly what is expected at each job site.

\* **SUPERVISION:**  A key component of our business, to ensure your job gets done right.

Thank you again for your time and interest.   If you have any questions, please contact me at:

Phone  (334)  222-9208

Very truly yours,
ALANY Divisions Inc.

Clifford Eisenberger
President of Operations

Caldwell v. Smart
26a & RFP
00043